**THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | | |
|---|---|---|
| ASUS TECHNOLOGY LICENSING INC. and CELERITY IP, LLC | § | |
| v. | § | CASE NO. 2:23-CV-486-JRG-RSP LEAD CASE |
| AT&T CORP., AT&T MOBILITY LLC, AT&T MOBILITY II LLC, and AT&T SERVICES, INC. | § | |

# CLAIM CONSTRUCTION ORDER

On April 17, 2025, the Court held a hearing to determine the proper construction of disputed terms in United States Patents No. 7,664,059, 9,237,489, 9,560,559, and 9,736,883. Before the Court is the Opening Claim Construction Brief (Dkt. No. 327) filed by Plaintiffs ASUS Technology Licensing Inc., Innovative Sonic Limited, and Celerity IP, LLC (collectively, "ISL"). Also before the Court are the Responsive Claim Construction Brief (Dkt. No. 359) filed by Defendants AT&T Corp., AT&T Mobility LLC, AT&T Mobility II LLC, AT&T Services, Inc., T-Mobile USA, Inc., Cellco Partnership d/b/a Verizon Wireless, Ericsson Inc., and Nokia of America Corporation (collectively, "Defendants"), Plaintiffs' reply (Dkt. No. 367), the parties' October 30, 2024 P.R. 4-3 Joint Claim Construction and Prehearing Statement (Dkt. No. 311), and the parties' March 10, 2025 and April 15, 2025 Patent Rule 4-5(d) Joint Claim Construction Charts (Dkt. No. 371; Dkt. No. 417).

Having reviewed the arguments made by the parties at the hearing and in their claim construction briefing, having considered the intrinsic evidence, and having made subsidiary factual findings about the extrinsic evidence, the Court hereby issues this Claim Construction Order. *See*

*Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005) (en banc); *Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 841 (2015).

Table of Contents

**I. BACKGROUND ........ 3**
**II. LEGAL PRINCIPLES ........ 5**
**III. AGREED TERMS ........ 8**
**IV. DISPUTED TERMS IN U.S. PATENT NO. 9,560,559 ........ 8**
A. "eNBs (evolved Node B)" ........ 8
B. Preambles ........ 16
C. "first eNB" and "second eNB" ........ 23
D. Order of Operations ........ 25
**V. DISPUTED TERMS IN U.S. PATENT NO. 9,237,489 ........ 30**
E. "eNB" ........ 30
F. "RRCConnectionReconfiguration message" and "mobilityControlInfo" ........ 33
**VI. DISPUTED TERMS IN U.S. PATENT NO. 9,736,883 ........ 38**
G. "eNB," "evolved Node B," "first evolved node B (eNB)," "first eNB," "second evolved Node B (eNB)," and "second eNB" ........ 38
H. "data path for a [first]/[second]/[third] radio bearer" and "the UE has multiple paths via different eNBs" ........ 41
**VII. DISPUTED TERMS IN U.S. PATENT NO. 7,664,059 ........ 44**
I. "a sequence number following a sequence number of a last in-sequence acknowledged packet of a transmitter" and "a sequence number of a next packet to be transmitted for the first time by the transmitter" ........ 44
J. "status report unit" ........ 48
**VIII. CONCLUSION ........ 51**
**APPENDIX A ........ 53**

## I. BACKGROUND

Plaintiffs allege infringement of United States Patents No. 7,664,059 ("the '059 Patent"), 9,237,489 ("the '489 Patent"), 9,560,559 ("the '559 Patent"), and 9,736,883 ("the '883 Patent") (collectively, the "patents-in-suit"). Dkt. No. 83, Exs. 1–4.

The '059 Patent, titled "Error Handling in a Wireless Communication System," issued on February 16, 2010, and bears an earliest priority date of April 5, 2005. The Abstract of the '059 Patent states:

> A method for detecting an erroneous sequence number in a status report in a wireless communications system includes receiving a status report sent from a receiver of the wireless communications system, detecting whether a negatively acknowledged sequence number is within a range that is larger than or equal to the sequence number following the sequence number of the last in-sequence acknowledged packet and smaller than the sequence number of the next packet to be transmitted for the first time, and detecting that the status report includes an erroneous sequence number when a negatively acknowledged sequence number is not within the abovementioned range.

The '489 Patent, titled "Method and Apparatus for Secondary Cell Release During Handover in a Wireless Communication System," issued on January 12, 2016, and bears an earliest priority date of November 2, 2010. The Abstract of the '489 Patent states:

> Methods and an apparatus for Secondary Cell (SCell) release during User Equipment (UE) handover comprises including information by a source eNB in a HandoverPreparationInformation message for a target eNB to control SCell release in the UE during handover, or including an indicator by a target eNB in a handover command for the UE to distinguish whether or not to release all configured SCells.

The '559 Patent, titled "Method and Apparatus for Implementing Small Cell Enhancements in a Wireless Communication System," issued on January 31, 2017, and bears an earliest priority date of February 8, 2013. The Abstract of the '559 Patent states:

> A method and apparatus for implementing small cell enhancements in a wireless communication system are disclosed. The method includes a first eNB (evolved Node B) controlling a first cell, wherein the first cell is serving a UE (User Equipment). The method further includes the first eNB configuring a second cell to

> serve the UE, wherein the second cell is controlled by a second eNB. The method also includes the first eNB allocating a measurement gap configuration to the UE. In addition, the method includes the first eNB sending the measurement gap configuration to the second eNB.

The ’883 Patent, titled “Method and Apparatus for Handling Inter-Node Connectivity in a Wireless Communication System,” issued on August 15, 2017, and bears an earliest priority date of January 30, 2013. The Abstract of the ’883 Patent states:

> A method and apparatus for handling inter-node connectivity in a wireless communication system are disclosed. The method includes transmitting a request from a first network node to a second network node to stop aggregating a SCell (Secondary Cell) for a UE (User Equipment); wherein the first network node controls the SCell and the second network node controls PCell (Primary Cell) of the UE. Also, another method and apparatus for handling inter-node connectivity in a wireless communication system are disclosed. The method includes transmitting a request from a first network node, which controls a first serving cell of a UE (User Equipment), to a second network node, which controls a second serving cell of the UE, to change a data path corresponding to a first type of transmission and/or reception of the UE from a first path to a different path; wherein the first path is via the first network node and used as the data path corresponding to the first type of transmission and/or reception of the UE, and a second path is via the second network node and used as a data path corresponding to a second type of transmission and/or reception of the UE. In addition, an alternative method and apparatus for handling inter-node connectivity in a wireless communication system are disclosed. The method includes transmitting a request from a first network node to a core network node to change a data path corresponding to a first type of transmission and/or reception of a UE (User Equipment) from a first path to a different path; wherein the first path is via the first network node and used as the data path corresponding to the first type and a third type of transmission and/or reception of the UE, a second path is via a second network node and used as a data path corresponding to a second type of transmission and/or reception of the UE, and the request does not indicate to change the data path corresponding to the third type of transmission and/or reception of the UE.

Shortly before the start of the April 17, 2025 hearing, for most of the disputed terms the Court provided the parties with preliminary constructions with the aim of focusing the parties’ arguments and facilitating discussion. Those preliminary constructions are noted below within the discussion for each term.

## II. LEGAL PRINCIPLES

"It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Phillips*, 415 F.3d at 1312 (quoting *Innova/Pure Water Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)). Claim construction is clearly an issue of law for the court to decide. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 970–71 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996). "In some cases, however, the district court will need to look beyond the patent's intrinsic evidence and to consult extrinsic evidence in order to understand, for example, the background science or the meaning of a term in the relevant art during the relevant time period." *Teva*, 135 S. Ct. at 841 (citation omitted). "In cases where those subsidiary facts are in dispute, courts will need to make subsidiary factual findings about that extrinsic evidence. These are the 'evidentiary underpinnings' of claim construction that we discussed in *Markman*, and this subsidiary factfinding must be reviewed for clear error on appeal." *Id.* (citing 517 U.S. 370).

To determine the meaning of the claims, courts start by considering the intrinsic evidence. *See Phillips*, 415 F.3d at 1313; *see also C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 861 (Fed. Cir. 2004); *Bell Atl. Network Servs., Inc. v. Covad Commc'ns Group, Inc.*, 262 F.3d 1258, 1267 (Fed. Cir. 2001). The intrinsic evidence includes the claims themselves, the specification, and the prosecution history. *See Phillips*, 415 F.3d at 1314; *C.R. Bard*, 388 F.3d at 861. Courts give claim terms their ordinary and accustomed meaning as understood by one of ordinary skill in the art at the time of the invention in the context of the entire patent. *Phillips*, 415 F.3d at 1312–13; *accord Alloc, Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361, 1368 (Fed. Cir. 2003).

The claims themselves provide substantial guidance in determining the meaning of particular claim terms. *Phillips*, 415 F.3d at 1314. First, a term's context in the asserted claim can

be very instructive. *Id.* Other asserted or unasserted claims can aid in determining the claim's meaning because claim terms are typically used consistently throughout the patent. *Id.* Differences among the claim terms can also assist in understanding a term's meaning. *Id.* For example, when a dependent claim adds a limitation to an independent claim, it is presumed that the independent claim does not include the limitation. *Id.* at 1314–15.

"[C]laims 'must be read in view of the specification, of which they are a part.'" *Id.* at 1315 (quoting *Markman*, 52 F.3d at 979). "[T]he specification 'is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'" *Phillips*, 415 F.3d at 1315 (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)); *accord Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002). This is true because a patentee may define his own terms, give a claim term a different meaning than the term would otherwise possess, or disclaim or disavow the claim scope. *Phillips*, 415 F.3d at 1316. In these situations, the inventor's lexicography governs. *Id.* The specification may also resolve the meaning of ambiguous claim terms "where the ordinary and accustomed meaning of the words used in the claims lack sufficient clarity to permit the scope of the claim to be ascertained from the words alone." *Teleflex*, 299 F.3d at 1325. But, "[a]lthough the specification may aid the court in interpreting the meaning of disputed claim language, particular embodiments and examples appearing in the specification will not generally be read into the claims." *Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1187 (Fed. Cir. 1998) (quoting *Constant v. Advanced Micro-Devices, Inc.*, 848 F.2d 1560, 1571 (Fed. Cir. 1988)); *accord Phillips*, 415 F.3d at 1323.

The prosecution history is another tool to supply the proper context for claim construction because a patent applicant may also define a term in prosecuting the patent. *Home Diagnostics,*

*Inc. v. Lifescan, Inc.*, 381 F.3d 1352, 1356 (Fed. Cir. 2004) ("As in the case of the specification, a patent applicant may define a term in prosecuting a patent."). "[T]he prosecution history (or file wrapper) limits the interpretation of claims so as to exclude any interpretation that may have been disclaimed or disavowed during prosecution in order to obtain claim allowance." *Standard Oil Co. v. Am. Cyanamid Co.*, 774 F.2d 448, 452 (Fed. Cir. 1985).

