THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
MARSHALL DIVISION

| | | |
|---|---|---|
| ASUS TECHNOLOGY LICENSING INC. and CELERITY IP, LLC | § § § § | |
| v. | § § | CASE NO. 2:23-CV-486-JRG-RSP LEAD CASE |
| AT&T CORP., AT&T MOBILITY LLC, AT&T MOBILITY II LLC, and AT&T SERVICES, INC. | § § § § § | |

## CLAIM CONSTRUCTION ORDER

On May 15, 2025, the Court held a hearing to determine the proper construction of disputed terms in United States Patents No. 10,148,402, 10,798,754, 10,887,868, and 10,951,359. Before the Court is the Opening Claim Construction Brief (Dkt. No. 333) filed by Plaintiffs ASUS Technology Licensing Inc., Innovative Sonic Limited, and Celerity IP, LLC (collectively, "Plaintiffs" or "ATL"). Also before the Court are the Responsive Claim Construction Brief (Dkt. No. 366) filed by Defendants AT&T Corp., AT&T Mobility LLC, AT&T Mobility II LLC, and AT&T Services, Inc. (collectively, "Defendants" or "AT&T"), Plaintiffs' reply (Dkt. No. 373), the November 13, 2024 P.R. 4-3 Joint Claim Construction and Prehearing Statement (Dkt. No. 322), and the March 19, 2025 Patent Rule 4-5(d) Joint Claim Construction Chart (Dkt. No. 381).

Having reviewed the arguments made by the parties at the hearing and in their claim construction briefing, having considered the intrinsic evidence, and having made subsidiary factual findings about the extrinsic evidence, the Court hereby issues this Claim Construction Order. *See Phillips v. AWH Corp.*, 415 F.3d 1303, 1314 (Fed. Cir. 2005) (en banc); *Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 135 S. Ct. 831, 841 (2015).

Table of Contents

**I. BACKGROUND** ................................................................................................ **2**

**II. LEGAL PRINCIPLES** ...................................................................................... **4**

**III. AGREED TERMS** ........................................................................................... **7**

**IV. DISPUTED TERMS IN U.S. PATENT NO. 10,887,868** ................................. **7**

   1. "Medium Access Control (MAC) signaling" ...................................................... 7

**V. DISPUTED TERMS IN U.S. PATENT NO. 10,148,402** ................................. **12**

   2. "refined beam" .................................................................................................. 12

**VI. DISPUTED TERMS IN U.S. PATENT NO. 10,798,754** ............................... **18**

   3. "not allowed" .................................................................................................... 18

**VII. DISPUTED TERMS IN U.S. PATENT NO. 10,951,359** ............................... **21**

   4. "interval" ........................................................................................................... 21

   5. Order of Operations in Claims 1, 12, and 22 of the '359 Patent ....................... 24

   6. Claim 4 of the '359 Patent ................................................................................ 27

   7. "wherein the processor is configured to execute a program code stored in the memory to: transmit a signal . . . not allowing to transmit the signal . . ." ........................... 30

**VIII. CONCLUSION** ............................................................................................. **34**

**APPENDIX A** ......................................................................................................... **36**

## I. BACKGROUND

Plaintiffs allege infringement of United States Patents No. 10,148,402 ("the '402 Patent") (Dkt. No. 333, Ex. 2), 10,798,754 ("the '754 Patent") (*id.*, Ex. 3), 10,887,868 ("the '868 Patent") (*id.*, Ex. 1), and 10,951,359 ("the '359 Patent") (*id.*, Ex. 4) (collectively, the "patents-in-suit").

The '402 Patent, titled "Method and Apparatus for Beam Management in a Wireless Communication System," issued on December 4, 2018, and bears an earliest filing date of January 6, 2017.  The Abstract of the '402 Patent states:

> A method and apparatus are disclosed from the perspective of a base station. In one embodiment, the method includes the base station transmitting to a UE a control signal associated with a reference signal for beam measurement, wherein the

control signal includes a beam-related information for transmitting the reference signal for beam measurement. The method also includes the base station transmitting the reference signal for beam measurement to the UE.

The '754 Patent, titled "Method and Apparatus for Serving Quality of Service (QoS) Flow in a Wireless Communication System," issued on October 6, 2020, and bears an earliest filing date of July 24, 2017. The Abstract of the '754 Patent states:

> A method and apparatus are disclosed from the perspective of a network node. In one embodiment, the method includes the network node transmitting a first message with a DRB (Data Radio Bearer) configuration to a UE (User Equipment) for establishing a default DRB for a PDU (Packet Data Unit) session, wherein the DRB configuration includes a QFI (QoS Flow Id) configuration used to indicate whether a QFI field is present or not in uplink for the default DRB and the QFI configuration is always set to a value indicating the QFI field is present in uplink for the default DRB. The method further includes the network node establishing the default DRB with a presence of the QFI field in uplink. The method also includes the network node receiving a SDAP (Service Data Adaptation Protocol) PDU with the QFI field via the default DRB from the UE.

The '868 Patent, titled "Method and Apparatus for Transmission or Reception Using Beamforming in a Wireless Communication System," issued on January 5, 2021, and bears an earliest filing date of July 22, 2016. The Abstract of the '868 Patent states:

> Methods and apparatuses for transmission or reception using beamforming in a wireless communication system are disclosed herein. In one method, a user equipment receives a second signal indicating a first information. The UE derives at least one specific UE beam based on the first information. The UE uses the at least one specific UE beam to receive or transmit at least one transmission, in which the at least one transmission is periodic channel state indication, scheduling request, and/or scheduling information for downlink assignment or uplink resource.

The '359 Patent, titled "Method and Apparatus for Providing Control Resource Set Configuration in a Wireless Communication System," issued on March 16, 2021, and bears an earliest filing date of January 18, 2018. The Abstract of the '359 Patent states:

> Methods and apparatuses for providing control resource set configuration in a wireless communication system are disclosed herein. In one method, a network node transmits a signal indicating at least a first duration and a bit map, wherein the first duration is time duration of a control resource set (CORESET) and the bit map

indicates first symbol(s) of monitoring occasion(s) of the CORESET within a slot, and wherein a set of bit position indicates value one in the bit map. The network node is not allowed to transmit the signal such that an interval between two bit positions in the set in the bit map is smaller than a second duration.

Shortly before the start of the May 15, 2025 hearing, the Court provided the parties with preliminary constructions with the aim of focusing the parties' arguments and facilitating discussion. Those preliminary constructions are noted below within the discussion for each term.

## II. LEGAL PRINCIPLES

"It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Phillips*, 415 F.3d at 1312 (quoting *Innova/Pure Water Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)). Claim construction is clearly an issue of law for the court to decide. *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 970–71 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370 (1996). "In some cases, however, the district court will need to look beyond the patent's intrinsic evidence and to consult extrinsic evidence in order to understand, for example, the background science or the meaning of a term in the relevant art during the relevant time period." *Teva*, 135 S. Ct. at 841 (citation omitted). "In cases where those subsidiary facts are in dispute, courts will need to make subsidiary factual findings about that extrinsic evidence. These are the 'evidentiary underpinnings' of claim construction that we discussed in *Markman*, and this subsidiary factfinding must be reviewed for clear error on appeal." *Id.* (citing 517 U.S. 370).

To determine the meaning of the claims, courts start by considering the intrinsic evidence. *See Phillips*, 415 F.3d at 1313; *see also C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 861 (Fed. Cir. 2004); *Bell Atl. Network Servs., Inc. v. Covad Commc'ns Group, Inc.*, 262 F.3d 1258, 1267 (Fed. Cir. 2001). The intrinsic evidence includes the claims themselves, the specification, and the prosecution history. *See Phillips*, 415 F.3d at 1314; *C.R. Bard*, 388 F.3d at 861. Courts

- 4 -

give claim terms their ordinary and accustomed meaning as understood by one of ordinary skill in the art at the time of the invention in the context of the entire patent. *Phillips*, 415 F.3d at 1312–13; *accord Alloc, Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361, 1368 (Fed. Cir. 2003).

