**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | |
|---|---|
| **ASUS TECHNOLOGY LICENSING INC. AND CELERITY IP, LLC**, <br><br> Plaintiffs, <br><br> v. <br><br> **AT&T CORP.**, <br> **AT&T MOBILITY LLC**, <br> **AT&T MOBILITY II LLC, AND** <br> **AT&T SERVICES, INC.**, <br><br> Defendants. <br><br> **ERICSSON INC.**, <br> **NOKIA CORPORATION OF AMERICA**, <br><br> Intervenors. | Civil Action No. 2:23-cv-486 <br> LEAD CASE <br><br> **JURY TRIAL** |

**JOINT NOTICE REGARDING TRIAL STRUCTURE AND CONSOLIDATION**

Pursuant to the Court's November 3, 2025 Oral Order requiring the parties to submit their respective positions regarding trial structure and consolidation for Case Nos. 2:23-cv-486; 2:23-cv-487; 2:23-cv-488; 2:23-cv-489; 2:23-cv-490; 2:23-cv-491; and 2:23-cv-721, the parties hereby submit this joint notice.

**I.      Plaintiffs' Position:**

The Plaintiffs acknowledge that this Court has no desire to try two mirror image sets of FRAND claims across two trials. At the same time, Plaintiffs respectfully submit that a single multi-week trial on all eight patents and FRAND claims would create significant undue prejudice given the complexity of the technology and the FRAND claims. This is not puffery. A single trial would require

the jury to answer up to 168 special interrogatories.  Each of the eight patents relates to distinct areas

of technology:

| Asserted Patent No. | Relevant Areas of Technology and Technical Specifications |
| --- | --- |
| 7,664,059 (IS) | Detecting erroneous transmissions in a wireless network<br>• Radio Link Control Specifications (3GPP TS 36.322, 3GPP TS 38.322) |
| 9,237,489 (IS) | Carrier Aggregation and Handover: Cell Release<br>• Radio Resource Control (RRC) Protocol Specifications (3GPP TS 36.331, 3GPP TS 38.331) |
| 9,560,559 (IS) | Dual Connectivity: Measurement Gap Coordination<br>• Evolved Universal Terrestrial Radio Access (E-UTRA) and NR; Multi-connectivity; Stage 2 (3GPP TS 37.340)<br>• Radio Resource Control (RRC) Protocol Specifications (3GPP TS 36.331, 3GPP TS 38.331) |
| 9,736,883 (IS) | Dual Connectivity: Handling Inter-node Connectivity<br>• Evolved Universal Terrestrial Radio Access (E-UTRA) and NR; Multi-connectivity; Stage 2 (3GPP TS 37.340)<br>• Evolved Universal Terrestrial Radio Access (E-UTRA) and Evolved Universal Terrestrial Radio Access Network (E-UTRAN);Overall description; Stage 2 (3GPP TS 36.300)<br>• NR; NR and NG-RAN Overall Description; Stage-2 (3GPP TS 38.300)<br>• Radio Resource Control (RRC) Protocol Specifications (3GPP TS 36.331, 38.331)<br>• X2/Xn Application Protocol Specifications (3GPP TS 38.423, 3GPP TS 38.423) |
| 10,148,402 (ATL) | Beam Management in a Cellular Network<br>• Radio Resource Control (RRC) Protocol Specification (3GPP TS 38.331)<br>• NR; Overall Description; Stage-2 (3GPP TS 38.300)<br>• Physical Layer Procedures for Data (3GPP TS 38.214)<br>• Physical Channels and Modulation (3GPP TS 38.211) |
| 10,798,754 (ATL) | Quality of Service Flows, Data Radio Bearers<br>• Radio Resource Control (RRC) Protocol Specification (3GPP TS 38.331)<br>• Service Data Adaptation Protocol (SDAP) Specification (3GPP TS 37.324) |

| Asserted Patent No. | Relevant Areas of Technology and Technical Specifications |
|---|---|
| 10,887,868 (ATL) | Transmission and Reception Using Beamforming<br>• Medium Access Control (MAC) protocol specification (3GPP TS 38.321)<br>• NR and NG-RAN Overall Description (3GPP TS 38.300)<br>• User Equipment (UE) radio transmission and reception; Part 2: Range 2 Standalone (3GPP TS 38.101-2)<br>• User Equipment (UE) Radio Access Capabilities (3GPP TS 38.306)<br>• Radio Resource Control (RRC) Protocol Specification (3GPP TS 38.331)<br>• Physical Layer Procedures for Control (3GPP TS 38.213) |
| 10,951,359 (ATL) | Control Resource Set Configurations<br>• Physical Layer Procedures for Control (3GPP TS 38.213)<br>• Radio Resource Control (RRC) Protocol Specification (38.331) |