Although extrinsic evidence can be useful, it is "less significant than the intrinsic record in determining the legally operative meaning of claim language." *Phillips*, 415 F.3d at 1317 (citations and internal quotation marks omitted). Technical dictionaries and treatises may help a court understand the underlying technology and the manner in which one skilled in the art might use claim terms, but technical dictionaries and treatises may provide definitions that are too broad or may not be indicative of how the term is used in the patent. *Id.* at 1318. Similarly, expert testimony may aid a court in understanding the underlying technology and determining the particular meaning of a term in the pertinent field, but an expert's conclusory, unsupported assertions as to a term's definition are entirely unhelpful to a court. *Id.* Generally, extrinsic evidence is "less reliable than the patent and its prosecution history in determining how to read claim terms." *Id.*

The Supreme Court of the United States has "read [35 U.S.C.] § 112, ¶ 2 to require that a patent's claims, viewed in light of the specification and prosecution history, inform those skilled in the art about the scope of the invention with reasonable certainty." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2129 (2014). "A determination of claim indefiniteness is a legal conclusion that is drawn from the court's performance of its duty as the construer of patent claims." *Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1347 (Fed. Cir. 2005) (citations and internal quotation marks omitted), *abrogated on other grounds by Nautilus,* 134

S. Ct. 2120. "Indefiniteness must be proven by clear and convincing evidence." *Sonix Tech. Co. v. Publ'ns Int'l, Ltd.*, 844 F.3d 1370, 1377 (Fed. Cir. 2017).

## III. AGREED TERMS

The parties reached agreement on constructions as stated in their October 30, 2024 P.R. 4-3 Joint Claim Construction and Prehearing Statement (Dkt. No. 311 at 1), in their briefing (Dkt. No. 327 at 25 n.3), and in their April 15, 2025 P.R. 4-5(d) Joint Claim Construction Chart (Dkt. No. 417, Ex. A). Those agreements are set forth in Appendix A to the present Claim Construction Order.

## IV. DISPUTED TERMS IN U.S. PATENT NO. 9,560,559

### A. "eNBs (evolved Node B)"

| **"eNBs (evolved Node B)"**<br>('559 Patent, Claims 1, 7) | |
|---|---|
| **Plaintiffs' Proposed Construction** | **Defendants' Proposed Construction** |
| "base station that has the capability of providing wireless communications to or from a user communication device"<br><br>Or if claims are limited to 3GPP wireless technology, "base station that has the capability of providing wireless communications to or from a user communication device via orthogonal division multiplex access (OFDMA)"[1] | "an E-UTRAN base station providing 4G/LTE cellular connectivity to the UE" |

Dkt. No. 311, Ex. A3 at 4; Dkt. No. 327 at 1; Dkt. No. 359 at 1; Dkt. No. 371, Ex. A at 8; Dkt. No. 417, Ex. A at 8. This term is also sometimes referred to as "eNodeB."

[1] Plaintiffs previously proposed: "base station." Dkt. No. 311, Ex. A3 at 4.

Shortly before the start of the April 17, 2025 hearing, the Court provided the parties with the following preliminary construction: "an E-UTRAN base station providing 4G/LTE cellular connectivity to the UE."

(1) The Parties' Positions

Plaintiffs argue that "[t]he '559 patent specification confirms that 'eNB' or an 'evolved Node B' is used as a generic term that is not limited to a particular 3GPP specification [such as 4G/LTE]." Dkt. No. 327 at 1 (citation omitted). Plaintiffs also argue that "[l]imiting the claims to E-UTRAN and 4G/LTE ignores that at the time of the patent a POSA understood that the 3GPP releases were constantly evolving." *Id.* at 3. Further, Plaintiffs argue that "[e]ven within the universe of 3GPP, the specification never limits the invention to LTE and is expressly forward looking." *Id.* at 5 (citing '559 Patent at 2:18–30). Plaintiffs urge that "Defendants' proposed construction is intended to usurp the question of infringement from the jury by limiting the base station that can be used to a single release of 3GPP, Release 8, which is recognized as LTE." *Id.* at 6. Alternatively, Plaintiffs argue: "If Defendants are correct that eNB is a nonce term that has no structure separate from those described in 3GPP specifications, th[e]n the requirements for means plus function should be strictly applied. This means that only the structures in the E-UTRAN 4G/LTE specifications necessary to perform the functions recited in the claims must be present, and their equivalents." *Id.* at 7 (citations omitted).

Defendants respond that "[b]ecause the term 'eNB' refers to a particular species of base station, the Court should adopt Defendants' proposed construction and reject Plaintiffs' attempt to expand the scope of the claims to cover base stations that are not 'eNBs.'" Dkt. No. 359 at 1. Defendants argue that "[t]he '559 Patent's consistent invocation of terminology, abbreviations, and capitalization from the 4G/LTE standard evidences that the claimed 'eNB' is the very same

'eNB' defined and discussed throughout 4G/LTE wireless standards." *Id.* at 2 (citations omitted). Defendants submit that if the patentee had intended broader coverage, the patentee could have used a broader term rather than a term of art from a particular standard. *Id.* at 4–5.

Plaintiffs reply that whereas their proposal is supported by the specification, "Defendants' proposed construction, by contrast, would contradict the specification by improperly limiting the claims to a single exemplary embodiment: E-UTRAN and 4G/LTE wireless networks." Dkt. No. 367 at 1.

At the April 17, 2025 hearing, Plaintiffs reiterated that including additional functionality would not avoid infringement, and Plaintiffs proposed that the Court's construction could make this clear by referring to "an E-UTRAN-*capable* base station."

(2) Analysis

Claim 1 of the '559 Patent recites:

> 1. A method for supporting dual connectivity in a wireless communication system, wherein separate eNBs (evolved Node B) are used to support dual connectivity, comprising:
>
> a first eNB controls a first cell, wherein the first cell is serving a UE (User Equipment); and
>
> the first eNB configures a second cell to serve the UE together with the first cell, wherein the second cell is controlled by a second eNB;
>
> the first eNB allocates a measurement gap configuration to the UE; and
>
> the first eNB sends the measurement gap configuration to the second eNB so that the second eNB could take measurement gaps into consideration when scheduling resources to the UE.

The specification discloses:

> The exemplary wireless communication systems and devices described below employ a wireless communication system, supporting a broadcast service. Wireless communication systems are widely deployed to provide various types of communication such as voice, data, and so on. These systems may be based on code division multiple access (CDMA), time division multiple access (TDMA), orthogonal frequency division multiple access (OFDMA), 3GPP LTE (Long Term Evolution) wireless access, 3GPP LTE-A or LTE-Advanced (Long Term Evolution

> Advanced), 3GPP2 UMB (Ultra Mobile Broadband), WiMax, or some other modulation techniques.
>
> In particular, the exemplary wireless communication systems devices described below may be designed to support one or more standards such as the standard offered by a consortium named “3rd Generation Partnership Project” referred to herein as 3GPP, including Document Nos. TS 36.321 Vl 1.1.0, “E-UTRA MAC protocol specification (Release 11)”; TS 36.331 V11.2.0, “E-UTRA RRC protocol specification (Release 11)”; RP-122033, “Study on Small Cell enhancements for E-UTRA and E-UTRAN-Higherlayer aspects”; and TR 36.932 v12.0.0, “Scenarios and Requirements for Small Cell Enhancements for E-UTRA and E-UTRAN”. The standards and documents listed above are hereby expressly incorporated herein.
>
> * * *
>
> An access network (AN) may be a fixed station or base station used for communicating with the terminals and may also be referred to as an access point, a Node B, a base station, an enhanced base station, an eNodeB, or some other terminology. An access terminal (AT) may also be called user equipment (UE), a wireless communication device, terminal, access terminal or some other terminology.

’559 Patent at 2:6–30 & 2:65–3:4.

Plaintiffs point out that the Federal Circuit has stated that “[o]ur case law allows for after-arising technology to be captured within the literal scope of valid claims that are drafted broadly enough.” *Innogenetics, N.V. v. Abbott Labs.*, 512 F.3d 1363, 1371 (Fed. Cir. 2008). Plaintiffs cite disclosure in the patent regarding future development, such as that “changes to the current body of 3GPP standard are currently being submitted and considered to evolve and finalize the 3GPP standard.” ’559 Patent at 1:38–40; *see id.* at 1:31–38 (“An exemplary network structure for which standardization is currently taking place is an Evolved Universal Terrestrial Radio Access Network (E-UTRAN).”). Plaintiffs argue that limiting “eNodeB” to 4G would be inappropriate because the claimed invention was intended to improve technology that was then under development, and 5G was under development at the time of the patent. *See, e.g.,* Dkt. No. 327, Ex. 18 (chronology regarding 5G).

Here, however, the patentee chose to use a term of art, "eNodeB," that has a well-established meaning in 4G cellular networks (which, at least as relevant here, are also referred to as "Long Term Evolution" ("LTE") networks). By not defining this term any more broadly, the patentee should be presumed to have used the term according to its well-established meaning in the relevant art. This indeed appears to have been the patentee's intent because the specification incorporates-by-reference several 3GPP standards regarding "E-UTRA" and "E-UTRAN," which relate to over-the-air communications between base stations and user equipment in 4G systems. *See, e.g.,* '559 Patent at 2:18–30. The patentee's use of the same capitalization as in the 4G standards is also noteworthy. *See, e.g., TQ Delta, LLC v. ZyXEL Commc'ns, Inc.*, No. 1:13-cv-02013-RGA, 2018 WL 2113226, at *5–*6 (D. Del. May 8, 2018) ("The patent's use of capitalization and abbreviations suggests that 'INP value' is a term of art derived from the ADSL2 and VDSL2 standards.").

The term "eNodeB" also has meaning in the context of 5G cellular networks, but that meaning is retrospective and tethered to the well-established meaning. This is unsurprising in the context of transitioning from 4G to 5G. *See* Dkt. No. 327, Ex. 1, 3GPP TS 38.331 V15.3.0 at 15 ("between a source eNB and target gNB during EUTRA-NR Dual Connectivity"); *see also id.*, Ex. 2, 3GPP TS 37.340 V15.3.0 at 8 (showing both eNBs and gNBs as part of E-UTRA-NR Dual Connectivity architecture); *id.*, Ex. 19, 3GPP 5G System Overview at 3 ("In addition to the new 5G-specific services, the 5G system supports almost all the 4G LTE ones . . . and mobility between a 5G core network and a 4G core network (EPC) is supported, with minimum impact on the user experience."); *id.*, Ex. 7, IEEE Overview of Release 15 at 6 ("3GPP has split the 5G standard into two releases: Release 15, which corresponds to NR Phase 1, and Release 16, which corresponds to NR Phase 2. In NR Phase 1, there are common elements between LTE [(4G)] and NR [(5G)],

such as both using orthogonal frequency division multiplexing (OFDM).”). The commonality of 4G and 5G both involving orthogonal frequency division does not warrant expanding the scope of the term “eNodeB.” *See id.*; *see also id.*, Ex. 10; ’559 Patent at 2:6–17.

Also, because the industry standards for 5G have been developed by the same standards-setting-organization as 4G, namely the 3rd Generation Partnership Project (“3GPP”), it stands to reason that the new standards would continue to apply the same well-established meaning of “eNodeB” unless otherwise specified. Plaintiffs do not demonstrate otherwise. On the contrary, Defendants demonstrate a progression of terminology for base stations. In the 3G standards that preceded 4G, the term for base stations under 3G was “nodeB.” The 4G standards created “eNodeB.” The 5G standards again created a new term, for the new type of base stations used in 5G networks, namely “gNodeB” (abbreviated as “gNB”). The opinions of Defendants’ expert are further persuasive that “eNBs are a specialized base station configured to be used in the context of an E-UTRAN [(4G)] system.” *See* Dkt. No. 327, Ex. 22, Oct. 30, 2024 Hansen Decl. at ¶ 55; *see id.* at ¶¶ 54–59 & 66–67.