The claims themselves provide substantial guidance in determining the meaning of particular claim terms. *Phillips*, 415 F.3d at 1314. First, a term's context in the asserted claim can be very instructive. *Id.* Other asserted or unasserted claims can aid in determining the claim's meaning because claim terms are typically used consistently throughout the patent. *Id.* Differences among the claim terms can also assist in understanding a term's meaning. *Id.* For example, when a dependent claim adds a limitation to an independent claim, it is presumed that the independent claim does not include the limitation. *Id.* at 1314–15.

"[C]laims 'must be read in view of the specification, of which they are a part.'" *Id.* at 1315 (quoting *Markman*, 52 F.3d at 979). "[T]he specification 'is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term.'" *Phillips*, 415 F.3d at 1315 (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)); *accord Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002). This is true because a patentee may define his own terms, give a claim term a different meaning than the term would otherwise possess, or disclaim or disavow the claim scope. *Phillips*, 415 F.3d at 1316. In these situations, the inventor's lexicography governs. *Id.* The specification may also resolve the meaning of ambiguous claim terms "where the ordinary and accustomed meaning of the words used in the claims lack sufficient clarity to permit the scope of the claim to be ascertained from the words alone." *Teleflex*, 299 F.3d at 1325. But, "[a]lthough the specification may aid the court in interpreting the meaning of disputed claim language, particular embodiments and examples appearing in the specification will not generally be read into

the claims." *Comark Commc'ns, Inc. v. Harris Corp.*, 156 F.3d 1182, 1187 (Fed. Cir. 1998) (quoting *Constant v. Advanced Micro-Devices, Inc.*, 848 F.2d 1560, 1571 (Fed. Cir. 1988)); *accord Phillips*, 415 F.3d at 1323.

The prosecution history is another tool to supply the proper context for claim construction because a patent applicant may also define a term in prosecuting the patent. *Home Diagnostics, Inc. v. Lifescan, Inc.*, 381 F.3d 1352, 1356 (Fed. Cir. 2004) ("As in the case of the specification, a patent applicant may define a term in prosecuting a patent."). "[T]he prosecution history (or file wrapper) limits the interpretation of claims so as to exclude any interpretation that may have been disclaimed or disavowed during prosecution in order to obtain claim allowance." *Standard Oil Co. v. Am. Cyanamid Co.*, 774 F.2d 448, 452 (Fed. Cir. 1985).

Although extrinsic evidence can be useful, it is "less significant than the intrinsic record in determining the legally operative meaning of claim language." *Phillips*, 415 F.3d at 1317 (citations and internal quotation marks omitted). Technical dictionaries and treatises may help a court understand the underlying technology and the manner in which one skilled in the art might use claim terms, but technical dictionaries and treatises may provide definitions that are too broad or may not be indicative of how the term is used in the patent. *Id.* at 1318. Similarly, expert testimony may aid a court in understanding the underlying technology and determining the particular meaning of a term in the pertinent field, but an expert's conclusory, unsupported assertions as to a term's definition are entirely unhelpful to a court. *Id.* Generally, extrinsic evidence is "less reliable than the patent and its prosecution history in determining how to read claim terms." *Id.*

The Supreme Court of the United States has "read [35 U.S.C.] § 112, ¶ 2 to require that a patent's claims, viewed in light of the specification and prosecution history, inform those skilled

in the art about the scope of the invention with reasonable certainty." *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2129 (2014). "A determination of claim indefiniteness is a legal conclusion that is drawn from the court's performance of its duty as the construer of patent claims." *Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1347 (Fed. Cir. 2005) (citations and internal quotation marks omitted), *abrogated on other grounds by Nautilus,* 134 S. Ct. 2120. "Indefiniteness must be proven by clear and convincing evidence." *Sonix Tech. Co. v. Publ'ns Int'l, Ltd.*, 844 F.3d 1370, 1377 (Fed. Cir. 2017).

### III.  AGREED TERMS

The parties reached agreement on constructions as stated in their March 19, 2025 P.R. 4-5(d) Joint Claim Construction Chart (Dkt. No. 381, Ex. A). Those agreements are set forth in Appendix A to the present Claim Construction Order.

### IV.  DISPUTED TERMS IN U.S. PATENT NO. 10,887,868

**1. "Medium Access Control (MAC) signaling"**

| "Medium Access Control (MAC) signaling"<br>('868 Patent, Claims 5, 13) | |
| --- | --- |
| **Plaintiffs' Proposed Construction** | **Defendants' Proposed Construction** |
| No further construction necessary | "Medium Access Control (MAC) signal not transmitted via a physical signal" |

Dkt. No. 322, Ex. A3 at 4; Dkt. No. 333 at 1; Dkt. No. 381, Ex. A at 2–3.

Shortly before the start of the May 15, 2025 hearing, the Court provided the parties with the following preliminary construction: "signaling that originates at a Medium Access Control (MAC) layer."

(a)  The Parties' Positions

Plaintiffs argue: "The claim language requires that the 'first signal' be a MAC-layer signal; no further construction is necessary, as the claim language itself clearly indicates what type of message must be used.  The claim is referring to a message *originating* at the MAC layer, and excludes the 'physical signals' *originating* at the PHY layer such as reference signals."  Dkt. No. 333 at 3 (emphasis added).  Plaintiffs urge that "there is no support for Defendants' reading that would exclude the only known implementation of transmitting MAC signals to a user equipment at the time of the invention (i.e., via transmission on physical channels implemented at the PHY layer)."  *Id.* at 6.  Plaintiffs submit that "a MAC signal is by definition different from a physical signal, but nonetheless relies on the PHY (physical) layer to transmit the information it contains." *Id.* at 7.

Defendants respond that, during prosecution, the patentee relied on the distinction between a "MAC signal" and a "physical signal" to overcome prior art.  Dkt. No. 366 at 1–6.  Defendants argue that "Plaintiffs should not be permitted to narrow the scope of their disclaimer now."  *Id.* at 6 (citations omitted).

Plaintiffs reply that "Defendants do not dispute that their proposed construction of 'Medium Access Control (MAC) signaling' would exclude the only known implementation of transmitting MAC signals to user equipment at the time of invention (via transmission on physical channels implemented at the PHY layer)," and "Defendants completely ignore their positions in their IPR petition on the '868 Patent."  Dkt. No. 373 at 1.

At the May 15, 2025 hearing, Plaintiffs agreed with the Court's preliminary construction, and the parties presented no oral arguments on this term and instead rested on their briefing.

(b)  Analysis

As a threshold matter, Plaintiffs cite Defendants' statements in *Inter Partes* Review ("IPR") proceedings (*see* Dkt. No. 333 at 4; *see also* Dkt. No. 373 at 1), but the cited IPR proceedings do not significantly affect the Court's claim construction analysis.

Claim 5 of the '868 Patent, for example, recites (emphasis added):

> 5. A method of a network node for transmission or reception using beamforming, the method comprising:
>> selecting a network beam;
>> transmitting a first signal to a user equipment (UE) to indicate a first information associated with the network beam for the UE to derive, based on a beam reference signal of the network beam, a UE beam used to transmit a periodic Channel State Information (CSI) and to transmit a scheduling request, wherein the first signal is a *Medium Access Control (MAC) signaling*; and
>> using the network beam, mapped to the UE beam, to receive the periodic CSI and to receive the scheduling request.