Moreover, Defendants' positions on essentiality on these 8 patents differ significantly:

| Patent | Defendants' Position |
|---|---|
| 7,664,059 (ISL) | **Not Essential.** Van Der Weide Op. Rpt. ¶ 540 |
| 9,237,489 (ISL) | **Not Essential**. Wicker Op. Rpt. ¶ 934 |
| 9,560,559 (ISL) | Essential based on ISL mapping. Wicker Op. Rpt. ¶ 927 |
| 9,736,883 (ISL) | Essential based on ISL mapping. Wicker Op. Rpt. ¶ 929 |
| 10,148,402 (ATL) | **Not Essential**. Villasenor Op. Rpt. ¶ 948 |
| 10,798,754 (ATL) | **Not Essential.** Van Der Weide Op. Rpt. ¶ 545 |
| 10,887,868 (ATL) | Essential based on ATL mapping. Villasenor Op. Rpt. ¶ 951 |
| 10,951,359 (ATL) | **Not Essential**. Villasenor Op. Rpt. ¶ 945 |

In addition, Defendants are taking the position that the asserted patents are essential if infringed. Thus, a jury would need to consider the following questions for each patent and each FRAND claim on that patent:

(a) Infringement;

(b) Essential based on the mapping presented by ATL or ISL;

(c) Essential if infringed;

(d) Breach of FRAND obligations regarding the patent.

The Court ordered the number of asserted claims for all eight asserted patents to be 40 at trial. Combining this with the current practice of the Court to ask separate interrogatories for each patent claim on infringement, validity, and damages, a single combined trial would require the jury to answer up to 168 questions. This does not account for the fact that two sets of damages instructions would need to be given: one for if the patents are essential and one for if the patents are not essential.

Plaintiffs propose two options, both of which they submit balance the goals of not trying the mirror image FRAND claims twice, while at the same time allowing for a single week-long trial that can serve as bellwether. Plaintiffs will not object to instructing the jury to analyze damages under a single standard that recites the ETSI FRAND obligation regardless of whether they find the patents essential, as opposed to receiving two different sets of instructions for essential and non-essential patents. This stream-lined bellwether trial could proceed on December 8, 2025. There is no meaningful prospect of settlement of these cases.

### A.     Option 1:

Plaintiffs propose two trials, each with four patents. The first trial would include both IS and ATL patents, as well as all FRAND claims brought by and against the carriers. Because the suit involves both IS and ATL patents, the FRAND claims could be definitively tried once as there would be claim preclusion given the presence of all parties. The time allotment proposed is 11.5 hours per side. The second trial would include the remaining IS and ATL patents. The time allotment is 10.5 hours per side.

### B.     Option 2:

The Defendants/Intervenors have already agreed to this structure at the PTC. *See* November 3, 2025 Hrg. Tr. at 17:4-7 (MR. MATHEWS: Understood, Your Honor. So I guess just taking a step

back, our preference would be to do a joint trial in the ATL case and then another joint trial in the ISL case."). The first trial would be a 5G-patent trial (the ASUS Technology Licensing ("ATL") Case Nos. -486, -487, and -488) with all FRAND claims brought by the Carriers or against the Carriers tried with these patents. Plaintiffs will agree that claim preclusion applies as to all the FRAND claims brought by or against the Carriers as relates to the Innovative Sonic 4G-Patents (discussed below), obviating the need for the second trial to involve FRAND claims. The time allotment proposed is 11.5 hours per side.

The second trial is a 4G patent trial (the Innovative Sonic ("IS") Case Nos. -489, -490, and -491). The time allotment is 10.5 hours per side. In addition to asking whether the claims are infringed, the jury can be given a special interrogatory as to whether they meet the definition of Essential in the ETSI IPR policy. This would then allow the determination of FRAND claims from the first case to be applied to the second case even if the Defendants did not agree to claim or issue preclusion. Plaintiffs would only bring a FRAND claim defensively if Defendants refused to agree to preclusion.

Although the Carriers have suggested that the FRAND claims are different when directed against ATL and IS, this is contradicted by the pleadings in which identical claims are presented based on Celerity's negotiation with the Carriers. *See* App. at 1-6 (showing that Defendants' FRAND claims and the underlying facts giving rise to those claims are substantively identical across the ATL and IS cases).

### ASUSTeK, Nokia and Ericsson Claims

The FRAND claims brought by and against Nokia and Ericsson directed at behavior between negotiations with the carriers would be severed and stayed.