This is also consistent with precedent of this Court and of the Federal Circuit when addressing terms that have a well-established meaning in the relevant art. *See, e.g., Ancora Techs., Inc. v. Apple, Inc.*, 744 F.3d 732, 738 (Fed. Cir. 2014) (regarding “volatile memory” and “nonvolatile memory,” finding that “the terms at issue have so clear an ordinary meaning that a skilled artisan would not be looking for clarification in the specification”); *Pantech Corp. v. OnePlus Tech. (Shenzhen) Co.*, No. 5:22-CV-00069-RWS-JBB, 2023 WL 5003574, at *8 & n.6 (E.D. Tex. Aug. 4, 2023) (Baxter, M.J.) (noting that any issue of “whether ‘eNB’ would read on a 5G base station” was not before the Court, but finding: “At most, the specification shows an eNB may be referred to as a Node-B, base station, or access point—not the other way around.”).

Plaintiffs argue that "requiring the eNB of the claim to implement all elements of an E-UTRAN 4G/LTE base station makes no sense because the claims recite all the required functionality of the base station" (Dkt. No. 327 at 4), and "[t]he inventors of the '559 Patent were not required to predict the naming convention that would be employed in [the] future." Dkt. No. 327 at 4. The patentee chose, however, to use a well-established term of art, "eNodeB," rather than a more generic term.

Plaintiffs cite *SuperGuide*, in which the Federal Circuit found that the claims there at issue encompassed digital signaling (which was under development at the relevant time) because "[h]ad the patentees intended to limit the disputed claim terms to 'analog' technology, they could have easily done so by explicitly modifying the disputed claim language with the term 'analog.'" *SuperGuide Corp v. DirecTV Enters.*, 358 F.3d 870, 880 (Fed. Cir. 2004). In the present case, however, the patentee used a limited term of art, eNodeB, rather than a more general description. Thus, to whatever extent *SuperGuide* is applicable, Defendants' proposed construction is consistent with *SuperGuide*.

Also, Plaintiffs argue: "If Defendants are correct that eNB is a nonce term that has no structure separate from those described in 3GPP specifications, th[e]n the requirements for means plus function should be strictly applied." Dkt. No. 327 at 7 (citing *Northrup Grumman Corp. v. Intel Corp.*, 325 F.3d 1346, 1352 (Fed. Cir. 2003); citing *Micro Chem., Inc. v. Great Plains Chem. Co.*, 194 F.3d 1250, 1258 (Fed. Cir. 1999)). The term at issue does not recite a "means," so U.S.C. § 112(f) is presumed not to apply, and Plaintiffs have not attempted to rebut the presumption. *Williamson v. Citrix Online LLC*, 792 F.3d 1339, 1348 (Fed. Cir. 2015). Plaintiffs' reliance on legal principles regarding 35 U.S.C. § 112(f) is unpersuasive.

Further, Plaintiffs argue that Defendants' proposal improperly precludes an "eNB" from having functionality beyond 4G, but Defendants' proposal does not appear to preclude an "eNB" from having additional functionality so long as it meets the requirements of an eNB under the relevant 4G standards.

Likewise, during the April 17, 2025 hearing, the parties forecasted potential disputes regarding whether a 5G gNB might satisfy the "eNB" limitations by including E-UTRAN 4G/LTE capabilities. These are factual, implementation-specific issues regarding infringement, not legal questions for claim construction. *See PPG Indus. v. Guardian Indus. Corp.*, 156 F.3d 1351, 1355 (Fed. Cir. 1998) ("after the court has defined the claim with whatever specificity and precision is warranted by the language of the claim and the evidence bearing on the proper construction, the task of determining whether the construed claim reads on the accused product is for the finder of fact"); *see also Acumed LLC v. Stryker Corp.*, 483 F.3d 800, 806 (Fed. Cir. 2007) ("[t]he resolution of some line-drawing problems . . . is properly left to the trier of fact") (citing *PPG*, 156 F.3d at 1355); *Eon Corp. IP Holdings LLC v. Silver Spring Networks, Inc.*, 815 F.3d 1314, 1318–19 (Fed. Cir. 2016) (citing *PPG*, 156 F.3d at 1355; citing *Acumed*, 483 F.3d at 806). Plaintiffs' alternative proposal of referring to "an E-UTRAN-capable base station" is likewise rejected as tending to confuse rather than clarify the scope of the claims and as being directed to factual issues regarding infringement rather than any legal question of claim construction.

With that understanding, the Court hereby construes "eNodeB" and "eNB" to mean **"an E-UTRAN base station providing 4G/LTE cellular connectivity to the UE."**

**B. Preambles**

| **"A method for supporting dual connectivity in a wireless communication system, wherein separate eNBs (evolved Node B) are used to support dual connectivity, comprising"**<br>('559 Patent, Claim 1) | |
|---|---|
| **Plaintiffs' Proposed Construction** | **Defendants' Proposed Construction** |
| Preamble is not limiting.<br>No further construction necessary. | Limiting.<br><br>"A method for supporting dual connectivity in a wireless communication system, wherein separate eNBs (evolved Node B) are used to support dual connectivity, which is when a UE (User Equipment) is served by both a macro eNB and a small cell eNB, comprising" |

| **"A method for supporting dual connectivity in a wireless communication system, wherein separate eNBs (evolved Node B) are used to support dual connectivity and a UE (User Equipment) is served by a first cell controlled by a first eNB, comprising"**<br>('559 Patent, Claim 7) | |
|---|---|
| **Plaintiffs' Proposed Construction** | **Defendants' Proposed Construction** |
| Preamble is not limiting.<br>No further construction necessary. | Limiting.<br><br>"A method for supporting dual connectivity in a wireless communication system, wherein separate eNBs (evolved Node B) are used to support dual connectivity, which is when a UE (User Equipment) is served by both a macro eNB and a small cell eNB, and the UE is served by a first cell controlled by a first eNB, comprising" |

Dkt. No. 311, Ex. A3 at 4; *see* Dkt. No. 327 at 19; Dkt. No. 359 at 6; Dkt. No. 371, Ex. A at 6 & 7.

(1) The Parties' Positions

Plaintiffs argue that these preambles are not limiting because "the claim body of both claims 1 and 7 of the '559 patent define a structurally complete invention (and the preamble

therefore does not recite essential structure or steps), and the preamble does no more than state a potential use of the invention (and therefore does not give life, meaning, or vitality to the claim)." Dkt. No. 327 at 20; *see id.* at 20–21.

Defendants respond that the preambles are limiting because they provide antecedent basis and because, during prosecution, the patentee relied on the preambles to distinguish prior art. Dkt. No. 359 at 7–8. Defendants also argue that the specification and the prosecution history demonstrate that "dual connectivity" means that a UE is connected to a macro eNB and a small cell eNB at the same time. *Id.* at 8–10.

Plaintiffs reply that "Defendants fail to overcome the presumption that the preambles are not limiting because the claim bodies recite a structurally complete invention and the preambles are only statements of intent or purpose." Dkt. No. 367 at 5 (citation omitted). Plaintiffs also argue that, contrary to Defendants' argument, the patentee did not rely on the preambles to distinguish prior art during prosecution. *See id.* at 5–6. Alternatively, Plaintiffs argue that, in light of the specification, "a POSA would understand that while one type of dual connectivity may include service by a macro and small cell, it could also include service by small cells." *Id.* at 6.

At the April 17, 2025 hearing, Plaintiffs argued that Defendants are attempting to narrow the meaning of "dual connectivity" to require a macro eNB and a small cell eNB. Defendants responded that the patentee's statements in European patent prosecution define "dual connectivity" as using a macro eNB and a small cell eNB.

<u>(2) Analysis</u>

> In general, a preamble limits the invention if it recites essential structure or steps, or if it is 'necessary to give life, meaning, and vitality' to the claim. *Pitney Bowes*[*, Inc. v. Hewlett-Packard Co.*], 182 F.3d [1298,] 1305 [(Fed. Cir. 1999)]. Conversely, a preamble is not limiting 'where a patentee defines a structurally complete invention in the claim body and uses the preamble only to state a purpose

> or intended use for the invention.' *Rowe v. Dror*, 112 F.3d 473, 478, 42 USPQ2d 1550, 1553 (Fed. Cir. 1997).

*Catalina Mktg. Int'l, Inc. v. Coolsavings.com, Inc.*, 289 F.3d 801, 808 (Fed. Cir. 2002);

"When limitations in the body of the claim rely upon and derive antecedent basis from the preamble, then the preamble may act as a necessary component of the claimed invention." *Eaton Corp. v. Rockwell Int'l Corp.*, 323 F.3d 1332, 1339 (Fed. Cir. 2003).

In some cases, a preamble may also be limiting if it states a "fundamental characteristic of the claimed invention," "serves to focus the reader on the invention that is being claimed," or "states the framework of the invention." *On Demand Mach. Corp. v. Ingram Indus., Inc.*, 442 F.3d 1331, 1343 (Fed. Cir. 2006). Also, a preamble may be limiting if it sets forth a feature "underscored as important by the specification." *Deere & Co. v. Bush Hog, LLC*, 703 F.3d 1349, 1358 (Fed. Cir. 2012) (quoting *Catalina*, 289 F.3d at 808).

Nonetheless, "the purpose or intended use of the invention . . . is of no significance to claim construction . . . ." *See Pitney Bowes*, 182 F.3d at 1305. This principle has sometimes been characterized as "the presumption against reading a statement of purpose in the preamble as a claim limitation." *Marrin v. Griffin*, 599 F.3d 1290, 1294–95 (Fed. Cir. 2010); *see Allen Eng'g Corp. v. Bartell Indus.*, 299 F.3d 1336, 1346 (Fed. Cir. 2002) ("Generally, the preamble does not limit the claims."); *see also Acceleration Bay, LLC v. Activision Blizzard Inc.*, 908 F.3d 765, 769–71 (Fed. Cir. 2018) (in preamble reciting "[a] computer network for providing an information delivery service for a plurality of participants," finding "information delivery service" to be non-limiting because it "merely describe[s] intended uses for what is otherwise a structurally complete invention").

Claims 1 and 7 of the '559 Patent recite:

> 1. A method for supporting *dual connectivity* in a wireless communication system, wherein *separate eNBs* (evolved Node B) are used to support dual connectivity, comprising:
>
> a first eNB controls a first cell, wherein the first cell is serving a UE (User Equipment); and
>
> the first eNB configures a second cell to serve the UE together with the first cell, wherein the second cell is controlled by a second eNB;
>
> the first eNB allocates a measurement gap configuration to the UE; and
>
> the first eNB sends the measurement gap configuration to the second eNB so that the second eNB could take measurement gaps into consideration when scheduling resources to the UE.
>
> * * *
>
> 7. A method for supporting *dual connectivity* in a wireless communication system, wherein *separate eNBs* (evolved Node B) are used to support dual connectivity and a UE (User Equipment) is served by a first cell controlled by a first eNB, comprising:
>
> a second eNB controls a second cell, wherein the second cell is configured by the first eNB to serve the UE together with the first cell; and
>
> the second eNB receives a measurement gap configuration from the first eNB so that the second eNB could take measurement gaps into consideration when scheduling resources to the UE, wherein the measurement gap configuration was allocated by the first eNB to the UE.