The specification discloses:

> The indication of the special UE or network beam(s) and a configuration related to transmissions via pre-allocated radio resources may be provided via *different signaling*, e.g. to save signaling overhead because the configuration does not need to be changed frequently. *The indication could be carried by Medium Access Control (MAC) or Physical (PHY) signaling.* The configuration could be carried by a Radio Resource Control (RRC) message. The configuration could be used to indicate or be used by the UE to determine the radio resources, transmission timing, frequency resources, and/or periodicity for the transmission. The configuration could be used to indicate information for the UE to determine which UE beam(s) to be used to receive or transmit the transmission associated with the configuration, e.g. whether to use special UE beam(s) or all of the UE beam candidates for the transmission.

'868 Patent at 12:66–13:14 (emphasis added).

The patentee added the disputed term by amendment during prosecution, and Defendants argue that when doing so, while distinguished the "Li" reference (U.S. Patent Publication No. 2013/0286960), the patentee definitively stating that a MAC signal is not a physical signal.  The patentee stated:

According to Paragraph [0137] of Li, FIG. 14 illustrates a process for a BS changing the beam width for data control channel. Paragraph [0140] of Li further describes the BS decides which one or multiple data control beams to include the information (e.g. the resource allocation information) for a UE, and Paragraph [0141] of Li states that the BS sends to the UE information that includes the TX beams to be used. Besides, according to Paragraph [0155] of Li, the data control channel could be a physical downlink channel (i.e. PDCCH), *which means that the information is transmitted via a physical signal*. Therefore, *Li does not disclose the claimed MAC signaling* to indicate the first information for deriving the at least one specific UE beam recited in claims 1, 8, 14, and 21.

Dkt. No. 333, Ex. 12, Feb. 28, 2019 Amendment at 7 (emphasis modified); *see id.* at 2–5 (amending claims).

In its reply brief, Plaintiffs submit: "It is irrelevant (and undisputed) that MAC signals are different from physical signals[;] the heart of the parties' dispute is whether MAC signals are *transmitted* via the physical layer." Dkt. No. 373 at 2.

Plaintiffs present evidence that the physical layer provides data transfer for the MAC layer. *See* Dkt. No. 333, Ex. 5, "*LTE; Evolved Universal Terrestrial Radio Access (E-UTRA); Medium Access Control (MAC) protocol specification (3GPP TS 36.321 version 13.0.0 Release 13)*" at 13 ("The physical layer provides the following services to MAC: - data transfer services; * * *"; "The access to the data transfer services is through the use of transport channels."). The '868 Patent incorporates by reference this technical standard TS 36.321 V13.0.0. *See* '868 Patent at 2:57–3:11.

An industry specification for the physical layer, in turn, discusses using physical channels to convey information for higher layers. *See, e.g., id.,* Ex. 6, "*LTE; Evolved Universal Terrestrial Radio Access (E-UTRA); Physical channels and modulation (3GPP TS 36.211 version 13.0.0 Release 13)*" at 61 ("A downlink physical channel corresponds to a set of resource elements carrying information originating from higher layers . . . ."). Also, the physical layer may itself generate signals, for example a "reference signal," and such signals do not carry information for

higher layers such as the MAC layer. *Id.* ("A downlink physical signal corresponds to a set of resource elements used by the physical layer but does not carry information originating from higher layers.").

This evidence demonstrates that information can originate within the physical layer (for signaling) or can originate in higher layers (such as the MAC layer). This is also discussed in an "Overall description" technical document for E-UTRAN:

> The physical layer offers information transfer services to MAC and higher layers. The physical layer transport services are described by *how* and with what characteristics data are transferred over the radio interface. An adequate term for this is "Transport Channel".
>
> NOTE: This should be clearly separated from the classification of what is transported, which relates to the concept of logical channels at MAC sublayer.

*Id.*, Ex. 7, "*LTE; Evolved Universal Terrestrial Radio Access (E-UTRA) and Evolved Universal Terrestrial Radio Access Network (E-UTRAN); Overall description; Stage 2 (3GPP TS 36.300 version 14.2.0 Release 14)*" at 66.

Defendants object to Plaintiffs' citation of these specifications, arguing that Plaintiffs failed to timely disclose them in the P.R. 4-3 Joint Claim Construction and Prehearing Statement. Dkt. No. 366 at 5. Defendants have not moved to strike this evidence but, in any event, the incorporation by reference of TS 36.321 V13.0.0 (*see* '868 Patent at 2:57–3:11) weighs in favor of considering this evidence because it is intrinsic evidence. Even if these specifications were set aside, Defendants' own expert acknowledged during deposition that the way MAC messages are transmitted from a base station to a UE is by being carried through a physical layer. Dkt. No. 366, Ex. 5, Nov. 26, 2024 Hansen dep. at 58:11–24; *see id.* at 48:19–49:11.

In this context, the above-reproduced prosecution history shows merely that the patentee distinguished between using "MAC signaling" and using a "physical signal." Defendants do not

persuasively demonstrate any disclaimer of using a physical signal to convey a MAC signal. Defendants' discussion of the disclosures in the Li reference (*see* Dkt. No. 366 at 3–4) are unpersuasive, particularly when considering that the primary focus of a disclaimer analysis is not the disclosure of the cited reference but rather what the patentee definitely stated about the claims (or about the cited reference in relation to the claims). *See Omega Eng'g Inc. v. Raytek Corp.*, 334 F.3d 1314, 1324 (Fed. Cir. 2003) ("As a basic principle of claim interpretation, prosecution disclaimer promotes the public notice function of the intrinsic evidence and protects the public's reliance on definitive statements made during prosecution.") (citation omitted).

In sum, the patentee distinguished between MAC signals and physical signals, but Defendants' proposed construction—"Medium Access Control (MAC) signal not transmitted via a physical signal"—is too narrow. Rather, the distinction drawn by the patentee, as reinforced by the above-discussed evidence, is between signals *originating at* the MAC layer and signals *originating at* the physical layer.

The Court therefore hereby construes "Medium Access Control (MAC) signaling" to mean **"signaling that originates at a Medium Access Control (MAC) layer."**

## V. DISPUTED TERMS IN U.S. PATENT NO. 10,148,402

**2. "refined beam"**

| "refined beam" ('402 Patent, Claims 3, 14) | |
| --- | --- |
| **Plaintiffs' Proposed Construction** | **Defendants' Proposed Construction** |
| No further construction necessary. Not indefinite. | Indefinite |

Dkt. No. 322, Ex. A1 at 1; Dkt. No. 333 at 7; Dkt. No. 381, Ex. A at 4.

Shortly before the start of the May 15, 2025 hearing, the Court provided the parties with the following preliminary construction: "Plain meaning [not indefinite]."

(a)  The Parties' Positions

Plaintiffs argue: "'[R]efined beam' is a definite term because the claim language and the '402 patent specification describe a 'refined beam' as a beam that has been adjusted to improve beam quality.  In the context of the dependent claims, the first beam indicated by the beam-related information transmitted as part of the control signal would be the 'refined beam.'"  Dkt. No. 333 at 7.  Plaintiffs also argue that "[t]he fact that there are multiple ways of refining a beam does not make the claim indefinite."  *Id.* at 10.

Defendants respond that "[t]he term 'refined beam' in claims 3 and 14 of the '402 patent fails to particularly point out and distinctly claim subject matter as required under Section 112" because "there are several potential interpretations of the term 'refined beam'" and "the potential interpretations of 'refined beam' are not coextensive; if one applies, the others do not."  Dkt. No. 366 at 7 (citations omitted).