In its statement below Defendants/Intervenors put in extraneous uninvited argument on the fully briefed issue of severing the world-wide FRAND dispute between ASUSTeK, Nokia and Ericsson. They cite *McDaniel v. Anheuser-Busch, Inc.*, 987 F.2d 298, 305 (5th Cir. 1993) for the assertion

that separate trials are only permitted under Rule 42(b) when the issues are "so distinct and separate from the others that a trial of it alone may be had without injustice." Because only those claims that relate to issues beyond negotiations with carriers are being severed, this standard is met.

### C.        Defendants' and Intervenors' Attempt at Extortion Should Be Rejected

Below, the Defendants/Intervenors take the position that if they do not receive one un-workable, omni-bus trial, they will require the Court to try at least six different cases. *See* Section II ("Defendants and Intervenors do not agree to Plaintiffs' proposed trial options. As a threshold matter, Defendants do not agree to waive their AIA joinder rights under the scenarios proposed by Plaintiffs, nor do Defendants and Intervenors agree that FRAND outcomes from a first trial would necessarily be preclusive on a second trial.").

First, this ship has sailed. Defendants have already agreed on the record to have one combined trial for ATL and one combined trial for ISL. *See* September 3, 2025 Hrg. Tr. at 15:17-24 (MR. MATHEWS: So, Your Honor, it is our preference to do a joint trial. We believe it's -- THE COURT: To do a joint trial? MR. MATHEWS: A joint trial. We believe that it is efficient for all parties involved. We believe that there are such -- so many overlapping facts that it makes sense to do a joint trial. If we were to do it, we have some concerns --THE COURT: And first off, you're talking a joint trial for ATL and a separate joint trial for ISL? MR. MATHEWS: Precisely.); 17:4-7 (MR. MATHEWS: Understood, Your Honor. So I guess just taking a step back, our preference would be to do a joint trial in the ATL case and then another joint trial in the ISL case."). As a result, they have already agreed to Option 2.

Second, Defendants state that "they do not agree that a finding on FRAND issues in one trial will be preclusive in the second trial, at least because the negotiations concerned two distinct portfolios." This is an empty assertion devoid of substance. The counter-claims brought in the ISL and ATL cases are verbatim. However, if this is really Defendants' position, and they do not want to

cooperate on rationalization of the cases, it counsels in favor of severing out the FRAND claims totally from the infringement case. This is feasible because Plaintiffs will agree to a single FRAND-based damages instruction in the infringement cases, which the jury will receive even if there are no FRAND or essentiality issues reached.

Third, Defendants' assertion that "the Court enter a further case narrowing order requiring Celerity to reduce the number of asserted claims from 40 down to 20 by the end of November 2025" proves that one trial is not feasible. The issue of how many claims could be presented to the jury was heavily briefed and resulted in an order from the Court that mandated a single round of claim narrowing. *See* Dkt. 566. Defendants are now asking for even more aggressive narrowing than previously proposed. Having said that, the narrowing Defendants propose results in Option 1. Plaintiffs can simply narrow to claims for four of the eight asserted patents, and under Federal Circuit precedent it has the right to try the claims from the other patents in a separate trial. *See Abbey v. Mercedes Benz of N. Am., Inc.*, 138 F. App'x 304, 308 (Fed. Cir. 2005) ("Because '[e]ach patent asserted raises an independent and distinct cause of action,' [] and because on this record, [Plaintiff's] claims of infringement of the '977 patent were never considered by the district court, they are not part of the final judgment that concluded the first lawsuit. Accordingly, a claim of infringement based on the '977 patent is not precluded by that judgment and can be the subject of a second lawsuit.") (citations omitted).

## II.    Defendants' Position:

*Defendants Consent to One Consolidated Trial.* Defendants AT&T, T-Mobile, and Verizon Wireless, and Intervenors Ericsson and Nokia agree to waive the AIA's prohibition on joinder and consent to a single consolidated trial of the pending claims in the six cases consolidated in Civil Action No. 2:23-cv-486, provided that the Court specially set the consolidated trial for two full weeks. Defendants and Intervenors appreciate the Court's suggesting that it is willing to provide

some scheduling options to the parties for a trial in 2026, given the logistical challenges associated with getting dozens of witnesses and party representatives to Marshall for a two-week trial.