The preamble recitals of "dual connectivity" do not provide antecedent basis for any limitations in the body of each claim. Rather, the preambles set forth "dual connectivity" as a purpose or objective by reciting "[a] method *for supporting* dual connectivity." *See id.*; *see also IMS Tech., Inc. v. Haas Automation, Inc.*, 206 F.3d 1422, 1434 (Fed. Cir. 2000) ("The phrase 'control apparatus' in the preamble merely gives a descriptive name to the set of limitations in the body of the claim that completely set forth the invention.").

Further, the preamble recitals of "separate eNBs" are not required for antecedent basis and are not necessary to understand the claims. Rather, the body of each claim recites a "first eNB" and "second eNB," which as a matter of claim drafting are already understood as being distinct from one another. *See 3M Innovative Props. Co. v. Avery Dennison Corp.*, 350 F.3d 1365, 1371

(Fed. Cir. 2003) ("use of the terms 'first' and 'second' is common patent-law convention to distinguish between repeated instances of an element").

In Claim 7, the preamble recitals of "a UE (User Equipment)" and "a first eNB" provide antecedent basis for "the first eNB" and "the UE." Nonetheless, "that [a] phrase in the preamble . . . provides a necessary structure for [the] claim . . . does not necessarily convert the entire preamble into a limitation, particularly one that only states the intended use of the invention." *TomTom Inc. v. Adolph*, 790 F.3d 1315, 1323 (Fed. Cir. 2015); *see id.* ("It was therefore error for the district court to use an antecedent basis rationale to justify converting this independent part of the preamble into a new claim limitation.").

On balance, the preamble recital of "a UE (User Equipment) is served by a first cell controlled by a first eNB" is limiting in Claim 7 of the '559 Patent, but the remainder of the preamble of Claim 7 of the '559 Patent is not limiting. *See id.*

Disclosures cited by Defendants do not demonstrate otherwise. For example, Defendants submit that "the '559 Patent is directed to 'small cell enhancements in a wireless communications system,'" and "the alleged invention is set forth in the context of RP-122033 ([Dkt. No. 359,] Ex. 5), a study item on small cell enhancements for Release 12 of the 3GPP standards." Dkt. No. 359 at 6 (citing '559 Patent at 1:16–19 & 4:62–64); *see* '559 Patent at 5:5–9 ("evaluate the benefits of UEs having dual connectivity to macro and small cell layers"); *see also id.* at 6:25–29 ("When separate eNBs are used to support dual connectivity, a new interface between the macro eNB and the small cell eNB would need to be specified.") & 6:41–46 ("it would be beneficial for the macro eNB to send a measurement gap configuration . . . to the small cell eNB"). These disclosures discuss dual connectivity but do not demonstrate that the claims necessarily require dual connectivity. *See Phillips*, 415 F.3d at 1323.

Defendants also argue that the patentee relied on "dual connectivity" to overcome cited art during prosecution. The Examiner rejected claims based on the "Li" and "Ji" references. The patentee argued that "[i]n contrast [to Li], claims 1, 4, and 7 cover a *dual connectivity* scenario in which a second cell is configured to serve the UE together with a first cell." Dkt. No. Ex. 7, June 1, 2015 Amendment to Office Action at 5–6 (emphasis added). In a subsequent response, the patentee further stated, regarding Li and Ji: "In short, *the technical effects of sending the measurement gap from one base station to the other base station are very different in the handover context disclosed by Ji and in the dual connectivity context discussed and claimed in the present application*." *Id.*, Mar. 16, 2015 Amendment to Office Action at 6 (emphasis in original). Defendants argue that "[t]hus, the applicant relied on the preambles' description of 'dual connectivity' to give meaning to the claims during prosecution." Dkt. No. 359 at 8.

This prosecution history, however, is consistent with the patentee having used the phrase "dual connectivity" as a description of the limitations set forth in the bodies of the claims and as distinguishing handover, not as confining the claims to using a macro eNB and a small cell eNB. Defendants do not identify any definitive statements that require "dual connectivity" as a distinct, narrower limitation or that otherwise require Defendants' proposal that "a UE (User Equipment) is served by both a macro eNB and a small cell eNB, and the UE is served by a first cell controlled by a first eNB." *See Omega Eng'g Inc. v. Raytek Corp.*, 334 F.3d 1314, 1324 (Fed. Cir. 2003) ("prosecution disclaimer promotes the public notice function of the intrinsic evidence and protects the public's reliance on definitive statements made during prosecution").

Finally, Defendants cite prosecution of a European counterpart to the '559 Patent, EP2765798, and cite authority that a "blatant admission" during foreign prosecution can support a claim construction. *Gillette Co. v. Energizer Holdings, Inc.*, 405 F.3d 1367, 1374 (Fed. Cir.

2005) (concluding that a "blatant admission" by a party before the EPO "clearly support[ed] the court's construction"). Defendants cite European prosecution statements regarding the meaning of "dual connectivity," stating that "a UE in dual connectivity is served by both a macro cell and a small cell, which is well known by the skilled person":

> Referring to the term "dual connectivity", it is noted that this term has been further clarified in the independent claims. In particular, the independent claims now define that the second cell serves the UE together with the first cell, which is providing a definition for dual connectivity.
>
> It is noted that this clarification is also in line with the priority document, which discloses that it is an aspect to "*Identify and evaluate the benefits of <u>UEs having dual connectivity to macro and small cell layers</u> served by different or same carrier and for which scenarios such dual connectivity is feasible and beneficial*[]", as already noted above.
>
> Thus, a UE in dual connectivity is served by both a macro cell and a small cell, which is well known by the skilled person.

Dkt. No. 359, Ex. 8, June 26, 2017 Response to the Office Action of February 15, 2017, at 3.

First, reliance on foreign patent prosecution is generally disfavored. *See, e.g., Pfizer, Inc. v. Ranbaxy Labs. Ltd.*, 457 F.3d 1284, 1290 (Fed. Cir. 2006) (finding that "the statements made during prosecution of foreign counterparts to the [patent-in-suit] are irrelevant to claim construction because they were made in response to patentability requirements unique to Danish and European law").

Second, the applicant also stated that "the independent claims now define that the second cell serves the UE together with the first cell, which is providing a definition for dual connectivity." *Id.* Thus, to whatever extent this foreign prosecution history is deemed relevant, the applicant characterized "dual connectivity" broadly and with reference to the recitals of "first" and "second" in the bodies of the claims, which is consistent with the preamble recitals of "dual connectivity" in the '559 Patent being merely descriptive of the limitations in the body of each claim.

Alternatively, at minimum, the above-reproduced statements in the European prosecution were ambiguous, not definitive, and therefore do not support Defendants' narrow interpretation of "dual connectivity." Even assuming for the sake of argument that Defendants are correct that the phrase "dual connectivity" was known in the art as referring to connecting to a macro eNB and a small cell eNB, this European prosecution history confirms that the patentee used the phrase "dual connectivity" more broadly.

The Court therefore hereby finds that **the preambles of Claims 1 and 7 of the '559 Patent are not limiting except that, in Claim 7, the preamble recital of "a UE (User Equipment) is served by a first cell controlled by a first eNB" is limiting.**

**C. "first eNB" and "second eNB"**

| **"first eNB"**<br>('559 Patent, Claims 1, 3, 7, 11) | |
|---|---|
| **Plaintiffs' Proposed Construction** | **Defendants' Proposed Construction** |
| No further construction necessary | "macro eNB" |
| **"second eNB"**<br>('559 Patent, Claims 1, 7, 8) | |
| **Plaintiffs' Proposed Construction** | **Defendants' Proposed Construction** |
| No further construction necessary | "small cell eNB" |

Dkt. No. 311, Ex. A3 at 4; Dkt. No. 327 at 8; Dkt. No. 371, Ex. A at 9; Dkt. No. 417, Ex. A at 9.

Shortly before the start of the April 17, 2025 hearing, the Court provided the parties with the following preliminary construction for both of these disputed terms: "Plain meaning (apart from the Court's construction of 'eNB,' above."

(1) The Parties' Positions

Plaintiffs argue that "[t]erms like 'first' and 'second' are routinely used in patent claims to distinguish between instances of the same term, and typically do not require construction," and "Defendants fail to overcome the presumption that plain and ordinary meaning should apply." Dkt. No. 327 at 8 (citations omitted).

Defendants incorporate their arguments as to the preambles and argue that "[t]he specification makes clear that the 'first eNB' of the claims is the macro eNB that 'sends measurement gap configuration' to the 'small cell eNB' (i.e., the 'second eNB' of the claims)." Dkt. No. 359 at 11 (citing '559 Patent at 6:41–46).

At the April 17, 2025 hearing, the parties presented oral arguments as to these terms together with their arguments as to the preambles of Claims 1 and 7 of the '559 Patent, which are addressed above.

(2) Analysis

Claim 1 of the '559 Patent, for example, recites:

> 1. A method for supporting dual connectivity in a wireless communication system, wherein separate eNBs (evolved Node B) are used to support dual connectivity, comprising:
>
> a *first eNB* controls a first cell, wherein the first cell is serving a UE (User Equipment); and
>
> the *first eNB* configures a second cell to serve the UE together with the first cell, wherein the second cell is controlled by a *second eNB*;
>
> the *first eNB* allocates a measurement gap configuration to the UE; and
>
> the *first eNB* sends the measurement gap configuration to the *second eNB* so that the *second eNB* could take measurement gaps into consideration when scheduling resources to the UE.

As discussed above regarding the preambles of Claims 1 and 7, the body of each claim recites a "first eNB" and "second eNB," which as a matter of claim drafting are understood as being distinct from one another. *See 3M*, 350 F.3d at 1371 ("use of the terms 'first' and 'second'

is common patent-law convention to distinguish between repeated instances of an element"). And as Plaintiffs submit, the specification uses "first" and "second" in this general manner. '559 Patent at 6:50–55 ("FIG. 5 is a flow chart 500 in accordance with one exemplary embodiment. In step 505, a first eNB controls a first cell that serves a UE. In step 510, the first eNB configures a second cell to serve the UE together with the first cell. The second cell is controlled by a second eNB that is different from the first eNB.").

The Court therefore hereby expressly rejects Defendants' proposed constructions, and no further construction is necessary.

The Court accordingly hereby construes "first eNB" and "second eNB" to have their **plain meaning** (apart from the Court's construction of "eNB," above).

**D. Order of Operations**

| **Order of Operations in Claims 1 and 7 of the '559 Patent** | |
|---|---|
| **Plaintiffs' Proposed Construction** | **Defendants' Proposed Construction** |
| No further construction necessary. There is no order required for the recited method steps. | The steps of the claims must be performed in the order listed in the claims. |

Dkt. No. 311, Ex. A3 at 5; Dkt. No. 327 at 22; Dkt. No. 359 at 12; Dkt. No. 371, Ex. A at 9; Dkt. No. 417, Ex. A at 6 & 7; Dkt. No. 417, Ex. A at 9.