Plaintiffs reply that "Defendants do not dispute that the refinement is a species of beam adjustment," and "[a] POSA would understand that a 'refined beam' is a beam that has been adjusted to improve beam quality."  Dkt. No. 373 at 3.  Plaintiffs submit that the specification, as well as extrinsic evidence, clarify what makes a beam a "refined beam."  *Id.*

At the May 15, 2025 hearing, Plaintiffs agreed with the Court's preliminary construction. Defendants expounded upon their reliance on *Halliburton*, cited in their brief, arguing that the boundaries of "refined" are too vague.  *See Halliburton Energy Servs., Inc. v. M-I LLC*, 514 F.3d 1244, 1251 (Fed. Cir. 2008).  Alternatively, Defendants argued that the ordinary meaning of "refine" is to distill or reduce, and Defendants argued that refining a first beam could include

changing direction but must nonetheless be narrower than, and confined within, the first beam. Plaintiffs responded that narrowing a beam is just one possibility.

(b)  Analysis

As a threshold matter, Plaintiffs note that Defendants did not argue indefiniteness in their IPR petition as to the '402 Patent, but an IPR petition cannot assert indefiniteness.  *See* 35 U.S.C. § 311(b); *see also Cuozzo Speed Tech., LLC v. Lee*, 136 S. Ct. 2131, 2141–42 (2016); *Samsung Elecs. Am., Inc. v. Prisua Eng'g Corp.*, 948 F.3d 1342, 1355 (Fed. Cir. 2020).

This disputed term appears for example in Claim 3 of the '402 Patent, which depends from Claim 1.  Claims 1 and 3 recite (emphasis added):

> 1. A method of a base station, comprising:
> the base station transmits to a UE a control signal associated with a reference signal for beam measurement, wherein the control signal triggers aperiodical transmission of the reference signal for beam measurement, and wherein the control signal includes a *beam-related information* for transmitting the reference signal for beam measurement and indicates how many symbols are used to carry the reference signal for beam measurement; and
> the base station transmits the reference signal for beam measurement to the UE.
>
> * * *
>
> 3. The method of claim 1, wherein the beam-related information indicates *a first beam*, and wherein the reference signal for beam measurement is transmitted on at least *a refined beam of the first beam*.

The specification discloses:

> [T]he direction of base station beam(s) used to transmit the aperiodic beam reference signal may be different from the direction of base station beam(s) used to transmit the periodic beam reference signal. For example, the direction of base station beam(s) used to transmit the aperiodic beam reference signal could be slightly adjusted compared to the periodic one so that the beam quality could be improved, *refined*, or fine-tuned (e.g., if UE location is not on the same direction of a beam used to carry periodic beam reference signal).
>
> * * *

- 14 -

From the perspective of the base station, it is also possible that the base station detects only some beam(s) or some TRP(s) among the beams within the base station beam set of the UE would require *refinement* or adjustment. When the base station transmits the beam reference signal on the beam(s) or the TRP(s), the UE may not be able to decide what is the correct UE beam to perform the beam measurement for beam adjustment or *refinement*.

A first general concept of this invention is that when a UE requests beam *refinement* or adjustment, the UE would indicate which beam(s) or beam(s) from which TRP(s) would require beam *refinement*/adjustment associated with the request. An example of requesting beam *refinement* or adjustment would be to request beam reference signal.

A general second concept of this invention is that when a base station triggers beam *refinement* or adjustment for a UE, the base station would indicate that beam *refinement* or adjustment is performed on which beam(s) or beam(s) from which TRP(s) associated with the trigger. An example of triggering beam *refinement* or adjustment for a UE would be to send an aperiodic trigger for beam reference signal to the UE.

'402 Patent at 7:15–24 & 8:5–28 (emphasis added).

The specification discloses refinement by, for example, adjusting beam direction. *See id.* at 7:15–24; *see also id.* at 7:44–55. The specification discusses "beamforming." *See id.* at 5:26–60. Defendants' expert acknowledged during deposition that, "yes, I believe changing a direction could be one type of beam refinement." Dkt. No. 366, Ex. 5, Nov. 26, 2024 Hansen dep. at 31:21–32:1. Also, as Plaintiffs emphasize, the claims expressly recite the beam that is refined, namely the "first beam."

Defendants' expert opines that the claim is unclear because there are multiple possible refinements:

There are various potential interpretations of the claimed "refined beam," and the '402 Patent does not provide any guidance as to which interpretation applies. For example, one interpretation would be that the "refined beam" must be narrower than the claimed "first beam" and entirely confined within the same spatial domain as the "first beam." Another interpretation would be that the "refined beam" must be narrower than the "first beam" and has at least some overlap with the "first beam" in the spatial domain, but that it need not be entirely confined to the same spatial domain, as in the first example. A further interpretation might ignore the

relative size of the "refined beam" and consider only whether it shares spatial overlap with the "first beam." Still another interpretation might consider only that the "refined beam" is spatially different in any way at all from the "first beam." Without guidance as to which of these scenarios constitutes a "refined beam," and which does not, a POSITA cannot understand the scope of dependent claims 3 and 14.

Dkt. No. 333, Ex. 14, Nov. 13, 2025 Hansen Decl. ¶ 68.

This suggestion that there are multiple possible refinements does not give rise to any indefiniteness because "[b]readth is not indefiniteness." *BASF Corp. v. Johnson Matthey Inc.*, 875 F.3d 1360, 1367 (Fed. Cir. 2017). Rather, Defendants' expert's opinions tend to reinforce that techniques for refining a beam were already known in the art and therefore did not need to be described in the patent. *See Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*, 875 F.3d 1369, 1376 (Fed. Cir. 2017) ("A patent need not explicitly include information that is already well known in the art") (citations omitted).

Also, Defendants argue that Plaintiffs' interpretation renders Claims 3 and 14 duplicative of Claims 2 and 13, respectively, but Plaintiffs persuasively reply that "[w]hile the reference signal in claims 2 and 13 is transmitted on the same beam that is indicated by the beam-related information, the reference signal in claims 3 and 14 is transmitted on a refined, or adjusted, version of the indicated beam." Dkt. No. 373 at 4–5.

Further, Defendants point to the disclosure that "the beam quality could be improved, refined, or fine-tuned" ('402 Patent at 7:15–24), arguing that the patent fails to distinguish between each of "improved," "refined," and "fine-tuned," and, Defendants argue, the scope of "refined" is therefore unclear. *See Manual of Patent Examining Procedure* § 2173.04 (Oct. 2019) ("For example, a genus claim that covers multiple species is broad, but is not indefinite because of its breadth, which is otherwise clear. But a genus claim that could be interpreted in such a way that it is not clear which species are covered would be indefinite (e.g., because there is more than one

reasonable interpretation of what species are included in the claim)."); *see also STX Inc. v. Brine Inc.*, 37 F. Supp. 2d 740, 754–56 (D. Md. 1999), *aff'd*, 211 F.3d 588, 54 USPQ2d 1347 (Fed. Cir. 2000) (specification did not "teach[] one skilled in the art how to avoid the trap of infringement in respect to a claim limitation providing an 'improved' invention") (citation omitted).

Plaintiffs persuasively argue, however, that the patentee used all three of "improved," "fine-tuned," and "refined" to describe the same types of adjustments.  Dkt. No. 373 at 3–4.

Finally, Defendants urge that indefiniteness has been established because the indefiniteness opinion of their expert has not been rebutted by any expert for Plaintiffs, and Defendants cite authority.  *See Berkheimer v. HP Inc.*, 881 F.3d 1360, 1364 (Fed. Cir. 2018) (upholding a district court's indefiniteness finding where the patent holder did not rebut defendant's expert testimony that the disputed claim term failed to provide reasonable certainty as to the boundaries of the claim).  Defendants do not persuasively demonstrate, however, that a patent holder must present a competing expert opinion or else suffer a finding of indefiniteness.  The burden of persuasion is on the challenger, not the patentee, and Defendants have not shown that this burden can be shifted or that the presumption of validity should be set aside.  *See Sonix*, 844 F.3d at 1377 ("Indefiniteness must be proven by clear and convincing evidence."); *see also* 35 U.S.C. § 282.