While not a condition to its consent to one consolidated trial, Defendants and Intervenors respectfully request that the Court enter a further case narrowing order requiring Celerity to reduce the number of asserted claims from 40 down to 20 by the end of November 2025. This narrowing will ensure that the parties are not wasting time and resources preparing witnesses and evidence regarding claims that Plaintiffs will not pursue at trial. Furthermore, Defendants and Intervenors respectfully request that Intervenors' breach-of-good-faith claims be tried together with Plaintiffs' and the Carriers' mirror-image claims. "[S]eparation of issues is not the usual course that should be followed." *State of Ala. v. Blue Bird Body Co.*, 573 F.2d 309, 318 (5th Cir. 1978). Federal Rule of Civil Procedure 42(b) **requires** that issues be tried together unless they are "so distinct and separate from the others that a trial of it alone may be had without injustice." *McDaniel v. Anheuser-Busch, Inc.*, 987 F.2d 298, 305 (5th Cir. 1993). As set forth in the briefing and at the recent pretrial conference, there is significant factual overlap between these counterclaims and the FRAND claims raised by Plaintiffs and Defendants. In view of that overlap, trying Intervenors' claims separately could easily lead to "intolerably anomalous results." *McDaniel*, 987 F.2d at 305. A separate trial risks conflicting resolutions on questions of fact regarding who acted in good and bad faith in the very same negotiations.

**Defendants Oppose Plaintiffs' Proposals.** Defendants and Intervenors do not agree to Plaintiffs' proposed trial options. As a threshold matter, Defendants do not agree to waive their AIA joinder rights under the scenarios proposed by Plaintiffs, nor do Defendants and Intervenors agree that FRAND outcomes from a first trial would necessarily be preclusive on a second trial. Plaintiffs' first option contemplates dividing the ATL and Innovative Sonic patents across two cases. This makes no sense. By cramming both ATL and Innovative Sonic patents into a one-week trial, the

parties will need to bring fact and expert witnesses to address ATL-specific and Innovative Sonic-specific issues in both trials. With respect to Plaintiffs' second option, there is no reasonable way to push all FRAND issues into a first trial. As noted above, Defendants and Intervenors do not agree that a finding on FRAND issues in one trial will be preclusive in the second trial, at least because the negotiations concerned two distinct portfolios. Furthermore, even if the first case did resolve the FRAND claims, Defendants and Intervenors would need to put on substantially the same FRAND-related and negotiation-focused evidence to rebut Plaintiffs' allegations of willful infringement. And the suggestion that there could be a 4G trial and a 5G trial is equally unavailing, as Celerity is asserting some patents against both 4G and 5G functionality. Splitting this case into multiple trials along the lines suggested by Plaintiffs would be far less efficient than a single consolidated trial, would necessitate multiple juries, multiple trips to Marshall, and the significant risk of inconsistent verdicts.

Plaintiffs' suggestion that Defendants have somehow already waived their AIA joinder rights is incorrect. Defendants made clear in their Joint Pretrial Order that they would be "amenable to discussion" of consolidated trials under certain circumstances, which are not present in either of Plaintiffs' proposals. Dkt. No. 817 at 27. For instance, Defendants never agreed to having the FRAND issues for the Innovative Sonic patents be tried with the ATL patents or vis-versa. To the contrary, Defendants firmly oppose such an arrangement, as Plaintiffs FRAND compliance is tied to the facts of each portfolios. For instance, the Innovative Sonic portfolio is encumbered with prior licenses that differ from those of the ATL portfolio. In any event, as the Court rightly pointed out at the Pretrial Conference, attempting to separate the trials would unnecessarily lead to potential conflicting verdicts and inevitable disputes about preclusion—issues that are avoided through a single consolidated trial. Furthermore, Defendants also made clear in the Joint Pretrial Order that consolidation of even half of the cases would require a minimum of 16 hours per side; Plaintiffs

suggest far less than that in this notice. Defendants' conditions of waiver are not "extortion." They are reasonable requests that balance the interests of streamlining trial while preserving Defendants' rights and avoiding the unfair prejudice of not having adequate time to try complex issues to the jury.

Dated:  November 7, 2025

*/s/  Nicholas Mathews (with permission)*
Nicholas Mathews (Lead Counsel)
Texas State Bar No. 24085457
nmathews@McKoolSmith.com
Warren Lipschitz
Texas State Bar No. 24078867
wlipschitz@McKoolSmith.com
Erik Fountain
Texas State Bar No. 24097701
efountain@mckoolsmith.com
Jonathan Powers
Texas State Bar No. 24098277
jpowers@mckool.smtih.com
Alex Chern
Texas State Bar No. 24109718
achern@mckoolsmith.com
Joseph Michelli
Texas State Bar No. 24107546
jmichelli@mckoolsmith.com
**MCKOOL SMITH, P.C.**
300 Crescent Court Suite 1500
Dallas, TX 75201
Telephone: (214) 978-4000
Telecopier: (214) 978-4044