Shortly before the start of the April 17, 2025 hearing, the Court provided the parties with the following preliminary construction: "The steps of Claims 1 and 7 of the '559 Patent must be performed in the order recited, except that the third step of Claim 1 could be performed before the second step of Claim 1."

(1) The Parties' Positions

Plaintiffs argue that "[t]here is no logic or grammar in the claim that would require the steps be performed in order," and "[t]he specification of the '559 Patent also does not require such a narrow construction." Dkt. No. 327 at 23.

Defendants respond that "[g]rammar and logic support the conclusion that the methods of claims 1 and 7 recite a series of steps that must be performed in the order they are listed." Dkt. No. 359 at 12.

Plaintiffs reply that the claim language does not require an order of steps, and Plaintiffs also argue that an order of steps cannot be imposed based on a disclosed preferred embodiment. Dkt. No. 367 at 7.

At the April 17, 2025 hearing, the parties presented oral arguments.

(2) Analysis

"Unless the steps of a method [claim] actually recite an order, the steps are not ordinarily construed to require one." *Mformation Techs., Inc. v. Research in Motion Ltd.*, 764 F.3d 1392, 1398 (Fed. Cir. 2014) (quoting *Interactive Gift Express, Inc. v. Compuserve, Inc.*, 256 F.3d 1323, 1342 (Fed. Cir. 2001)).

Courts apply a two-part test to determine whether a particular order of steps is required: "First, we look to the claim language to determine if, as a matter of logic or grammar, they must be performed in the order written," and "[i]f not, we next look to the rest of the specification to determine whether it directly or implicitly requires such a narrow construction." *Altiris, Inc. v. Symantec Corp.*, 318 F.3d 1363, 1369–70 (Fed. Cir. 2003) (citation omitted).

Claims 1 and 7 of the '559 Patent recite:

> 1. A method for supporting *dual connectivity* in a wireless communication system, wherein *separate eNBs* (evolved Node B) are used to support dual connectivity, comprising:
>
> a first eNB controls a first cell, wherein the first cell is serving a UE (User Equipment); and
>
> the first eNB configures a second cell to serve the UE together with the first cell, wherein the second cell is controlled by a second eNB;
>
> the first eNB allocates a measurement gap configuration to the UE; and
>
> the first eNB sends the measurement gap configuration to the second eNB so that the second eNB could take measurement gaps into consideration when scheduling resources to the UE.

The first step of Claim 1 must be performed first because the recital of "a first eNB" provides antecedent basis for "the first eNB" in the remaining steps, and the second step's recital of "to serve the UE together with the first cell" refers back to the first step's recital of "the first cell is serving a UE (User Equipment)." Likewise, the third and fourth steps refer back to "the UE."

The fourth step of Claim 1 must be performed last because it refers to "the measurement gap configuration" that was allocated in the third step, and the fourth step also involves "the second eNB" that was introduced in the second step.

As between the second and third steps of Claim 1, however, the claim does not express or imply any ordering as between these two steps. Defendants do not persuasively show any reason why the first eNB must configure a second cell to serve the UE (second step) prior to the first eNB allocating a measurement gap configuration to the UE (third step).

Defendants cite Figure 5 of the '559 Patent, which is reproduced here:




Defendants discuss Figure 5 as well as accompanying disclosure in the specification. *See* '559 Patent at 6:30–40. Figure 5 illustrates an ordering of steps, but this is merely a disclosed embodiment. '559 Patent at 6:50–51 ("FIG. 5 is a flow chart 500 in accordance with one *exemplary embodiment*.") (emphasis added). Defendants do not persuasively demonstrate that the claims must be limited to this disclosed embodiment.

At the April 17, 2025 hearing, Defendants argued that the second step of Claim 1 must be performed before the third step because the point of the allocation that is recited in the third step is what happens in the fourth step, which in turn involves the second eNB recited in the second step. Defendants perhaps have shown that this order is desirable, but Defendants do not persuasively show that this order is logically necessary or otherwise compelled by the intrinsic

evidence. The Court concludes that the third step of Claim 1 could potentially be performed before the second step of Claim 1.

As for Claim 7, the claim recites only two steps:

> 7. A method for supporting *dual connectivity* in a wireless communication system, wherein *separate eNBs* (evolved Node B) are used to support dual connectivity and a UE (User Equipment) is served by a first cell controlled by a first eNB, comprising:
>
> a second eNB controls a second cell, wherein the second cell is configured by the first eNB to serve the UE together with the first cell; and
>
> the second eNB receives a measurement gap configuration from the first eNB so that the second eNB could take measurement gaps into consideration when scheduling resources to the UE, wherein the measurement gap configuration was allocated by the first eNB to the UE.

The second step recites “the second eNB,” which refers back to the first step for antecedent basis (“a second eNB”). In light of this antecedent basis relationship, the steps of Claim 7 must be performed in the order recited.

At the April 17, 2025 hearing, the parties raised a dispute regarding whether the last clause of Claim 7 is a distinct step and the nature of its temporal requirement. Defendants argued that the “wherein” clause at the end of Claim 7—"wherein the measurement gap configuration was allocated by the first eNB to the UE”—refers to an allocation that must occur *after* the first step of Claim 7. Defendants do not persuasively demonstrate that this must be so. Rather, the recital of “was allocated” requires merely that this allocation occurs at some time before the second step of Claim 7, without any limitation as to whether this allocation occurs before or after the first step of Claim 7.

With that understanding, the Court hereby finds that **the steps of Claims 1 and 7 of the ’559 Patent must be performed in the order recited except that the third step of Claim 1 could be performed before the second step of Claim 1.**

## V. DISPUTED TERMS IN U.S. PATENT NO. 9,237,489

### E. "eNB"

| **"eNB"**<br>('489 Patent, Claims 1, 3–12, 14–22) | |
|---|---|
| **Plaintiffs' Proposed Construction** | **Defendants' Proposed Construction** |
| "base station that has the capability of providing wireless communications to or from a user communication device"<br><br>Or if claims are limited to 3GPP, "base station that has the capability of providing wireless communications to or from a user communication device via orthogonal division multiplex access (OFDMA)"[2] | "an E-UTRAN base station providing 4G/LTE cellular connectivity to the UE" |

Dkt. No. 311, Ex. A2 at 3; Dkt. No. 327 at 8–9; Dkt. No. 359 at 19; Dkt. No. 371, Ex. A at 4; Dkt. No. 417, Ex. A at 5.

Shortly before the start of the April 17, 2025 hearing, the Court provided the parties with the following preliminary construction: "an E-UTRAN base station providing 4G/LTE cellular connectivity to the UE."

(1) The Parties' Positions

Plaintiffs argue that "the '489 Patent makes clear it is designed to improve upon existing 3GPP specifications, the exact opposite of limiting it to a particular 3GPP specification . . . ." Dkt. No. 327 at 9 (citing '489 Patent at 1:36–39). Plaintiffs urge that "[t]he solutions in the patent are inherently future looking, making limiting the claims to E-UTRAN and 4G/LTE incoherent because that specification had been frozen in 2008." *Id.* (citation omitted). Alternatively, Plaintiffs argue that "if eNB is not a term with common meaning but is instead is [*sic*] a nonce

[2] Plaintiffs previously proposed: "base station." Dkt. No. 311, Ex. A2 at 3.

word whose structure is defined solely by the E-UTRAN 4G/LTE specifications, as opposed to any other 3GPP specification, it is means plus function," and "[t]his means that only the structures in the E-UTRAN 4G/LTE specification necessary to perform the functions recited in the claims must be present, and their equivalents." *Id.* at 11.

Defendants respond that "eNB" is a term of art and that "[i]f the applicants wanted to use a more expansive term, they could have instead used the term 'base station,' which was well-known at the time and used in the '489 Patent's specification, but they chose not to do so." Dkt. No. 359 at 19. Defendants also argue that "[t]he '489 Patent's statement that wireless communication systems 'may' use a disjunctive list of various 'modulation techniques' does not support Plaintiffs' attempt to broaden the term 'eNB' to any base station that has the capability to support OFMDA." *Id.* at 21.

Plaintiffs reply that "[n]othing in the cited 3GPP technical specification dictates that 'eNB,' as used in the '489 Patent, is exclusive to 4G/LTE wireless networks." Dkt. No. 367 at 3. Plaintiffs argue that "Defendants' construction would improperly exclude 5G and LTE-Advanced, which are based on OFDMA, and limit the invention to 4G/LTE networks." *Id.*

At the April 17, 2025 hearing, Plaintiffs emphasized disclosure in the specification that refers to carrier aggregation, which Plaintiffs submitted was not part of E-UTRAN at the time of the patent and which Plaintiffs argues reinforces that the patent is forward-looking and not limited to E-UTRAN as it was defined as of the priority date of the patent. Defendants responded that Plaintiffs' argument cannot be persuasive because all patents are forward-looking because any analysis of infringement occurs *after* the patent issues.

<u>(2) Analysis</u>

Plaintiffs point out that the '489 Patent refers to various wireless communication systems:

> The exemplary wireless communication systems and devices described below employ a wireless communication system, supporting a broadcast service. Wireless communication systems are widely deployed to provide various types of communication Such as Voice, data, and so on. These systems may be based on code division multiple access (CDMA), time division multiple access (TDMA), orthogonal frequency division multiple access (OFDMA), 3GPP LTE (Long Term Evolution) wireless access, 3GPP LTE-A (Long Term Evolution Advanced), 3GPP2 UMB (Ultra Mobile Broadband), WiMax, or some other modulation techniques.

’489 Patent at 2:10–23. Also, the specification discloses that “changes to the current body of 3GPP standard are currently being submitted and considered to evolve and finalize the 3GPP standard.” ’489 Patent at 1:36–39. Plaintiffs further note that the specification refers to 4G/LTE as using OFDMA. *Id.* at 4:64–5:1.

Nonetheless, substantially the same analysis applies to the ’489 Patent as discussed above regarding the same term in the ’559 Patent. *See* ’489 Patent at 2:21–27 (incorporating standards). The patentee chose to use a term of art, “eNodeB,” that has a well-established meaning in 4G cellular networks, which use E-UTRAN. *See id.* For example, the specification discloses:

> An exemplary network structure of an Evolved Universal Terrestrial Radio Access Network (E-UTRAN) 100 as a mobile communication system is shown in FIG. 1 according to one exemplary embodiment. *The E-UTRAN generally includes eNode B or eNB 102, which function similar to a base station in a mobile Voice communication network.* Each eNB is connected by X2 interfaces. The eNBs are connected to terminals or user equipment (UE) 104 through a radio interface, and are connected to Mobility Management Entities (MME) or Serving Gateway (S-GW) 106 through S1 interfaces.

’489 Patent at 2:28–40 (emphasis added); *see id.* at Fig. 1. The specification is thus consistent with “eNodeB” being a well-established term in the 4G and E-UTRAN standards. By not defining this term any more broadly, the patentee should be presumed to have used the term according to its well-established meaning in the relevant art.