The Court therefore hereby expressly rejects Defendants' indefiniteness argument. Although Plaintiffs proposed in their briefing that no construction is necessary, "some construction of the disputed claim language will assist the jury to understand the claims." *TQP Dev., LLC v. Merrill Lynch & Co.*, No. 2:08-CV-471-WCB, 2012 WL 1940849, at *2 (E.D. Tex. May 29, 2012) (Bryson, J., sitting by designation).  At the May 15, 2025 hearing, Plaintiffs proposed referring to "adjusting" the beam, which is supported by the specification.  *See* '402 Patent at 8:5–28 (reproduced above).

The Court therefore hereby construes "refined beam" to mean **"adjusted beam."**

## VI. DISPUTED TERMS IN U.S. PATENT NO. 10,798,754

### 3. "not allowed"

| "not allowed" ('754 Patent, Claims 2, 7) | |
|---|---|
| **Plaintiffs' Proposed Construction** | **Defendants' Proposed Construction** |
| No further construction necessary. Not indefinite. | Indefinite |

Dkt. No. 322, Ex. A2 at 3; Dkt. No. 333 at 13; Dkt. No. 381, Ex. A at 7–8.

Shortly before the start of the May 15, 2025 hearing, the Court provided the parties with the following preliminary construction: "Plain meaning [not indefinite]."

(a)  The Parties' Positions

Plaintiffs argue that "[a] POSA reading the claims alone would understand that 'not allowed' mean[s] exactly what it says: the network node, after transmitting a first RRC message to the UE with a QFI configuration indicating QFI field is present, may not send subsequent RRC message that reconfigures the QFI configuration to 'no presence' of the QFI field." Dkt. No. 333 at 13.

Defendants respond that these dependent claims are indefinite because they are nonsensical when read together with the claim from which they depend. Dkt. No. 366 at 12; *see id.* at 11–13. Alternatively, Defendants argue that, under Plaintiffs' interpretation, these dependent claims are indefinite because of failure to add anything to the claim from which they depend. *Id.* at 13.

Plaintiffs reply that a person of skill in the art reading the claims would know exactly what a network node is or is not allowed to do, and Plaintiffs argue that the dependent claims are not superfluous because Defendants are misreading the independent claims. Dkt. No. 373 at 5–6.

At the May 15, 2025 hearing, Plaintiffs agreed with the Court's preliminary construction, and the parties presented no oral arguments on this term and instead rested on their briefing.

(b)  Analysis

As a threshold matter, Plaintiffs note that Defendants did not argue indefiniteness in their IPR petition as to the '754 Patent, but an IPR petition cannot assert indefiniteness.  *See* 35 U.S.C. § 311(b); *see also Cuozzo Speed Tech., LLC v. Lee*, 136 S. Ct. 2131, 2141–42 (2016); *Samsung Elecs. Am., Inc. v. Prisua Eng'g Corp.*, 948 F.3d 1342, 1355 (Fed. Cir. 2020).

The disputed term appears in Claims 2 and 7 of the '754 Patent.  Claim 2 depends from Claim 1, and Claim 7 depends from Claim 6.  Claim 7 recites the same additional limitation that is recited in Claim 2.  The specification discloses:

> The UE [(User Equipment)] may initiate the default DRB [(Data Radio Bearer)] when receiving a DRB configuration (e.g. included in a RRC [(Radio Resource Control)] message) from the gNB.  The DRB configuration may include a *QFI* [(QoS Flow ID)] *configuration*.
>
> * * *
>
> In principle, the gNB would not reconfigure no presence of QFI for the default DRB if the gNB cannot make sure no further new QoS flows will be initiated by the UE.  In this situation, QFI for the default DRB is always present.

'754 Patent at 25:17–21 & 25:39–42 (emphasis added).  Claims 1 and 2, for example, recite (emphasis added):

> 1. A method of a network node, comprising:
>     *transmitting a first RRC (Radio Resource Control) message* with a DRB (Data Radio Bearer) configuration to a UE (User Equipment) for establishing a default DRB for a PDU (Protocol Data Unit) session, wherein the DRB configuration includes a *QFI (QoS Flow Id) configuration* used to indicate whether a QFI field is present or not in uplink for the default DRB and the QFI configuration is *always set to a value indicating the QFI field is present* in uplink for the default DRB;
>         establishing the default DRB with a presence of the QFI field in uplink; and receiving a SDAP (Service Data Adaptation Protocol) PDU with the QFI field via the default DRB from the UE.

2. The method of claim 1, wherein the network node is *not allowed* to transmit a second RRC message to the UE *for reconfiguring the QFI configuration* for the default DRB to no presence of the QFI field.

Defendants argue that the limitation in Claim 2 regarding a message "to the UE *for reconfiguring* the QFI configuration" is nonsensical because Claim 1 recites that the QFI configuration is set by the network node, not the UE.  Dkt. No. 366 at 12.

Defendants' apparent reading of "for reconfiguring" as referring to configuration being determined by the UE rather than by the network node (and therefore being inconsistent with Claim 1) is an overly narrow reading of "for reconfiguring."  A fair reading is that "to the UE for reconfiguring" encompasses a configuration determined by the network node that is then merely implemented by the UE.

Defendants also point to the recital in Claim 1 of "always set to a value indicating the QFI field is present," and Defendants cite authority that where a dependent claim merely "recites limitations already required by [the independent] claim" rather than "specifying a further limitation beyond those incorporated in [the independent claim]," the dependent claim should be found invalid under 35 U.S.C. § 112.  *Hitkansut LLC v. U.S.*, 119 Fed. Cl. 258, 268 (2014).  The recitals of "not allowed to *transmit*" in the dependent claims, however, are distinct from the recitals of what is "*set*" in the independent claims, particularly when considering that the dependent claims refer to a "second RRC message" (rather than the "first" RRC message recited in the independent claims).  Defendants have not overcome the presumption of validity.

The Court therefore hereby expressly rejects Defendants' indefiniteness argument. Defendants present no alternative proposed construction, and no further construction is necessary.

The Court accordingly hereby construes "not allowed" to have its **plain meaning**.

## VII.  DISPUTED TERMS IN U.S. PATENT NO. 10,951,359

**4.  "interval"**

<table>
<tr><td colspan="2" align="center"><strong>"interval"</strong><br>('359 Patent, Claims 1, 12, 22)</td></tr>
<tr><td><strong>Plaintiffs' Proposed Construction</strong></td><td><strong>Defendants' Proposed Construction</strong></td></tr>
<tr><td>"distance between two bit positions"</td><td>"the difference between two bit positions or the number of bits between two bit positions"</td></tr>
</table>

Dkt. No. 322, Ex. A4 at 5; Dkt. No. 333 at 14; Dkt. No. 381, Ex. A at 10.

Shortly before the start of the May 15, 2025 hearing, the Court provided the parties with the following preliminary construction: "distance."

(a)  The Parties' Positions

Plaintiffs argue that "[t]he '359 Patent specification expressly teaches that 'interval' refers to a 'distance between two bit position [*sic*, positions],' and frequently uses the terms 'interval' and 'distance' interchangeably."  Dkt. No. 333 at 14–15 (citations omitted).  Plaintiffs also argue that "the patentee included one specific method of implementing an 'interval' in dependent claims but omitted the specific method in the independent claims . . . ."  *Id.* at 16.  Further, Plaintiffs argue that Defendants' reliance on purportedly narrower disclosure in the provisional patent application does not warrant a narrow construction.  *Id.* at 17 (citation omitted).

Defendants respond that "Plaintiffs' proposed construction is completely unhelpful," and "Plaintiffs' construction ignores the express definitional statements in the specification and appears to create unresolvable problems for the dependent claims."  Dkt. No. 366 at 15–16; *see id.* at 16–17.