Kevin Hess
Texas State Bar No. 24087717
khess@McKoolSmith.com
Matthew Cameron
Texas State Bar No. 24097451
mcameron@mckoolsmith.com
**MCKOOL SMITH, P.C.**
303 Colorado Street, Suite 2100
Austin, TX 78701
Telephone: (512) 692-8752
Telecopier: (512) 692-8744

Respectfully submitted,

*/s/  Robert C. Bunt (with permission)*
Robert C. Bunt
Texas State Bar No. 00787165
rcbunt@pbatyler.com
**PARKER, BUNT & AINSWORTH, P.C.**
100 E. Ferguson, Suite 418
Tyler, Texas 75702
Tel: (903) 531-3535

Jason Sheasby
California State Bar No. 205455
(pro hac vice)
jsheasby@irell.com
Rebecca Carson
California State Bar No. 254105
(pro hac vice)
rcarson@irell.com
Tony Rowles
California State Bar No. 301209
(pro hac vice)
trowles@irell.com
**IRELL & MANELLA LLP**
1800 Avenue of the Stars, Suite 900
Los Angeles, CA 90067-4276
Tel: (310) 277-1010

M. Jill Bindler
Texas Bar No. 02319600
jbindler@grayreed.com
**GRAY REED & McGRAW, P.C.**
1601 Elm Street, Suite 4600
Dallas, Texas 75201
Telephone: (214) 954-4135
Facsimile: (214) 953-1332

**ATTORNEYS FOR PLAINTIFFS ASUS**

Eliza Beeney
New York State Bar No. 5518972
ebeeney@mckoolsmith.com
John Briody
New York State Bar No. 4231270
jbriody@mckoolsmith.com
**MCKOOL SMITH, P.C.**
1301 Avenue of the Americas
32nd Floor
New York, NY 10019
212-402-9400

Samuel F. Baxter
Texas State Bar No. 01938000
sbaxter@McKoolSmith.com
Jennifer L. Truelove
Texas State Bar No. 24012906
jtruelove@McKoolSmith.com
**MCKOOL SMITH, P.C.**
104 East Houston Street, Suite 300
Marshall, TX 75670
Telephone: (903) 923-9000
Telecopier: (903) 923-9099

Deron R. Dacus
State Bar No. 00790553
ddacus@dacusfirm.com
**THE DACUS FIRM, PC**
821 ESE Loop 323, Suite 430
Tyler, TX 75701
Telephone: (903)705-1117
Facsimile: (903) 581-2543

**COUNSEL FOR AT&T CORP., AT&T
MOBILITY LLC, AT&T MOBILITY II
LLC, AT&T SERVICES, INC., T-
MOBILE USA, INC., AND CELLCO
PARTNERSHIP D/B/A VERIZON
WIRELESS.**

**TECHNOLOGY LICENSING INC.,
INNOVATIVE SONIC LIMITED, AND
CELERITY IP, LLC**

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the above and foregoing document has been

served on all counsel of record via ECF on November 7, 2025.

/s/ *Robert C. Bunt*
Robert C. Bunt

**CERTIFICATE OF CONFERENCE**

Pursuant to Local Rule CV-7(h), I hereby certify that, on November 7, 2025, counsel for

Plaintiffs met and conferred with counsel for Defendants on the substance of this joint notice.