The Court therefore hereby construes “eNB” to mean **“an E-UTRAN base station providing 4G/LTE cellular connectivity to the UE.”**

### F. "RRCConnectionReconfiguration message" and "mobilityControlInfo"

| **"RRCConnectionReconfiguration message"** ('489 Patent, Claims 2, 3, 11, 13, 14, 22) | |
|---|---|
| **Plaintiffs' Proposed Construction** | **Defendants' Proposed Construction** |
| No construction necessary.<br><br>It is undisputed by the parties that RRC is radio resource control information.<br><br>Alternatively, if the claim is limited to 3GPP[:] "RRCConnectionReconfiguration message in an orthogonal division multiple[3] access (OFDMA) wireless system" | "RRCConnectionReconfiguration message as defined in 4G/LTE standard specification TS 36.331-940" |
| **"mobilityControlInfo"** ('489 Patent, Claims 2, 13) | |
| **Plaintiffs' Proposed Construction** | **Defendants' Proposed Construction** |
| No construction necessary<br><br>Alternatively, if the claim is limited to 3GPP[:] "mobilityControlInfo[] in a orthogonal division multiple[4] access (OFDMA) wireless system" | "mobilityControlInfo as defined in 4G/LTE standard specification TS 36.331-940" |

Dkt. No. 311, Ex. A2 at 3; Dkt. No. 327 at 11–12; Dkt. No. 359 at 22; Dkt. No. 371, Ex. A at 5; Dkt. No. 417, Ex. A at 5.

Shortly before the start of the April 17, 2025 hearing, the Court provided the parties with the following preliminary constructions: "RRCConnection-Reconfiguration message as defined in 4G/LTE standard specifications"; and "mobilityControlInfo as defined in 4G/LTE standard specifications."

[3] Plaintiffs previously proposed "multiplex." Dkt. No. 311, Ex. A2 at 3; Dkt. No. 327 at 11–12.

[4] Plaintiffs previously proposed "multiplex." Dkt. No. 311, Ex. A2 at 3; Dkt. No. 327 at 12.

(1) The Parties' Positions

Plaintiffs argue that Defendants' proposal of referring to "4G/LTE standard specification TS 36.331-940" would be impossible for a jury to apply and also would improperly limit these terms to a particular version of a particular standard because, Plaintiffs argue, the specification is "forward looking to account for future evolution." Dkt. No. 327 at 13; *see id.* at 12–15.

Defendants respond that the terms "'RRCConnectionReconfiguration message' and 'mobilityControlInfo' are terms of art that specifically refer to messages in the 4G/LTE standard." Dkt. No. 359 at 23. Defendants submit that the patentee could have chosen to use broader language but did not. *Id.*

Plaintiffs reply that "[t]he '489 Patent's specification and file history do not restrict the claim terms to th[e] specific 3GPP specification" proposed by Defendants. Dkt. No. 367 at 3.

At the April 17, 2025 hearing, the parties rested on their briefing.

(2) Analysis

Claim 2 of the '489 Patent, for example, depends from Claim 1, and Claims 1 and 2 recite (emphasis added):

> 1. A method of Secondary Cell (SCell) release during handover comprising:
> configuring at least one SCell by a source eNB to a User Equipment (UE); and
> including information by the source eNB in a HandoverPreparationInformation message for a target eNB to control SCell release in the UE during a handover,
> wherein the information indicates SCell indexes of all SCells configured to the UE before the handover, thereby allowing the target eNB to include a sCellToReleaseList with all the SCells configured to the UE in a handover command for the UE to release the SCells included in the sCellToReleaseList.
>
> 2. The method of claim 1, wherein the handover command corresponds to an *RRCConnectionReconfiguration* message including *mobilityControlInfo*.

The specification discloses:

> The exemplary wireless communication systems devices described below may be designed to support one or more standards such as the standard offered by a consortium named '3rd Generation Partnership Project' referred to herein as 3GPP, including Document Nos. TS36.331-940, TS36.300-950, and R2-105971.
>
> * * *
>
> For UEs that support CA [(carrier aggregation)], E-UTRAN can change the PCell with the handover procedure using an RRCConnectionReconfiguration message including the mobilityControlInfo. The RRCConnectionReconfiguration message is the command to modify an RRC connection. It may convey information for measurement configuration, mobility control, radio resource configuration (including RBS, MAC main configuration and physical channel configuration) including any associated dedicated NAS information and security configuration.

'489 Patent at 2:21–26 & 6:11–20; *see id.* at 7:54–65.

Substantially the same analysis applies to the '489 Patent as discussed above regarding "eNodeB" in the '559 Patent. Much like as with "eNodeB," the patentee chose to use terms of art, "RRCConnectionReconfiguration message" and "mobilityControlInfo," that have well-established meanings in 4G cellular networks. By not defining these terms any more broadly, the patentee should be presumed to have used the terms according to their well-established meanings in the relevant art. The patentee's use of the same capitalization as in the 4G standards is also noteworthy. *See, e.g., TQ Delta*, 2018 WL 2113226, at *5–*6 ("The patent's use of capitalization and abbreviations suggests that 'INP value' is a term of art derived from the ADSL2 and VDSL2 standards."). Also, because the industry standards for 5G have been developed by the same standards-setting-organization as 4G, and because 5G technology includes interacting with 4G devices, it stands to reason that the new standards would continue to apply the same well-established meanings of "RRCConnectionReconfiguration message" and "mobilityControlInfo" unless otherwise specified. Plaintiffs do not demonstrate otherwise, and the opinions of Defendants' expert are further persuasive in this regard. Dkt. No. 327, Ex. 22, Oct. 30, 2024 Hansen Decl. at ¶¶ 60–64.

Further, Plaintiffs argue: "If the Defendants are correct that these terms are in effect nonce term[s] that ha[ve] no structure separate from the structures described in 3GPP specifications, then the requirements for means plus function should be strictly applied. The means is an 'RRCConnectionReconfiguration message' and 'mobilityControlInfo' described in 3GPP specifications, or its equivalent." Dkt. No. 327 at 15. The term at issue does not recite a "means," so 35 U.S.C. § 112(f) is presumed not to apply, and Plaintiffs have not attempted to rebut the presumption. *Williamson*, 792 F.3d at 1348. Plaintiffs' reliance on legal principles regarding 35 U.S.C. § 112(f) is unpersuasive.

The standard referenced by Defendants in their proposed constructions, "TS 36.331," is identified and incorporated-by-reference in the specification:

> In particular, [t]he exemplary wireless communication systems devices described below may be designed to support one or more standards such as the standard offered by a consortium named "3rd Generation Partnership Project" referred to herein as 3GPP, including Document Nos. *TS36.331-940*, TS36.300-950, and R2-105971. The standards and documents listed above are hereby expressly incorporated herein.

'489 Patent at 2:21–26 (emphasis added).

TS36.331 is also referenced in a 5G standard document that Defendants cite as relating to a handover involving a 4G/E-UTRA target:

| targetRAT-Type | Standard to apply | targetRAT-MessageContainer |
|---|---|---|
| eutra | 3GPP TS 36.331 (clause 5.4.2) | RRCConnectionReconfiguration |

Dkt. No. 359, Ex. 10, ETSI TS 138 331 V15.3.0 (2018-10) at 113; *see* Dkt. No. 327, Ex. 24, ETSI TS 138 331 V15.3.0 (2018-10) at 419; *see also* '489 Patent at 7:62–65 ("The RRCConnectionReconfiguration message including mobilityControlInfo corresponds to the handover command received from the target eNB."). Defendants also note a distinction between

"RRCConnectionReconfiguration" message in "eutra" (E-UTRA, which is a 4G standard) and "RRCReconfiguration" in "nr" (New Radio, which is a 5G standard):

| targetRAT-Type | Standard to apply | targetRAT-MessageContainer |
|---|---|---|
| *cdma2000-1XRTT* | C.S0001 or later, C.S0007 or later, C.S0008 or later | |
| *cdma2000-HRPD* | C.S0024 or later | |
| *eutra* | TS 36.331 (clause 5.4.2) | *RRCConnectionReconfiguration* |
| *geran* | GSM TS 04.18, version 8.5.0 or later, or TS 44.018 (clause 9.1.15)<br><br>TS 44.060, version 6.13.0 or later (clause 11.2.43)<br><br>TS 44.060, version 7.6.0 or later (clause 11.2.46) | HANDOVER COMMAND<br><br>PS HANDOVER COMMAND<br><br>DTM HANDOVER COMMAND |
| *nr* | TS 38.331 (clause 6.2.2) | RRCReconfiguration |
| *utra* | TS 25.331 (clause 10.2.16a) | HANDOVER TO UTRAN COMMAND |

Dkt. No. 359, Ex. 11, ETSI TS 138 331 V18.2.0 (2024-08) at 407.

Finally, Plaintiffs argue that "directing the jury to a detailed specification makes it impossible for the jury to actually apply Defendants' construction." Dkt. No. 327 at 14–15. Plaintiffs' argument is unpersuasive because any dispute in this regard pertains to factual questions regarding infringement as to which the jury will have assistance from competing experts who will be tested through cross-examination at trial. In the context of the particular terms here at issue, which are technical terms used by a particular standard setting organization in a specific technical context, referring to a standard is appropriate.

Nonetheless, Defendants' proposal of referring to a specific 4G standard is unnecessary and has not been sufficiently justified. Rather, "RRCConnectionReconfiguration message" and "mobilityControlInfo" should be applied in accordance with the full extent of their usage in 4G standards.

The Court therefore hereby construes these disputed terms as set forth in the following chart:

| Term | Construction |
|---|---|
| "RRCConnectionReconfiguration message" | **"RRCConnectionReconfiguration message as defined in 4G/LTE standard specifications"** |
| "mobilityControlInfo" | **"mobilityControlInfo as defined in 4G/LTE standard specifications"** |

## VI. DISPUTED TERMS IN U.S. PATENT NO. 9,736,883

### G. "eNB," "evolved Node B," "first evolved node B (eNB)," "first eNB," "second evolved Node B (eNB)," and "second eNB"

| **"eNB"**<br>**"evolved Node B"**<br>('883 Patent, Claims 1, 2, 4–11) | |
|---|---|
| **Plaintiffs' Proposed Construction** | **Defendants' Proposed Construction** |
| "base station that has the capability of providing wireless communications to or from a user communication device"<br><br>Or if claims are limited to 3GPP, "base station that has the capability of providing wireless communications to or from a user communication device via orthogonal division multiple[5] access (OFDMA)"[6] | "an E-UTRAN base station providing 4G/LTE cellular connectivity to the UE" |
| **"first evolved node B (eNB)"**<br>**"first eNB"**<br>('883 Patent, Claims 1, 5–7, 9, 11) | |
| **Plaintiffs' Proposed Construction** | **Defendants' Proposed Construction** |
| No construction necessary | "a first E-UTRAN base station providing 4G/LTE cellular connectivity to the UE" |

[5] Plaintiffs previously proposed: "multiplex." Dkt. No. 311, Ex. A4 at 6; Dkt. No. 327 at 16.