Plaintiffs reply that their proposal tracks the specification.  Dkt. No. 373 at 6.  Plaintiffs argue that "[i]nstead of using the 'distance between two bit positions' definition from the '359

Patent specification, Defendants argue that the Court should adopt two definitions taken from exemplary embodiments in the specification: the difference between two bit positions or the number of bits between two bit positions," which Plaintiffs argue "is an attempt to limit the claims to examples in the specification, which should be rejected." *Id.* at 7 (citation omitted). Plaintiffs also argue that "Plaintiffs' proposed construction does not conflict with any dependent claims." *Id.*

At the May 15, 2025 hearing, Plaintiffs agreed with the Court's preliminary construction, and the parties discussed this term as set forth herein.

(b)  Analysis

Claims 1, 9, and 10 of the '359 Patent, for example, recites (emphasis added):

1. A method of a network node, the method comprising:
    transmitting a signal indicating at least a first duration and a bit map,
    wherein the first duration is time duration of a control resource set (CORESET), and
    wherein the bit map includes a set of bit positions, where each bit position has a value of one or zero and each bit position with the value of one indicates a starting Orthogonal Frequency Division Multiplexing (OFDM) symbol of a monitoring occasion of the CORESET within a slot; and
    not allowing to transmit the signal such that an *interval between any two bit positions* with the value of one in the set of bit positions in the bit map is smaller than the first duration.

* * *

9. The method of claim 1, wherein the *interval* is the difference between two bit positions.

10. The method of claim 1, wherein the *interval* is number of bits between two bit positions.

The specification discloses:

The interval (or distance) between each bit position (indicating value one) in the set (or bitmap) is larger than or equal to a number. The *interval (or distance) between two bit positions* indicating the value one in the bit map is larger than or equal to a number. The interval (or distance) between two neighboring bit positions indicating

value one in the set is larger than or equal to a number. The interval (or distance) between two neighboring bit positions indicating value one in the set is larger than or equal to a number. Two neighboring bit positions indicating the value one could be the two closest bit positions indicating value 1. An interval or distance between two bit positions could be a number of bits between the two bit positions. The two bit positions could be neglected when calculating the interval or distance. For example, an interval or distance between two bit positions indicating value 1 for a bitmap "10001000000000" is 3. *Alternatively, an interval or distance between two bit positions could be difference of the two bit positions.*

\* \* \*

The UE does not expect to receive a configuration of a bit map such that the interval (or distance) between the two bit positions indicating value one in the bit map is smaller than the number (e.g., the bit map is 11000000000000). The UE could ignore a configuration of the bit map such that the interval (or distance) between two bit positions indicating value one in the bit map is smaller than the number (e.g., the bit map is 11000000000000 when the number is 1).

'359 Patent at 16:34–49 & 16:58–17:3; *see id.* at 19:63–20:7 ("In this example, the bit locations with too short interval/distance are excluded. . . . In [another] example, one (the latter one) of the two bit locations with too short interval/distance are excluded."); *see also id.* at 20:49–55 ("For bit locations corresponding to short interval or distance . . . .").

Plaintiffs also submit that United States Provisional Patent Application No. 62/619,041, to which the '359 Patent claims priority, uses "interval" and "distance" interchangeably. *See* Dkt. No. 333, Ex. 18 at 28 ("Interval (or distance) between two bit positions . . . . \* \* \*"). The '359 Patent incorporates-by-reference the provisional in its entirety. '359 Patent at 1:9–12.

At the May 15, 2025 hearing, Plaintiffs agreed that Defendants' proposed construction reflects the proper claim scope, to wit, that there are two ways to measure an "interval" in the '359 Patent. The parties disputed only whether Defendants' proposed construction would be helpful to the finder of fact. On balance, Defendants' proposal is supported by the above-cited disclosures and will assist the finder of fact. To whatever extent the parties have any remaining dispute regarding whether the '359 Patent can properly claim priority to a provisional application

- 23 -

(discussed during the May 15, 2025 hearing), any such priority date dispute is not a matter for claim construction.

The Court therefore hereby construes "interval" to mean **"the difference between two bit positions or the number of bits between two bit positions."**

### 5.  Order of Operations in Claims 1, 12, and 22 of the '359 Patent

| Plaintiffs' Proposed Construction | Defendants' Proposed Construction |
|---|---|
| No further construction necessary.  There is no order required for the recited method steps. | The steps of the claims must be performed in the order listed in the claims. |

Dkt. No. 322, Ex. A4 at 5; Dkt. No. 333 at 18; Dkt. No. 381 at 11.

Shortly before the start of the May 15, 2025 hearing, the Court provided the parties with the following preliminary construction: "Claims 1, 12, and 22 of the '359 Patent do not require an order of operations."

(a)  The Parties' Positions

Plaintiffs argue that "[n]either the claim language nor the specification justify requiring the steps of the claimed methods be performed in order."  Dkt. No. 333 at 19.  Plaintiffs argue that "Defendants' unsupported imposition of an order of operations should be rejected because it contradicts logic, grammar, and the patent specification."  *Id.* at 20.

Defendants respond that "[e]ach [claim] requires 'transmitting a signal' in the first limitation and then 'not allowing to transmit the signal' in the final limitation," and "[t]he claim's use of antecedent basis for the term here clearly designates a transmission of the signal prior to not allowing the transmission."  Dkt. No. 366 at 18 (footnote omitted).  Defendants also argue that "[t]he '359 Specification provides no alternative embodiment that adjusts this prescribed order."  *Id.* at 20.

Plaintiffs reply that "logic does not require an order; conversely, it dictates that one should not be imposed," and that "Defendants also fail to show that the specification imposes an order." Dkt. No. 373 at 8 (citation omitted).

At the May 15, 2025 hearing, Plaintiffs agreed with the Court's preliminary construction. Defendants reiterated their argument that "not allowing" is a step, as indicated by the patentee using a gerund ("allowing") rather than a "wherein" clause. Defendants urged that the recital of "not allowing to transmit . . ." is not a recital of merely not trying but rather is a recital of trying and being stopped. Plaintiffs responded that there is no recital or disclosure of blocking a signal that has already been transmitted, and Plaintiffs urged that "not allowing to transmit the signal . . ." is a condition for "transmitting the signal . . .," such that the "transmitting" will not transmit a bitmap that does not comply with the "not allowing . . ." clause.

(b)  Analysis

"Unless the steps of a method actually recite an order, the steps are not ordinarily construed to require one." *Interactive Gift Exp., Inc. v. Compuserve Inc.*, 256 F.3d 1323, 1342–43 (Fed. Cir. 2001) (citation omitted).

Courts apply a two-part test to determine whether a particular order of steps is required: "First, we look to the claim language to determine if, as a matter of logic or grammar, they must be performed in the order written," and "[i]f not, we next look to the rest of the specification to determine whether it directly or implicitly requires such a narrow construction." *Altiris, Inc. v. Symantec Corp.*, 318 F.3d 1363, 1369–70 (Fed. Cir. 2003) (citations omitted). "If not, the sequence in which such steps are written is not a requirement." *Id.*

Claim 1 of the '359 Patent, for example, recites (emphasis added):

1. A method of a network node, the method comprising:
        transmitting a signal indicating at least a first duration and a bit map,

wherein the first duration is time duration of a control resource set (CORESET), and

wherein the bit map includes a set of bit positions, where each bit position has a value of one or zero and each bit position with the value of one indicates a starting Orthogonal Frequency Division Multiplexing (OFDM) symbol of a monitoring occasion of the CORESET within a slot; and

not allowing to transmit the signal such that an interval between any two bit positions with the value of one in the set of bit positions in the bit map is smaller than the first duration.