/s/ *Robert C. Bunt*
Robert C. Bunt

# Appendix

### III.    Defendants' Factual Allegations Regarding the Parties' Licensing Discussions

| Dkt. 72 (AT&T's -489 Counterclaims)[1] ¶¶ 17-33 | Dkt. 34 (AT&T's -486 Counterclaims) ¶¶ 17-33 |
| --- | --- |
| 17. On August 25, 2022, Celerity contacted AT&T indicating that it had been retained by Innovative Sonic to act as an "exclusive agent" to license a portfolio of patents originally developed by ASUS and its employees and allegedly declared as essential to one or more of the 3G, 4G, and 5G standards (the "Innovative Sonic Portfolio"). Celerity requested AT&T's availability to "begin licensing discussions" regarding this Portfolio. In addition, and without explaining the need for an NDA or identifying any alleged-to-be confidential information that Celerity needed to share with AT&T, Celerity attached a draft NDA and indicated its position that "it would be best" to execute the NDA as a prerequisite to substantive discussions. | 17. On August 25, 2022, Celerity contacted AT&T indicating that it had been retained by an entity named Innovative Sonic Limited ("Innovative Sonic") to act as an "exclusive agent" to license a portfolio of patents originally developed by ASUS and its employees and allegedly declared as essential to one or more of the 3G, 4G, and 5G standards (the "Innovative Sonic Portfolio"). Celerity requested AT&T's availability to "begin licensing discussions" regarding this Portfolio. In addition, and without explaining the need for an NDA or identifying any alleged-to-be confidential information that Celerity needed to share with AT&T, Celerity attached a draft NDA and indicated its position that "it would be best" to execute the NDA as a prerequisite to substantive discussions. |
| 18. On September 22, 2022, Celerity contacted AT&T indicating that it had also been retained by ASUS to license a second portfolio of patents also originally developed by ASUS and its employees and also allegedly declared as essential to one or more of the 3G, 4G, and 5G standards (the "ASUS Portfolio"). Again, Celerity requested AT&T's availability to "begin licensing discussions" regarding the portfolios. And again, and without explaining the need for an NDA or identifying any alleged-to-be confidential information that Celerity needed to share with AT&T, Celerity attached a draft NDA and indicated its position that "it would be best" to execute the NDA as a prerequisite to substantive discussions. | 18. On September 22, 2022, Celerity contacted AT&T indicating that it had also been retained by ASUS to license a second portfolio of patents also originally developed by ASUS and its employees and also allegedly declared as essential to one or more of the 3G, 4G, and 5G standards (the "ASUS Portfolio"). Again, Celerity requested AT&T's availability to "begin licensing discussions" regarding the portfolios. And again, and without explaining the need for an NDA or identifying any alleged-to-be confidential information that Celerity needed to share with AT&T, Celerity attached a draft NDA and indicated its position that "it would be best" to execute the NDA as a prerequisite to substantive discussions. |
| 19. Celerity's second letter claimed that although the Innovative Sonic Portfolio and the ASUS Portfolio were two "separate and distinct" portfolios of patents developed by ASUS and | 19. Celerity's second letter claimed that although the Innovative Sonic Portfolio and the ASUS Portfolio were two "separate and distinct" portfolios of patents developed by ASUS and |

---

[1] AT&T's Counterclaims are representative for each Defendant.

declared-essential to the 3G, 4G, and 5G standards, Celerity sought to negotiate a license for AT&T to both portfolios at the same time.

20. On October 7, 2022, AT&T promptly responded to Celerity's request. To advance discussions, AT&T requested further information regarding Celerity's position that AT&T needed a license to the ASUS and Innovative Sonic Portfolios, including an identification of the allegedly infringing products, the patents that Celerity contended were infringed, and claim charts showing how each accused product allegedly infringed each element of each identified patent. AT&T also explained that an NDA was not necessary because "there [is] no confidential information that needs to be protected" at this time and nor had Celerity identified any. AT&T further explained that it could not enter into an NDA with Celerity—even though Celerity failed to identify any alleged-to-be confidential information—because it was important that AT&T be permitted to share information regarding Celerity's claims of infringement with its vendors whose products were implicated by Celerity's infringement allegations.

21. On October 17, 2023, Celerity responded. While Celerity noted AT&T's "concern about sharing information with the suppliers," Celerity did not offer any viable mechanism whereby AT&T could share information related to Celerity's allegations. Instead, Celerity again attached its "standard NDA," and encouraged AT&T to sign.

22. Celerity did not contact AT&T again until January 23, 2023. In this communication, Celerity again noted AT&T's "concern about being able to provide information to your suppliers" but failed to provide any viable mechanism whereby AT&T could share information related to Celerity's allegations with its suppliers. Celerity also indicated that it considered its claim charts to be confidential (without ever identifying any alleged-to-be

declared-essential to the 3G, 4G, and 5G standards, Celerity sought to negotiate a license for AT&T to both portfolios at the same time.

20. On October 7, 2022, AT&T promptly responded to Celerity's request. To advance discussions, AT&T requested further information regarding Celerity's position that AT&T needed a license to the ASUS and Innovative Sonic Portfolios, including an identification of the allegedly infringing products, the patents that Celerity contended were infringed, and claim charts showing how each accused product allegedly infringed each element of each identified patent. AT&T also explained that an NDA was not necessary because "there [is] no confidential information that needs to be protected" at this time and nor had Celerity identified any. AT&T further explained that it could not enter into an NDA with Celerity—even though Celerity failed to identify any alleged-to-be confidential information—because it was important that AT&T be permitted to share information regarding Celerity's claims of infringement with its vendors whose products were implicated by Celerity's infringement allegations.

21. On October 17, 2023, Celerity responded. While Celerity noted AT&T's "concern about sharing information with the suppliers," Celerity did not offer any viable mechanism whereby AT&T could share information related to Celerity's allegations. Instead, Celerity again attached its "standard NDA," and encouraged AT&T to sign.