[6] Plaintiffs previously proposed: "base station." Dkt. No. 311, Ex. A4 at 6.

| **"second evolved Node B (eNB)"**<br>**"second eNB"**<br>('883 Patent, Claims 1, 2, 5, 7–9) | |
|---|---|
| **Plaintiffs' Proposed Construction** | **Defendants' Proposed Construction** |
| No construction necessary | "a second E-UTRAN base station providing 4G/LTE cellular connectivity to the UE" |

Dkt. No. 311, Ex. A4 at 6; Dkt. No. 327 at 16; Dkt. No. 359 at 15; Dkt. No. 371, Ex. A at 11–12; Dkt. No. 417, Ex. A at 13–15.

Shortly before the start of the April 17, 2025 hearing, the Court provided the parties with the following preliminary constructions: "an E-UTRAN base station providing 4G/LTE cellular connectivity to the UE"; "a first E-UTRAN base station providing 4G/LTE cellular connectivity to the UE"; and "a second E-UTRAN base station providing 4G/LTE cellular connectivity to the UE."

(1) The Parties' Positions

Plaintiffs argue that "[t]he '883 patent provides identical disclosures as the '489 and/or '559 Patents making clear the eNB is used as a generic term for a base station and it is not limited to any specific 3GPP specification." Dkt. No. 327 at 16. Plaintiffs also argue that "[t]he prosecution history [of the '883 Patent] . . . says nothing to support [Defendants' expert's] argument that the claimed inventions are limited to the context of E-UTRAN base stations providing 4G/LTE cellular connectivity." *Id.* at 18; *see id.* at 17–18.

Defendants respond that "'eNB' is a term of art that refers to a base station providing 4G/LTE cellular connectivity to mobile devices" and that "the intrinsic record of the '883 Patent confirms that the patentee did not deviate from the plain and ordinary meaning of 'eNB.'" Dkt. No. 359 at 15 (citations omitted).

Plaintiffs reply: "Like the '489 and '559 Patents, the '883 Patent uses 'eNB' as a generic term for a base station. Thus, 'eNB' here should be construed as a base station that provides wireless communications to or from a user communication device, and not be limited to any specific 3GPP specification." Dkt. No. 367 at 4. Plaintiffs argue that the prosecution history cited by Defendants does not warrant any narrower interpretation. *Id.* at 4–5.

At the April 17, 2025 hearing, the parties referred to their arguments as to the same term in the above-discussed '559 Patent and '489 Patent.

(2) Analysis

Claim 1 of the '883 Patent recites:

> 1. A method for handling inter-node connectivity in a wireless communication system, comprising:
> receiving, by a first evolved node B (eNB), a first request from a second eNB for aggregating a Secondary Cell (SCell) for a User Equipment (UE);
> transmitting an accept message from the first eNB to the second eNB in response to the first request; and
> transmitting a second request from the first eNB, which controls the SCell of the UE, to the second eNB, which controls a Primary Cell (PCell) of the UE, to change a data path for a first radio bearer of the UE, wherein the second request does not indicate to change the data path for a third radio bearer of the UE;
> wherein a first path is via the first eNB and used as the data path for the first radio bearer and the third radio bearer before changing the data path for the first radio bearer.

The specification discloses, for example:

> An *access network (AN)* may be a fixed station or *base station* used for communicating with the terminals and may also be referred to as an access point, a Node B, a *base station*, an enhanced base station, an *eNB*, or some other terminology.

'883 Patent at 3:32–38 (emphasis added).

Substantially the same analysis applies to the '883 Patent as discussed above regarding the same term in the '489 Patent and the '559 Patent. The patentee chose to use a term of art, "eNodeB," that has a well-established meaning in 4G cellular networks and E-UTRAN. And, here

too, the specification identifies industry standards. *See* ’883 Patent at 2:47–64 (citing TR 36.932 v12.0.0, RP-122033 (Ex. 5), TS 36.300 v11.4.0 (Ex. 2), and TS 36.331 v11.2.0).

The parties dispute whether or not the prosecution history favors Defendants’ proposed construction. The patentee distinguished the “Sambhwani” reference, arguing that the network nodes disclosed in Sambwani “control base stations or nodeBs” and are different than eNodeBs. Dkt. No. 327, Ex. 25, Oct. 31, 2016 Remarks at 8. This prosecution history does not significantly affect the Court’s analysis; nothing in the cited prosecution history contradicts the above-discussed well-established meaning of “eNodeB.”

The Court therefore hereby construes these disputed terms as set forth in the following chart:

| Term | Construction |
|---|---|
| “eNB”<br>“evolved Node B” | **“an E-UTRAN base station providing 4G/LTE cellular connectivity to the UE”** |
| “first evolved node B (eNB)”<br>“first eNB” | **“a first E-UTRAN base station providing 4G/LTE cellular connectivity to the UE”** |
| “second evolved Node B (eNB)”<br>“second eNB” | **“a second E-UTRAN base station providing 4G/LTE cellular connectivity to the UE”** |

**H. “data path for a [first]/[second]/[third] radio bearer” and “the UE has multiple paths via different eNBs”**

| **“data path for a first radio bearer”**<br>(’883 Patent, Claims 1, 4, 7, 9, 10) | |
|---|---|
| **Plaintiffs’ Proposed Construction** | **Defendants’ Proposed Construction** |
| No further construction necessary.<br>Not indefinite. | Indefinite |

| **"data path for a second radio bearer"**<br>('883 Patent, Claims 2, 8) | |
|---|---|
| **Plaintiffs' Proposed Construction** | **Defendants' Proposed Construction** |
| No further construction necessary.<br>Not indefinite. | Indefinite |
| **"data path for a third radio bearer"**<br>('883 Patent, Claims 1, 7) | |
| **Plaintiffs' Proposed Construction** | **Defendants' Proposed Construction** |
| No further construction necessary.<br>Not indefinite. | Indefinite |
| **"the UE has multiple paths via different eNBs"**<br>('883 Patent, Claims 4, 10) | |
| **Plaintiffs' Proposed Construction** | **Defendants' Proposed Construction** |
| No further construction necessary.<br>Not indefinite. | Indefinite |

Dkt. No. 331, Ex. A4 at 6–7; Dkt. No. 327 at 25–26; Dkt. No. 359 at 17; Dkt. No. 371, Ex. A at 13 & 15.

Shortly before the start of the April 17, 2025 hearing, the Court provided the parties with the following preliminary construction for these disputed terms: "Plain meaning."

(1) The Parties' Positions

Plaintiffs argue that "the terms are not indefinite because the claim language and the '883 patent specification disclose sufficient structure for performing the claimed methods such that a POSA would understand that 'data path' describe a set of protocols that governs the ways data is delivered between base stations and the UE." Dkt. No. 327 at 26. Plaintiffs also argue that "[t]he meaning of 'data path' is self-evident from the claim language and further defined in the patent specification." *Id.*

Defendants respond that "the problem is that the '883 Patent establishes a 1:1 correspondence between a data path and a radio bearer which renders the way those terms are used in the claims meaningless." Dkt. No. 359 at 17.

Plaintiffs reply that the claim language is clear and that "[t]he network protocols Defendants argue are confusing are simply rules and standards that decide which path data should be transmitted on." Dkt. No. 367 at 8.

At the April 17, 2025 hearing, the parties presented oral arguments.

(2) Analysis

Defendants argue that the specification provides an example of a "data path" as being a "radio bearer," which Defendants argue means there is a "1:1 correspondence between a data path and a radio bearer" (Dkt. No. 359 at 17):

> [T]he second eNB could send a request to the first eNB or a core network node (such as a MME (Mobility Management Entity) or a S-GW (Serving Gateway), to switch a *data path (such as a radio bearer*, a service, or a logical channel). The switching is from between the UE and the second eNB to between the UE and the first eNB.

'883 Patent at 6:37–43 (emphasis added).

This "passing reference[]" in the specification is insufficient to give rise to any lack of reasonable certainty where the phrase "data path," on its face, is reasonably clear in the context of the claims at issue. *Ancora*, 744 F.3d at 738. Moreover, Plaintiffs point to another portion of the specification that refers to a data path "*for* a radio bearer":

> As discussed above, the general concept is that a first eNB controlling one serving cell of a UE could send a request to a second eNB controlling another serving cell of the UE or a core network node (such as a MME or a S-GW) to switch a *data path* or to change a splitting rule (such as *for a radio bearer*, a service, or a logical channel). The data path switching could be from between the UE and a first eNB to between the UE and a second eNB.

*Id.* at 7:19–27 (emphasis added); *see id.* at 1:60–64.

Defendants' apparent argument that "data path" lacks any plain meaning in the relevant art is unpersuasive, and the opinions of Defendants' expert are likewise unpersuasive. *See* Dkt. No. 327, Ex. 22, Oct. 30, 2024 Hansen Decl. at ¶¶ 79–84.

The Court therefore hereby expressly rejects Defendants' indefiniteness argument. Defendants present no alternative proposed constructions, and no further construction is necessary.

The Court accordingly hereby construes these disputed terms to have their **plain meaning**.

## VII. DISPUTED TERMS IN U.S. PATENT NO. 7,664,059

### I. "a sequence number following a sequence number of a last in-sequence acknowledged packet of a transmitter" and "a sequence number of a next packet to be transmitted for the first time by the transmitter"

| **"a sequence number following a sequence number of a last in-sequence acknowledged packet of a transmitter"** ('059 Patent, Claims 1, 3, 8) | |
|---|---|
| **Plaintiffs' Proposed Construction** | **Defendants' Proposed Construction** |
| No further construction necessary | "a Sequence Number of a next expected acknowledged Protocol Data Unit (PDU), meaning the SN following an SN of a last in-sequence acknowledged PDU" |
| **"a sequence number of a next packet to be transmitted for the first time by the transmitter"** ('059 Patent, Claims 1, 3, 8) | |
| **Plaintiffs' Proposed Construction** | **Defendants' Proposed Construction** |
| No further construction necessary | "a Sequence Number of a next Protocol Data Unit (PDU) to be transmitted for a first time (i.e. excluding retransmitted PDUs)" |

Dkt. No. 311, Ex. A1 at 2; Dkt. No. 327 at 28; Dkt. No. 359 at 25–26; Dkt. No. 371, Ex. A at 1 & 2; Dkt. No. 417, Ex. A at 1 & 2.

Shortly before the start of the April 17, 2025 hearing, the Court provided the parties with the following preliminary construction for these disputed terms: "Plain meaning."

(1) The Parties' Positions

Plaintiffs argue that "Defendants' proposed constructions completely redraft the claims to limit them to a particular embodiment . . . ." Dkt. No. 327 at 28; *see id.* at 28–29.

Defendants respond that their proposals "reflect[] the definitions provided by the patent itself." Dkt. No. 359 at 26; *see id.* at 26–27.

Plaintiffs reply that "Defendants' proposed construction is an improper attempt to limit the claims of the '059 Patent to a single disclosed embodiment," and "there is no suggestion in the intrinsic record that the applicant intended the claims to be limited to the single embodiment focused on by Defendants." Dkt. No. 367 at 8 & 9.

At the April 17, 2025 hearing, the parties presented oral arguments.