Figure 7 of the '359 Patent illustrates ". . . is not allowed . . ." with a distinct box in a flow chart. Figure 7 is reproduced here (and Figure 8 is similar in this regard):



Defendants argue that, "as a matter of logic or grammar," "transmitting a signal . . ." and "not allowing to transmit the signal . . ." are distinct steps and must be performed in order as written. *Altiris*, 318 F.3d at 1369–70 (citation omitted); *see, e.g., Hytera Commc'ns Co. Ltd. v. Motorola Solutions, Inc.*, 841 F. App'x 210 (Fed. Cir. Jan. 19, 2021) ("each step of the method provides an antecedent basis for the steps that follow").

Yet, the "not allowing to transmit *the* signal such that . . ." limitations refer back to the "transmitting *a* signal . . ." limitations for antecedent basis. The claims affirmatively recite performing "transmitting a signal" (further modified by wherein clauses), and the claim drafter's

use of the definite article, "the," to refer back to an antecedent basis is clear. A fair reading of "not allowing to transmit the signal *such that* an interval between any two bit positions with the value of one in the set of bit positions in the bit map is smaller than the first duration" is that the claims are setting forth a further limitation on the transmitted signal. This is consistent with the specification. *See, e.g.,* '359 Patent at 17:8–11 ("In one embodiment, a base station does not configure the UE with a bit map such that the interval (or distance) between two positions indicating value one in the bit map is smaller than the number (e.g., the bit map is 11000000000000 when the number is 1).").

Because the claims thus recite only one step, the Court hereby expressly rejects Defendants' proposal of requiring an order of operations.

The Court accordingly hereby finds that **Claims 1, 12, and 22 of the '359 Patent do not require an order of operations.**

### 6. Claim 4 of the '359 Patent

| **"The method of claim 1, wherein the network node is not allowed to transmit the signal such that interval between any bit position in the set in the bit map and the least significant bit position in the bit map is smaller than the first duration minus one"** <br> ('359 Patent, Claim 4) | |
|---|---|
| **Plaintiffs' Proposed Construction** | **Defs.' Proposal (emphasis added)** |
| No further construction necessary | "The method of claim 1, wherein the network node is not allowed to transmit the signal such that an interval between any bit position *with a value of 0 or 1* in the set in the bit map and the least significant bit position in the bit map is smaller than the first duration minus one." |

Dkt. No. 322, Ex. A4 at 5; Dkt. No. 333 at 20; Dkt. No. 381, Ex. A at 12.

Shortly before the start of the May 15, 2025 hearing, the Court provided the parties with the following preliminary construction: "Plain meaning."

(a)  The Parties' Positions

Plaintiffs argue that "Claim 1 of the '359 Patent already states that each bit position has a value of one or zero," and "Dr. Hansen [(Defendants' expert)] provides no justification for why a claim element from Claim 1 must be copied and added to Claim 4, one of its dependent claims." Dkt. No. 333 at 21.  Plaintiffs also argue that "the fact that the patentee included a 'with the value of one' requirement for the bit position element in Claim 12, but omitted a similar requirement for the bit position element in Claim 4, further confirms that no such requirement exists for Claim 4." *Id.* (citation omitted).

Defendants respond that "Defendants' construction is necessary in this case because Plaintiffs clearly intend to ignore the plain language of claim 4 and advance an unsupported interpretation."  Dkt. No. 366 at 21.  Defendants believe that Plaintiffs "intend to treat 'any bit position' in claim 4 as if it says 'any bit position with the value of 1' as found in claim 12."  *Id.* (citation omitted).  Finally, Defendants urge that, contrary to Plaintiffs' arguments, Defendants' proposal will not add any purported confusion because it uses the same terminology that appears in the independent claim.  *Id.* at 22.

Plaintiffs reply that "Defendants' construction confuses the scope of the claim," and "Defendants do not attempt to identify any actual ambiguity in the claim language."  Dkt. No. 373 at 9 (citations omitted).  Plaintiffs also argue that "because claims 1 and 12 recited 'with the value of one' requirements for the 'interval' terms, while claim 4 omitted such a requirement, there is no basis to read in the 'with a value of 0 or 1' limitation to claim 4."  *Id.* at 10.

At the May 15, 2025 hearing, Plaintiffs agreed with the Court's preliminary construction, and the parties discussed this claim as set forth herein.

(b)  Analysis

Claims 1 and 4 of the '359 Patent recite (emphasis added):

1. A method of a network node, the method comprising:
 transmitting a signal indicating at least a first duration and a bit map,
 wherein the first duration is time duration of a control resource set (CORESET), and
 wherein the bit map includes a set of bit positions, *where each bit position has a value of one or zero* and each bit position with the value of one indicates a starting Orthogonal Frequency Division Multiplexing (OFDM) symbol of a monitoring occasion of the CORESET within a slot; and
 not allowing to transmit the signal such that an interval between any two bit positions with the value of one in the set of bit positions in the bit map is smaller than the first duration.

\* \* \*

4. The method of claim 1, wherein the network node is not allowed to transmit the signal such that interval between *any bit position* in the set in the bit map and the least significant bit position in the bit map is smaller than the first duration minus one.

The independent claim thus recites that "each bit position has a value of one or zero."  At the May 15, 2025 hearing, Plaintiffs agreed that Defendants' proposal does not change the scope of the claim, and Plaintiffs merely argued that Defendants' proposal of repeating language from the independent claims is unnecessary and would confuse the finder of fact.  Defendants responded that in light of Plaintiffs' statements at the hearing, Defendants are amenable to the Court's preliminary construction.

Any remaining dispute as to this claim relates to infringement rather than to the scope of the claim.  No construction is necessary.  *See, e.g., U.S. Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997) ("Claim construction is a matter of resolution of disputed meanings and technical scope, to clarify and when necessary to explain what the patentee covered by the claims, for use in the determination of infringement.  It is not an obligatory exercise in redundancy.").

The Court accordingly hereby construes "The method of claim 1, wherein the network node is not allowed to transmit the signal such that interval between any bit position in the set in the bit map and the least significant bit position in the bit map is smaller than the first duration minus one" to have its **plain meaning.**

**7.  "wherein the processor is configured to execute a program code stored in the memory to: transmit a signal . . . not allowing to transmit the signal . . ."**

| "wherein the processor is configured to execute a program code stored in the memory to: transmit a signal . . . not allowing to transmit the signal . . ."<br>('359 Patent, Claim 22) | |
| --- | --- |
| **Plaintiffs' Proposed Construction** | **Defendants' Proposed Construction** |
| No further construction necessary. The term is not required to be construed under 35 U.S.C. § 112(f). | The term is subject to construction under §112(6).<br><br>Structure:<br>    "transmit (TX) data processor 214 for example as shown and described in Figure 2 and at 3:15–45, and equivalents thereof"<br><br>Function:<br>    "transmit a signal" for example as shown in Step 705 in Figure 7 and "not allowing to transmit the signal" for example as shown in Step 710 in Figure 7. |

Dkt. No. 322, Ex. A4 at 5; Dkt. No. 333 at 22; Dkt. No. 381, Ex. A at 12.

Shortly before the start of the May 15, 2025 hearing, the Court provided the parties with the following preliminary construction: "Plain meaning [not governed by 35 U.S.C. § 112(f)]."

(a)  The Parties' Positions

Plaintiffs argues that Defendants do not overcome the presumption against means-plus-function treatment for this non-means term, in which "processor" connotes structure, particularly

- 30 -

when read in the context of surrounding claim language and in the context of disclosures in the specification. *See* Dkt. No. 333 at 22–26.

Defendants respond: "Because there is extensive structure required to perform the function of the processor that is only provided in the specification, Claim 22 should be subject to § 112(6), and limited to the functions of, first, 'transmitting a signal' for example as shown in Step 705 in Figure 7, and second, 'not allowing to transmit the signal' for example as shown in Step 710 in Figure 7, in that order." Dkt. No. 366 at 24.