22. Celerity did not contact AT&T again until January 23, 2023. In this communication, Celerity again noted AT&T's "concern about being able to provide information to your suppliers" but failed to provide any viable mechanism whereby AT&T could share information related to Celerity's allegations with its suppliers. Celerity also indicated that it considered its claim charts to be confidential (without ever identifying any alleged-to-be

confidential information) and continued to insist on an NDA as a prerequisite to further discussions, particularly if AT&T was to share information related to Celerity's allegations with its suppliers. In addition, Celerity also offered to make a "view only" "data room" available without NDA but never specifically identified the information that would be made available for "view only" access or agreed that AT&T's suppliers would be permitted access to the information in the "data room."

23. On February 17, 2023 AT&T responded and again noted that its wireless services, including 5G, "are enabled by products that we purchase from our vendors" which was why it was important that AT&T be permitted to share information related to Celerity's allegations with its suppliers. AT&T also explained that it "relies on its vendors not only in support of its wireless services but also in evaluating offers to license patents that allegedly relate to its products." AT&T further explained that if any of its "vendors are unlicensed and Celerity is not already in direct discussions with them, please identify them so that we can ask them to contact Celerity to discuss your license offer." AT&T additionally explained that "Celerity's proposed NDA would impose restrictions on how the vendors may respond to an infringement allegation, which is contrary to our contractual obligations to them" and indicated that Celerity's suggestion "of allowing [AT&T] to view the claim charts without an NDA belies Celerity's position that the information is confidential." Regardless, AT&T indicated its continued to willingness to "initiate discussions" and included AT&T personnel who would "lead discussions over the business terms." Celerity did not respond to this correspondence. Celerity also did not engage with AT&T's vendors, did not identify the alleged-to-be unlicensed vendors, did not identify any alleged-to-be confidential information that supposedly required the entry of an NDA, and otherwise failed to substantively respond to any of AT&T's requests.

| | |
|---|---|
| 24. AT&T never accessed Celerity's "data room" and has no knowledge of what information, if any, was contained therein. | 24. AT&T never accessed Celerity's "data room" and has no knowledge of what information, if any, was contained therein. |
| 25. Instead of engaging with AT&T, on October 19, 2023, shortly after ASUS assigned several patents (including the Patents-in-Suit) from its portfolio to Innovative Sonic, and after sitting silent without response to AT&T's February 17, 2023 correspondence, Celerity and Innovative Sonic filed the Complaint. | 25. Instead of engaging with AT&T, on October 19, 2023, shortly after ASUS assigned several patents (including the '359 patent) from its portfolio to ATL, and after sitting silent without response to AT&T's February 17, 2023 correspondence, Celerity and ATL filed the Complaint. |
| 26. On information and belief, ASUS is the current or former assignee to one or more of the patents in both the ASUS Portfolio and the Innovative Sonic Portfolio. | 26. On information and belief, ASUS is the current or former assignee to one or more of the patents in both the ASUS and Innovative Sonic Portfolios. |
| 27. On information and belief, ASUS will share in any revenue Celerity and/or Innovative Sonic obtain from any license of or lawsuit asserting the Innovative Sonic Portfolio patents. | 27. On information and belief, ASUS will share in any revenue Celerity and/or ATL obtain from any license of or lawsuit asserting the ASUS and Innovative Sonic Portfolio patents. |
| 28. On information and belief, ASUS, Celerity, and Innovative Sonic, were working in concert in the negotiation with AT&T. | 28. On information and belief, ASUS, Celerity, and ATL, were working in concert in the negotiation with AT&T. |
| 29. Counterclaim Defendants failed to negotiate in good faith towards a FRAND license to their portfolio of allegedly essential patents and/or the Patents-in-Suit. For example, Celerity and Innovative Sonic filed this lawsuit seeking "all equitable relief," which may include an injunction, before making a FRAND offer (or any offer) to their allegedly essential patents and/or the Patents-in-Suit. Counterclaim Defendants also failed to provide AT&T with the information it requested, failed to permit AT&T to involve its vendors in the discussions, and instead insisted on a superfluous NDA without establishing the presence of any confidential information. | 29. Counterclaim Defendants failed to negotiate in good faith towards a FRAND license to their portfolio of allegedly essential patents and/or the Patents-in-Suit. For example, Celerity and ATL filed this lawsuit seeking "all equitable relief," which may include an injunction, before making a FRAND offer (or any offer) to their allegedly essential patents and/or the Patents-in-Suit. Counterclaim Defendants also failed to provide AT&T with the information it requested, failed to permit AT&T to involve its vendors in the discussions, and instead insisted on a superfluous NDA without establishing the presence of any confidential information. |
| 30. In view of the foregoing, there exists an actual and justiciable controversy between the parties with respect to whether Counterclaim Defendants satisfied their obligation to negotiate in good faith for a FRAND license to their | 30. In view of the foregoing, there exists an actual and justiciable controversy between the parties with respect to whether Counterclaim Defendants satisfied their obligation to negotiate in good faith for a FRAND license to their |