(2) Analysis

Claim 1 of the '059 Patent, for example, recites (emphasis added):

> 1. A method of detecting an erroneous sequence number of a status report unit in a wireless communications system, the method comprising:
>
> receiving a status report unit output from a receiver of the wireless communications system;
>
> detecting whether a negatively acknowledged sequence number lies in a range of greater than or equal to *a sequence number following a sequence number of a last in-sequence acknowledged packet of a transmitter* and less than *a sequence number of a next packet to be transmitted for the first time by the transmitter* when the negatively acknowledged sequence number is detected in the status report unit; and
>
> detecting that the status report unit comprises an erroneous sequence number when the negatively acknowledged sequence number is not in the range.

Defendants do not appear to contend that the claim language on its face requires its proposed constructions. Rather, Defendants rely on what they characterize as definitions in the specification.

The Background of the Invention section of the specification states:

> For more efficient transmission, under the AM [(Acknowledged Mode)], the transmitter defines status variables below:
>
> 1. Variable VT(S): represents *a Sequence Number (SN) of a next Protocol Data Unit (PDU) to be transmitted for a first time* (i.e. excluding retransmitted PDUs). The variable is updated after corresponding PDUs are transmitted. An initial value of the variable is 0.
>
> 2. Variable VT(A): represents *an SN of a next expected acknowledged PDU, meaning the SN following an SN of a last in-sequence acknowledged PDU*. The variable is updated after a status report unit showing the expected PDU had been positively acknowledged.

'059 Patent at 1:56–67 (emphasis added). The specification further discloses:

> In accordance to the procedure 10, when a status report unit shows a negatively acknowledged SN, *the present invention* detects whether the negatively acknowledged SN lies in a range of greater than or equal to an SN following an SN of a last in-sequence acknowledged packet of a transmitter and less than an SN of a next packet to be transmitted for the first time by the transmitter, *meaning* to detect whether the negatively acknowledged SN agrees with VT(A)≦SN<VT(S).

'059 Patent at 4:31–37 (emphasis added). Defendants submit that "procedure 10" (*id.*) is illustrated in Figure 1 and that Step 104 of Figure 1 uses the same language as the claim limitation here at issue. *See id.* at Fig. 1.

The cited disclosures, however, do not set forth any lexicography because the disclosures do not define the disputed terms with "reasonable clarity, deliberateness, and precision sufficient to narrow the definition of the claim term in the manner urged." *Abbott Labs. v Syntron Bioresearch, Inc.*, 334 F.3d 1343, 1355 (Fed. Cir. 2003); *see Thorner v. Sony Comput. Entm't Am. LLC*, 669 F.3d 1362, 1367–68 (Fed. Cir. 2012) ("Both [lexicography and disavowal] require a clear and explicit statement by the patentee.") (citations omitted). The use of the word "meaning" is insufficient in the context used here, and even the phrase "the present invention" is insufficient because it is tethered to a particular embodiment, namely it is "[i]n accordance to the procedure

10." '059 Patent at 4:31–37. Even though, as Defendants submit, procedure 10 is illustrated in Figure 1 with the same language used in the claim, Defendants do not demonstrate that this warrants limiting the claim language to the details of the disclosed embodiment. *See Phillips*, 415 F.3d at 1323.

Finally, at the April 17, 2025 hearing, Defendants cited portions of United States Provisional Patent Application No. 60/594,415 ("the '415 Provisional"), to which the '059 Patent claims priority. The '415 Provisional is not addressed in Defendants' briefing and is not incorporated-by-reference in the '059 Patent. Moreover, even if considered, the portions of the '415 Provisional discussed by the parties during the April 17, 2025 hearing do not affect the Court's analysis.

The Court therefore hereby expressly rejects Defendants' proposed constructions, and no further construction is necessary. *See U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997) ("Claim construction is a matter of resolution of disputed meanings and technical scope, to clarify and when necessary to explain what the patentee covered by the claims, for use in the determination of infringement. It is not an obligatory exercise in redundancy."); *see also O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co., Ltd.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008); *Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1207 (Fed. Cir. 2010) ("Unlike *O2 Micro*, where the court failed to resolve the parties' quarrel, the district court rejected Defendants' construction."); *ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d 1312, 1326 (Fed. Cir. 2012); *Summit 6, LLC v. Samsung Elecs. Co., Ltd.*, 802 F.3d 1283, 1291 (Fed. Cir. 2015); *Bayer Healthcare LLC v. Baxalta Inc.*, 989 F.3d 964, 977–79 (Fed. Cir. 2021).

The Court accordingly hereby construes these disputed terms to have their **plain meaning**.

**J. "status report unit"**

| **"status report unit"**<br>('059 Patent, Claims 1, 2, 3, 4, 8) | |
|---|---|
| **Plaintiffs' Proposed Construction** | **Defendants' Proposed Construction** |
| "a data unit containing status report information" | "a status report comprising at least the sequence number of a PDU" |

Dkt. No. 311, Ex. A1 at 2; Dkt. No. 327 at 30; Dkt. No. 359 at 28; Dkt. No. 371, Ex. A at 3; Dkt. No. 417, Ex. A at 3.

Shortly before the start of the April 17, 2025 hearing, the Court provided the parties with the following preliminary construction: "a status report that includes a sequence number of a packet."

(1) The Parties' Positions

Plaintiffs argues that "Plaintiffs' construction does not alter the scope of the claim term, only clarifies it," and "[i]n the absence of such a construction, a juror may mistakenly think that a 'status report unit' is hardware." Dkt. No. 327 at 30.

Defendants respond that the specification defines this term and that Plaintiffs' proposal attempts to improperly broaden the term. Dkt. No. 359 at 28; *see id.* at 28–30.

Plaintiffs reply that "Defendants again improperly attempt to limit the term 'status report unit' to a single embodiment," and "Plaintiffs' proposed construction clarifies the term 'status report unit' for the jury so it will understand the term is referencing data as opposed to a physical unit of some hardware." Dkt. No. 367 at 10.

At the April 17, 2025 hearing, the parties presented oral arguments as to this term together with their oral arguments as to the "sequence number" terms, which are addressed above.

(2) Analysis

Claim 1 of the '059 Patent, for example, recites (emphasis added):

> 1. A method of detecting an erroneous sequence number of a *status report unit* in a wireless communications system, the method comprising:
>
> receiving a *status report unit* output from a receiver of the wireless communications system;
>
> detecting whether a negatively acknowledged sequence number lies in a range of greater than or equal to a sequence number following a sequence number of a last in-sequence acknowledged packet of a transmitter and less than a sequence number of a next packet to be transmitted for the first time by the transmitter when the negatively acknowledged sequence number is detected in the *status report unit*; and
>
> detecting that the *status report unit* comprises an erroneous sequence number when the negatively acknowledged sequence number is not in the range.

The context in which the claims recite "status report unit" thus demonstrates that it is not a unit of hardware or programming but rather is a unit of information, and the surrounding claim language demonstrates that a "status report unit" includes a sequence number.

Defendants argue that this sequence number must be "of a PDU," arguing that the claim language aligns with disclosure in the specification regarding "VT(A)≦SN<VT(S)," wherein VT(A) and VT(S) are defined in the '059 Patent as follows:

> 1. Variable VT(S): represents a Sequence Number (SN) of a next Protocol Data Unit (PDU) to be transmitted for a first time (i.e. excluding retransmitted PDUs). The variable is updated after corresponding PDUs are transmitted. An initial value of the variable is 0.
>
> 2. Variable VT(A): represents an SN of a next expected acknowledged PDU, meaning the SN following an SN of a last in-sequence acknowledged PDU. The variable is updated after a status report unit showing the expected PDU had been positively acknowledged.

'059 Patent at 1:58–67.

The parties dispute whether "status report unit" encompasses Service Data Units ("SDUs"), and Plaintiffs cite the following disclosure:

> When transmitting signals, the second layer interface 306 stores a plurality of Service Data Units (SDUs) 308, which are submitted from the third layer interface 302, in a buffer 312. Then, the second layer interface 306 generates a plurality of Protocol Data Units (PDUs) 314 according to the SDUs 308 stored in the buffer 312, and outputs the PDUs 314 generated to a destination through the first layer interface 318.

'059 Patent at 3:61–66. This disclosure refers to Figure 3 of the '059 Patent, which is reproduced here:




Fig. 3

On balance, Defendants do not persuasively justify limiting the claim language to the disclosure involving Protocol Data Units ("PDUs"). Rather than referring to PDUs, the above-

reproduced claim refers to sequence numbers of packets. This is consistent with other disclosure in the specification:

> In accordance to the procedure 10, when a status report unit shows a negatively acknowledged SN [(Sequence Number]), the present invention detects whether the negatively acknowledged SN lies in a range of greater than or equal to an SN following an SN of a last in-sequence acknowledged packet of a transmitter and less than an SN of a next packet to be transmitted for the first time by the transmitter, meaning to detect whether the negatively acknowledged SN agrees with VT(A)≦SN<VT(S). The status report unit is determined to comprise an erroneous SN when disagreement occurs.

’059 Patent at 4:31–39.

Any remaining dispute regarding whether a particular implementation uses a “status report unit” is a factual dispute regarding infringement rather than a legal dispute for claim construction. *See PPG*, 156 F.3d at 1355 (“after the court has defined the claim with whatever specificity and precision is warranted by the language of the claim and the evidence bearing on the proper construction, the task of determining whether the construed claim reads on the accused product is for the finder of fact”); *see also Acumed*, 483 F.3d at 806 (“[t]he resolution of some line-drawing problems . . . is properly left to the trier of fact”) (citing *PPG*, 156 F.3d at 1355); *Eon*, 815 F.3d at 1318–19 (citing *PPG*, 156 F.3d at 1355; citing *Acumed*, 483 F.3d at 806).

Construction will be helpful, however, to assist the finder of fact in understanding that, as noted above, a “status report unit” is not a functional “unit” but rather is a unit of information and includes a sequence number.

The Court therefore hereby construes “status report unit” to mean **“a status report that includes a sequence number of a packet.”**

## VIII. CONCLUSION

The Court adopts the constructions set forth in this opinion for the disputed terms of the patent-in-suit. The parties are ordered that they may not refer, directly or indirectly, to each other’s

claim construction positions in the presence of the jury. Likewise, the parties are ordered to refrain from mentioning any portion of this opinion, other than the actual definitions adopted by the Court, in the presence of the jury. Any reference to claim construction proceedings is limited to informing the jury of the definitions adopted by the Court.

**SIGNED this 20th day of April, 2025.**

ROY S. PAYNE
UNITED STATES MAGISTRATE JUDGE

**APPENDIX A**

| Term | Parties' Agreement |
|---|---|
| "user equipment" Terms<br>('394 Patent, Claims 1, 5, 11, 15) | Plain and ordinary meaning |
| "Primary Cell" / "PCell"<br>('883 Patent, Claims 1, 7)<br><br>"Secondary Cell" / "SCell"<br>('883 Patent, Claims 1, 7) | Plain and ordinary meaning |
| "User Equipment (UE)" / "UE"<br>('489 Patent, Claims 1, 2, 11, 12, 14, 22; '559 Patent, Claim 1, 2, 3, 7, 8, 10, 11; '883 Patent) | Plain and ordinary meaning |

Dkt. No. 311 at 1; Dkt. No. 327 at 25 n.3; Dkt. No. 371, Ex. A at 4, 6 & 11; Dkt. No. 417, Ex. A at 4, 6, 11 & 12.