Plaintiffs reply by reiterating the presumption against means-plus-function treatment and by arguing, for example, that "the '359 Patent specification discloses the objectives and operations of the processor and connotes sufficient structural detail to the 'processor,' 'memory,' and 'code' terms to avoid means-plus[-]function claiming." Dkt. No. 373 at 10.

At the May 15, 2025 hearing, Plaintiffs agreed with the Court's preliminary construction, and the parties presented no oral arguments on this term and instead rested on their briefing.

(b)  Analysis

Title 35 U.S.C. § 112(f) (formerly § 112, ¶ 6) provides: "An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof." "In exchange for using this form of claiming, the patent specification must disclose with sufficient particularity the corresponding structure for performing the claimed function and clearly link that structure to the function." *Triton Tech of Tex., LLC v. Nintendo of Am., Inc.*, 753 F.3d 1375, 1378 (Fed. Cir. 2014).

"[T]he failure to use the word 'means' . . . creates a rebuttable presumption . . . that § 112, para. 6 does not apply." *Williamson v. Citrix Online LLC*, 792 F.3d 1339, 1348 (Fed. Cir. 2015) (citations and internal quotation marks omitted).  "When a claim term lacks the word 'means,' the presumption can be overcome and § 112, para. 6 will apply if the challenger demonstrates that the claim term fails to recite sufficiently definite structure or else recites function without reciting sufficient structure for performing that function." *Id.* at 1349 (citations and internal quotation marks omitted).

*Williamson*, in an *en banc* portion of the decision, abrogated prior statements that the absence of the word "means" gives rise to a "strong" presumption against means-plus-function treatment. *Id.* (citation omitted). *Williamson* also abrogated prior statements that this presumption "is not readily overcome" and that this presumption cannot be overcome "without a showing that the limitation essentially is devoid of anything that can be construed as structure." *Id.* (citations omitted). Instead, *Williamson* found, "[h]enceforth, we will apply the presumption as we have done prior to *Lighting World* . . . ." *Id.* (citing *Lighting World, Inc. v. Birchwood Lighting, Inc.*, 382 F.3d 1354, 1358 (Fed. Cir. 2004)).

Here, Claim 22 of the '359 Patent recites (emphasis added):

22. A network node, comprising:
    a control circuit;
    a *processor* installed in the control circuit; and
    a memory installed in the control circuit and coupled to the *processor*;
*wherein the processor is configured to execute a program code stored in the memory to:*
        transmit a signal indicating at least a first duration and a bit map, wherein the first duration is time duration of a control resource set (CORESET), and
        wherein the bit map includes a set of bit positions, where each bit position has a value of one or zero and each bit position with the value of one indicates a starting Orthogonal Frequency Division Multiplexing (OFDM) symbol of a monitoring occasion of the CORESET within a slot; and

> not allowing to transmit the signal such that an interval between
> any two bit positions with the value of one in the set of bit
> positions in the bit map is smaller than the first duration.

The body of each claim recites operations of the "processor," which weighs against applying 35 U.S.C. § 112(f), *see Linear Tech. Corp. v. Impala Linear Corp.*, 379 F.3d 1311, 1319–21 (Fed. Cir. 2004), and the specification discloses that various types of hardware and programming can be used. '359 Patent at 36:8–25 & 36:36–59.

Also, in this context, the term "processor" itself connotes a class of structures. *See Samsung Elecs. Am., Inc. v. Prisua Eng'g Corp.*, 948 F.3d 1342, 1354 (Fed. Cir. 2020) ("As used in the claims of the [patent-in-suit], the term 'digital processing unit' clearly serves as a stand-in for a 'general purpose computer' or a 'central processing unit,' each of which would be understood as a reference to structure in this case, not simply any device that can perform a particular function.") (citations omitted).

Defendants cite this Court's decision in *St. Isidore*, which found that the presumption against means-plus-function treatment under 35 U.S.C. § 112, ¶ 6 had been rebutted because "[i]n the context of the 'processor configured to . . .' terms, . . . each processor is defined only by the function that it performs." *St. Isidore Research, LLC v. Comerica Inc.*, No. 2:15-CV-1390-JRG-RSP, 2016 WL 4988246, at *14 (E.D. Tex. Sept. 19, 2016). The terms at issue in *St. Isidore* were "a processor configured to verify the authenticity of the account access request based on the response" and "a processor configured to identify a second device associated with the account." The disputed terms in the present case, by contrast, such as the examples set forth above, recite numerous operations, interrelationships, and configuration details that underscore the structural meaning of "processor" in the context of the claims of the patents-in-suit. *St. Isidore* itself noted that "[t]he Court has typically found 'processor' to connote sufficient structure to avoid the

application of § 112, ¶ 6 in different circumstances." *Id.*, at \*15.  The Court's analysis in the *SyncPoint* case, for example, is applicable.  *See SyncPoint Imaging, LLC v. Nintendo of Am. Inc.*, No. 2:15-CV-247, 2016 WL 55118, at \*18–\*21 (E.D. Tex. Jan. 5, 2016).  The Federal Circuit's above-cited *Samsung* decision, as well as additional more recent Federal Circuit decisions, are also in accord:

> As used in the claims of the '591 patent, the term "digital processing unit" clearly serves as a stand-in for a "general purpose computer" or a "central processing unit," each of which would be understood as a reference to structure in this case, not simply any device that can perform a particular function.

*Samsung*, 948 F.3d at 1354; *see VDPP, LLC v. Vizio, Inc.*, No. 2021-2040, 2022 WL 885771, at \*3–\*4 (Fed. Cir. Mar. 25, 2022) (reversing means-plus-function treatment of "a processor adapted to") (discussing *Dyfan, LLC v. Target Corp.*, 28 F.4th 1360 (Fed. Cir. 2022) (finding that "code" and "application" limitations were not means-plus-function)); *see also WSOU Invs. LLC v. Google LLC*, No. 2022-1063, 2023 WL 6889033, at \*4 (Fed. Cir. Oct. 19, 2023) ("In light of the intrinsic record in this case, we conclude that a person of ordinary skill in the art would understand the structure of the claimed 'computer program code,' 'memory,' and 'processor.'").

The Court therefore hereby expressly rejects Defendants' proposal of means-plus-function treatment under 35 U.S.C. § 112(f).  Defendants present no alternative proposed construction, and no further construction is necessary.

The Court accordingly hereby construes "wherein the processor is configured to execute a program code stored in the memory to: transmit a signal . . . not allowing to transmit the signal . . ." to have its **plain meaning**.

## VIII.  CONCLUSION

The Court adopts the constructions set forth in this Order for the disputed terms of the patent-in-suit.  The parties are ordered that they may not refer, directly or indirectly, to each other's

claim construction positions in the presence of the jury.  Likewise, the parties are ordered to refrain from mentioning any portion of this opinion, other than the actual definitions adopted by the Court, in the presence of the jury.  Any reference to claim construction proceedings is limited to informing the jury of the definitions adopted by the Court.

**SIGNED this 19th day of May, 2025.**

ROY S. PAYNE
UNITED STATES MAGISTRATE JUDGE

**APPENDIX A**

| Term | Parties' Agreement |
|---|---|
| "user equipment (UE)"<br>"UE"<br><br>('868 Patent, Claims 5, 13, 16, 18;<br>'402 Patent, Claims 1, 12;<br>'754 Patent, Claims 1–10;) | No construction necessary |
| "network node"<br><br>('868 Patent, Claims 5, 13, 15, 16, 18;<br>'754 Patent, Claims 1–10;<br>'359 Patent, Claims 1–23) | No construction necessary |

Dkt. No. 381, Ex. A at 1, 2, 4, 6.