| | |
|---|---|
| portfolio of allegedly essential patents and/or the Patents-in-Suit. | portfolio of allegedly essential patents and/or the Patents-in-Suit. |
| 31. Through the conduct described above, Counterclaim Defendants breached the obligation to negotiate in good faith. | 31. Through the conduct described above, Counterclaim Defendants breached the obligation to negotiate in good faith. |
| 32. In addition, by their Complaint, Plaintiffs purport to assert a claim against AT&T for infringement of the Patents-in-Suit. | 32. In addition, by their Complaint, Plaintiffs purport to assert a claim against AT&T for infringement of the Patents-in-Suit. |
| 33. AT&T denies that it directly or indirectly infringes any valid and enforceable claim of the Patents-in-Suit. In view of the foregoing, there exists and actual and justiciable controversy between the parties with respect to the alleged infringement of the Patents-in-Suit. | 33. AT&T denies that it directly or indirectly infringes any valid and enforceable claim of the Patents-in-Suit. In view of the foregoing, there exists and actual and justiciable controversy between the parties with respect to the alleged infringement of the Patents-in-Suit. |

## IV.    Defendants' Breach of FRAND Counterclaims

| Dkt. 72 (AT&T's -489 Counterclaims) ¶¶ 50-56 | Dkt. 34 (AT&T's -486 Counterclaims) ¶¶ 50-56 |
|---|---|
| 50. AT&T restates and incorporates by reference each of the allegations of its Counterclaims from paragraphs 1–37. | 50. AT&T restates and incorporates by reference each of the allegations of its Counterclaims from paragraphs 1–49. |
| 51. French law governs the ETSI FRAND commitment, and under French law, once Counterclaim Defendants, including ASUS, commenced negotiations for itself and/or as a licensing agent on behalf of ASUS with AT&T, Counterclaim Defendants were obligated to negotiate in good faith. | 51. French law governs the ETSI FRAND commitment, and under French law, once Counterclaim Defendants, including ASUS, commenced negotiations for itself and/or as a licensing agent on behalf of ASUS with AT&T, Counterclaim Defendants were obligated to negotiate in good faith. |
| 52. Counterclaim Defendants have failed to negotiate in good faith with AT&T and thus breached their obligation for the reasons described above. | 52. Counterclaim Defendants have failed to negotiate in good faith with AT&T and thus breached their obligation for the reasons described above. |
| 53. Counterclaim Defendants' conduct demonstrates that they did not seriously engage in discussions with AT&T with the aim of concluding an agreement, and instead filed this case without engaging in good faith negotiations. | 53. Counterclaim Defendants' conduct demonstrates that they did not seriously engage in discussions with AT&T with the aim of concluding an agreement, and instead filed this case without engaging in good faith negotiations. |

| | |
|---|---|
| 54. Counterclaim Defendants' failure to negotiate in good faith constitutes a breach of their obligations to AT&T. | 54. Counterclaim Defendants' failure to negotiate in good faith constitutes a breach of their obligations to AT&T. |
| 55. As a result of this breach, AT&T has been injured in its business or property, including AT&T's costs and expenses in pursuing futile discussions with Counterclaim Defendants, in an amount to be determined at trial. | 55. As a result of this breach, AT&T has been injured in its business or property, including AT&T's costs and expenses in pursuing futile discussions with Counterclaim Defendants, in an amount to be determined at trial. |
| 56. In addition to other forms of relief, there is a dispute between AT&T and Counterclaim Defendants concerning whether Counterclaim Defendants have complied with their obligation to negotiate in good faith, and this controversy is of sufficient immediacy and reality to warrant the issuance of a declaratory judgment that Counterclaim Defendants have not complied with their obligation to act in good faith during their negotiations with AT&T with respect to FRAND terms for a license to the parties' essential patents. | 56. In addition to other forms of relief, there is a dispute between AT&T and Counterclaim Defendants concerning whether Counterclaim Defendants have complied with their obligation to negotiate in good faith, and this controversy is of sufficient immediacy and reality to warrant the issuance of a declaratory judgment that Counterclaim Defendants have not complied with their obligation to act in good faith during their negotiations with AT&T with respect to FRAND terms for a license to the parties' essential patents. |