**PUBLIC REDACTED**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | |
|---|---|
| **ASUS TECHNOLOGY LICENSING INC., ET AL.,**<br>**Plaintiffs,**<br>**vs.**<br>**AT&T INC., ET AL,**<br>**Defendants,**<br><br>**ERICSSON INC., AND NOKIA OF AMERICA CORPORATION,**<br>**Intervenors.** | **Civil Action No. 2:23-CV-00486**<br>**(Lead Case)**<br>**Civil Action No. 2:23-CV-00487**<br>**(Member Case)**<br>**Civil Action No. 2:23-CV-00488**<br>**(Member Case)**<br>**Civil Action No. 2:23-CV-490**<br>**(Lead Case)**<br>**Civil Action No. 2:23-CV-489**<br>**(Member Case)**<br>**Civil Action No. 2:23-CV-491**<br>**(Member Case)**<br>**JURY TRIAL DEMANDED** |

**<u>DEFENDANTS AND INTERVENORS' MOTION FOR ATTORNEYS' FEES</u>**

[redacted]

## TABLE OF CONTENTS


I. INTRODUCTION .......... 1

II. ARGUMENT .......... 3

A. Plaintiffs deliberately tried to evade the ETSI IPR Policy .......... 4

B. Plaintiffs filed baseless antitrust claims to collaterally attack the joint defense .......... 6

C. Plaintiffs engaged in bad faith negotiation tactics .......... 8

D. Plaintiffs' inflated damages theories .......... 10

E. Plaintiffs consistently and needlessly deployed sharp litigation tactics .......... 11

F. Plaintiffs' claims were exceptionally weak on the merits .......... 13

III. CONCLUSION .......... 15

[redacted]

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AdjustaCam, LLC v. Newegg, Inc.*,
861 F.3d 1353 (Fed. Cir. 2017)....................13

*Cartner v. Alamo Grp., Inc.*,
561 F. App'x 958 (Fed. Cir. 2014)....................14

*G+ Commc'ns, LLC v. Samsung Elecs. Co.*,
2024 U.S. Dist. LEXIS 10789 (Jan. 22, E.D. Tex. 2024)....................2, 3, 9

*Octane Fitness, LLC v. ICON Health & Fitness, Inc.*,
572 U.S. 545 (2014)....................3

*Optis Wireless Tech., LLC, et al v. Huawei Device USA, Inc., et al*,
No. 2:17-CV-123, Dkt. 409 (E.D. Tex., Nov. 15, 2019)....................15

**Statutes**

Sherman Act....................6

[redacted]

**TABLE OF EXHIBITS**

| Ex. No. | Description |
|---|---|
| Ex. 1 | Excerpt of ABI Research, *Identifying 3GPP Contributions and How These Map to Activities* |
| Ex. 2 | ASUSTeK IPR Information Statement and Licensing Declaration |
| Ex. 3 | Interim Master Services Agreement (CSPI003968) |
| Ex. 4 | Opening Expert Report of Defendants' Expert Paul Melin, Schedules 2 and 5 |
| Ex. 5 | March 29, 2024 Letter from C. Hilyard to N. Gupta (VERIZON_CELERITY_00487423) |
| Ex. 6 | Excerpt of June 4, 2025 Deposition of Chad Hilyard |
| Ex. 7 | Plaintiffs' Original Petition and Application for Temporary and Permanent Injunction, *Celerity IP, LLC et al v. AT&T Corp. et al*, DC-24-10566 (July 17, 2024) |
| Ex. 8 | Excerpt of November 19, 2024 Hearing Transcript |
| Ex. 9 | Excerpt of January 23, 2025 Hearing Transcript |
| Ex. 10 | Excerpt of Expert Report of Plaintiffs' Expert Malik Idri |
| Ex. 11 | Excerpt of Opening Expert Report of Plaintiffs' Expert David Kennedy |
| Ex. 12 | Excerpt of Opening Expert Report of Plaintiffs' Expert James Malackowski |
| Ex. 13 | Excerpt of ETSI Directives |
| Ex. 14 | October 2022 Emails between C. Hilyard and G. Sutcliffe (ATT_CELERITY_00054589) |
| Ex. 15 | September 2022 to October 2023 Emails between C. Hilyard and N. Gupta (VERIZON_CELERITY_00487404) |
| Ex. 16 | Excerpt of June 3, 2025 Deposition of Chad Hilyard |
| Ex. 17 | Excerpt of Rebuttal Report of Plaintiffs' Expert Nicolas Molfessis |
| Ex. 18 | January 2023 to June 2023 Emails between C. Hilyard and N. Gupta (VERIZON_CELERITY_00487415) |
| Ex. 19 | [redacted] (CELERITY_ServiceProviders005831) |
| Ex. 20 | May 24, 2024 Letter from C. Hilyard to T. Cason (ERIC_CELERITY_00423232) |
| Ex. 21 | August 2, 2024 Letter from C. Hilyard to D. Patel (NOK_CELERITY_01991412) |
| Ex. 22 | July 2025 Emails between Counsel |
| Ex. 23 | July 17, 2026 Email from J. Sheasby |
| Ex. 24 | Excerpt of Trial Transcript |

[redacted]

| Ex. No. | Description |
|---|---|
| Ex. 25 | Celerity Claim Chart, U.S. Patent No. 10,798,754 (CSPA004459) |
| Ex. 26 | Excerpt of June 20, 2024 Hearing Transcript |

[redacted]

## I. INTRODUCTION

In 2021, before Plaintiff Celerity even existed, ASUSTeK Computer and litigation financier GLS Capital devised a plan to aggressively monetize ASUS's 4G and 5G standard essential patent portfolios. That plan, however, faced two significant hurdles. *First*, relative to other 3GPP participants, ASUS's 4G and 5G portfolios are of marginal size and strength. Based on industry reports cited by its own experts, ASUS is responsible for a mere 0.04% of all approved 3GPP contributions. Ex. 1. To put that in perspective, if all 3GPP contributions represented a single day, ASUS's share would amount to 31 seconds. ASUS' own license agreements, including with [redacted] demonstrate the portfolio's modest value. This negligible footprint posed a direct threat to monetization goals, as market valuation in this space is often dependent on the scale and size of a patent portfolio and what others have paid to license that portfolio.

*Second*, ASUS and GLS had to contend with the legal encumbrances tethered to the portfolios themselves. All of ASUS's patents were declared essential to the 4G or 5G standards and are bound by FRAND commitments. These commitments require fair and reasonable licensing, and do not support the outsized royalties that GLS Capital and its investors coveted. The ETSI IPR Policy, which defines FRAND obligations, mandates that SEP holders license their patents to Equipment manufacturers (e.g., base station manufacturers) under principles of reciprocity that clash directly with the campaign's intent to target downstream telecommunications carriers. Because licensing at the Equipment level yields lower base valuations, GLS and ASUS sought to bypass their contractual obligations to extract larger returns from carriers.

To surmount these commercial and legal hurdles, ASUS and GLS engineered a complex workaround designed to circumvent ETSI constraints, defy pre-existing FRAND commitments, and maximize investor returns. The manifestation of this strategy was the launch of an aggressive and unprincipled litigation campaign. Throughout this dispute, Plaintiffs pursued a litigation

[redacted]

strategy defined by untenable and legally inconsistent positions advanced solely to obscure the portfolio's weakness, evade its FRAND obligations, and hinder Defendants' ability to defend the case on the merits.

Plaintiffs' bad-faith conduct was not confined to a single misstep; rather, their campaign was defined by a systemic pattern of egregious litigation offenses, including the following:

- **Efforts to Evade ETSI IPR Policy:** Plaintiffs executed a complete flip-flop regarding whether the asserted patents were standard-essential to evade the legal constraints of their FRAND commitments.
- **Collateral Antitrust Litigation:** In an attempt to fracture the defense, Plaintiffs filed a separate, meritless antitrust lawsuit in state court seeking to enjoin the joint defense group. Even after agreeing to dismiss anything "sounding in antitrust" with prejudice, Plaintiffs maintained antitrust expert reports until they were stricken at the pretrial conference.
- **Bad-Faith Negotiations:** The negotiation record was riddled with misrepresentations, shifting demands, and gamesmanship—including efforts to pierce the mediation privilege.
- **Radically Inflated Damages Model:** Plaintiffs advanced a financial framework demanding [redacted], predicated on a failure to apportion and a consumer survey so detached from market realities that the Court struck it in its entirety.
- **Sharp Litigation Tactics:** Throughout discovery and trial preparation, Plaintiffs deployed sharp tactics divorced from the merits and designed to compound the financial burden of defending the case.
- **Weak Technical Merits:** Plaintiffs prosecuted a case built on the premise that a 5G node is really a 4G node, asserted patents they rewrote after the standard came out, and offered no substantive response to the prior art that invalidated their claims.

The Court should grant Defendants' motion for attorneys' fees on two independent bases. First, it is undisputed that under French law (which governs Defendants/Intervenors' breach-of-good-faith claims), the prevailing party is entitled to damages, including but not limited to attorney's fees and costs of litigation. *See, e.g.*, *G+ Commc'ns, LLC v. Samsung Elecs. Co.*, 2024 U.S. Dist. LEXIS 10789, *8 (Jan. 22, E.D. Tex. 2024). It is undisputed that the jury found for Defendants/Intervenors on each good-faith question; they are therefore entitled to fees and costs under French law. Second, Defendants are entitled to fees because by any measure, this case is

[redacted]

exceptional. While any single category of Plaintiffs' misconduct independently justifies fee-shifting, their combined weight leaves no room for debate. Because the litigation was built on weak claims and pursued in a uniquely abusive manner, the Court should look to the totality of the circumstances and grant Defendants' request for attorneys' fees.

## II. ARGUMENT

Under French law, "the party who fails to act in good faith is liable to the other party for any reasonable damages which arise from such breach, including but not limited to attorney's fees and the cost of litigation." *G+ Commc'ns, LLC*, 2024 U.S. Dist. LEXIS 10789, *8. As Plaintiffs' French law expert concedes, prevailing on the good faith claims entitles Defendants/Intervenors to "costs and/or fees associated with the present infringement case incurred due to the bad-faith conduct." Ex. 17 at ¶ 18 (Rebuttal Report of N. Molfessis). Here, the jury found that Plaintiffs and ASUS failed to negotiate with AT&T, Verizon, and T-Mobile (collectively, "the Carriers") and Ericsson and Nokia. *See* Dkt. 1109. Defendants are therefore entitled to attorneys' fees under undisputed principles of French law.

Separately, Defendants are entitled to fees because this is an exceptional case, "one that stands out from others with respect to the substantive strength of a party's litigating position (considering both the governing law and the facts of the case) or the unreasonable manner in which the case was litigated." *Octane Fitness, LLC v. ICON Health & Fitness, Inc.*, 572 U.S. 545, 554 (2014). District courts evaluate whether a case is exceptional by assessing the "totality of the circumstances," utilizing their discretion. *Id*. Factors guiding this inquiry include "frivolousness, motivation, objective unreasonableness (both in the factual and legal components of the case) and the need in particular circumstances to advance considerations of compensation and deterrence." *Id*. at 554 n.6. This case readily satisfies *Octane Fitness*. Seeking to extract massive financial returns that far exceeded the economic value of their patents, Plaintiffs attempted from the outset

[redacted]

to evade ASUS's pre-existing FRAND commitments. To achieve this goal, they deployed extraordinary efforts to circumvent ETSI obligations and an aggressive corporate and litigation workaround. This strategy collapsed at trial. The jury returned a sweeping rejection of the merits of Plaintiffs' case—unanimously finding no infringement, invalidating every asserted claim, and concluding Plaintiffs breached their FRAND obligations. Because this campaign was born of an effort to bypass standard-setting obligations and was litigated in an abusive manner, but ultimately resulted in a total defeat on the merits, it stands out as a quintessentially exceptional case.

### A. Plaintiffs deliberately tried to evade the ETSI IPR Policy

Plaintiffs' litigation campaign was built on evasion of the ETSI IPR Policy and the FRAND commitments that encumber every patent in their portfolio. All of ASUS's patents were declared essential to the 4G or 5G standards, and those declarations are contractual in nature: each one an irrevocable undertaking to grant licenses on FRAND terms. Ex 2. Those obligations, however, interfered with the monetization goals of ASUS and its litigation financier, GLS Capital. As a result, ASUS and GLS engineered a workaround: they created ASUS Technology Licensing as a special-purpose licensing entity, created Celerity as an exclusive licensing agent, and targeted downstream telecommunications carriers rather than Equipment manufacturers, all to bypass the ETSI IPR Policy and extract non-FRAND returns.

What is worse, ASUS and GLS [redacted] impeded Celerity from executing a cross-license with equipment manufacturers. [redacted] [redacted]; [redacted]

[redacted]

The centerpiece of Plaintiffs' strategy was a flip-flop on the essentiality of their patents. Pre-suit, Plaintiffs repeatedly represented to Defendants, to third-party patent pools, and to other prospective licensees that their patents were standard-essential. [redacted] Plaintiffs also submitted detailed claim charts to the Via patent pool mapping every element of the asserted patents to the 4G standard, representing a "good faith belief" that these patents are essential. Ex. 4 (P. Melin Schedules 2 and 5). Yet once this litigation was filed and the legal implications of essentiality became inconvenient, Plaintiffs executed a calculated about-face: Celerity began claiming that the patents were "commercially essential"—a term that, as multiple industry witnesses testified, has no recognized meaning in the industry—and disclaimed having performed the analysis required to determine essentiality under the ETSI IPR Policy. Ex. 5 (Letter from C. Hilyard). When pressed in deposition on whether the asserted patents were essential under the ETSI IPR Policy, Mr. Hilyard testified that "we did not do that analysis for these patents." Ex. 6 at 30:10-11. It strains credulity for Plaintiffs to proudly proclaim their patents to be essential when monetizing them outside of litigation—to patent pools, to prospective licensees, and to investors—and then denounce that essentiality in litigation in an effort to evade FRAND compliance.

This litigation-driven reversal was not just inconsistent; it was designed to have it both ways. Plaintiffs sought the benefits of essentiality when beginning their licensing campaign, then

[redacted]

disclaimed it when it triggered obligations they found inconvenient. This culminated with Plaintiffs' summary judgment motion seeking to rid the case of all FRAND issues. Dkt. 611. Not only did the Court deny the motion, it affirmatively held that the asserted patents are essential and subject to FRAND. Dkts. 899, 1043.

### B. Plaintiffs filed baseless antitrust claims to collaterally attack the joint defense

Plaintiffs' litigation misconduct extended well beyond their flip-flop on essentiality. In an effort to fracture the joint defense, Plaintiffs filed a separate lawsuit in Dallas County on July 17, 2024 against the Carriers and Ericsson, asserting claims under the state-law equivalent of the Sherman Act. After the case was removed to federal court, Plaintiffs added Sherman Act claims. The complaint was packed with antitrust buzzwords—"conspiracy," "boycott," and "price-fixing"—yet it lacked a single plausible allegation to support those conclusory accusations. Ex. 7. The real target was Defendants' joint defense group: Plaintiffs' petition alleged that the Carriers and Ericsson had engaged in a conspiracy facilitated by "shar[ing] information through their common counsel" and explicitly sought an injunction restraining the Carriers and Ericsson. Ex. 7. The scope of the relief Plaintiffs demanded reveals the breadth of this gambit. The Dallas County petition asked the state court to immediately restrain Defendants from three categories of conduct: (a) "[d]irectly or indirectly engaging in any collective discussions or decision making regarding licensing or negotiating terms for the Wireless Patents"; (b) "[d]irectly or indirectly engaging in any discussion with any co-Defendant in this lawsuit regarding licensing or negotiating terms for the Wireless Patents"; and (c) "[i]nitiating or maintaining any legal proceeding for the purpose of inducing ASUSTeK to provide a grant back license to the Wireless Patents as a condition for ASUSTeK obtaining a license to any Ericsson Patents." Ex. 7. The first two demands would have shut down Defendants' ability to coordinate the defense of the six consolidated East Texas cases, including licensing, FRAND, valuation, and essentiality issues inherently common to all

[redacted]

Defendants. The third was a direct attack on Defendants' counterclaims and [redacted]. In other words, Plaintiffs asked a state court to enjoin conduct that was not only lawful but constitutionally protected—and to do so in a forum they deliberately chose over this Court.

The Court quickly recognized the antitrust case as a tactic designed to manufacture litigation leverage. At a November 19, 2024 case management conference, the Court found that the antitrust case had "the appearance that it's a tactical decision" and warned that "the presence of the antitrust claims and the way in which they're being framed has a chilling effect on the way the Defendants would go about their joint defense of the infringement case." Ex. 8 at 26:25, 4:18-22. Facing the prospect of a stay that would delay their patent case, Plaintiffs abruptly reversed course and volunteered to dismiss: "I'm dismissing this with prejudice because I can't have it be used to delay the patent case." Ex. 8 at 31:23-24. On January 23, 2025, counsel confirmed on the record that "anything that sounds in antitrust has been dismissed" with prejudice. Ex. 9 at 10:1-2.

But Plaintiffs' retreat was a façade: Plaintiffs later served expert reports advancing the very same antitrust theories they had purportedly abandoned. Malik Idri (European competition law expert) simply assumed facts such as collective dominance without conducting any economic analysis. James Malackowski (licensing expert) similarly peppered his reports with references to a "conspiracy" or "oligopoly" with Defendants engaged in "price-fixing" And opined on whether Ericsson had engaged in "horizontal anticompetitive practices" such as "[p]rice fixing" and the use of "[t]ying clauses," all without any substantive analysis and despite having no expertise in antitrust law. *See, e.g.*, Ex. 10 (Expert Report of M. Idri); Ex. 11 (Expert Report of D. Kennedy); Ex. 12 (Expert Report of J. Malackowski). In the end, the Court struck these opinions wholesale. Dkts. 829, 957, and 966. Defendants needlessly spent significant time and resources responding

[redacted]

to and seeking to strike these improper antitrust opinions.

### C. Plaintiffs engaged in bad faith negotiation tactics

Plaintiffs' bad faith permeated the entire negotiation record. The ETSI IPR Policy, governed by French law, imposes a duty of good faith on SEP holders, and ETSI's Guide on IPRs specifies that members should "engage in an impartial and honest essential IPR licensing negotiation process for FRAND terms and conditions." Ex. 13. Plaintiffs violated this duty at every turn. Before filing suit, Celerity represented it had "prepared a pricing structure" for the Carriers and that Celerity does not consider its pricing to be confidential. Ex. 14 at 1; Ex. 15 at 8. Yet when the Carriers asked for that pricing, Celerity refused. Plaintiffs never made a single FRAND offer—or indeed any offer—to AT&T, Verizon, T-Mobile, Ericsson, or Nokia before filing this lawsuit, and provided the jury with no evidence of any non-mediation offer ever being made. When pressed about pricing at his deposition, Celerity's CEO, Chad Hilyard testified: "As I sit here today, I don't have a specific number, per se." Ex. 16 at 143:25-144:1. And when Defendants moved to compel production of the non-confidential pricing, Celerity asserted a dubious claim of privilege. Dkt. 234 at 5. Meanwhile, Celerity attempted to breach the mediation privilege by injecting mediation offers into evidence. In other words, Plaintiffs told Defendants they had pricing, refused to share it, and then claimed privilege when asked about it in litigation.

Celerity also made misrepresentations in negotiations that were laid bare at trial. When Verizon asked Mr. Hilyard whether Celerity was in discussions with its base station vendors—Nokia, Ericsson, and Samsung—Hilyard wrote back: "Regarding the product manufacturers, we are not talking to any of them at this time." Ex. 18 at 1. As the trial evidence showed, that was false. In 2023 when Mr. Hilyard made that representation, [redacted] Ex. 19. As defense counsel established on cross-examination of Mr. Hilyard at trial, and as Verizon's

[redacted]

Neer Gupta confirmed on direct, this misrepresentation was not a casual oversight—it was a deliberate effort to prevent the Carriers from learning that their vendors had already licensed or were negotiating licenses to the very same patents. Good faith requires, at a minimum, honesty—and Celerity's correspondence with the Carriers was anything but.

Plaintiffs' negotiations with the Intervenors were equally obstructive. When Ericsson approached Celerity on April 3, 2024 to propose technical discussions and enter into a patent license agreement, Celerity declined and instead imposed a series of preconditions: Ericsson was told it must first identify the patents it desired a license to, specify "which Ericsson products Ericsson contends infringe those patents," state for each patent whether Ericsson "contends the patent meets the ETSI definition of Essentiality," and furnish "the list of non-infringing alternatives Ericsson contends exist to the patents in suit." Ex. 20. Celerity imposed similar preconditions on Nokia. Ex. 21. These preconditions amounted to a constructive refusal to negotiate. Demanding that the prospective licensee effectively admit infringement and concede essentiality before negotiations can even begin is far from the "impartial and honest" licensing process ETSI contemplates.

After hearing the full record of Plaintiffs' conduct, the jury unanimously found that Plaintiffs failed to comply with their FRAND obligations in negotiating with Defendants/Intervenors. This finding is an independent basis for fees. Indeed, it is undisputed that Defendants and Intervenors' breach-of-good-faith claims are governed by French law and, in turn, that the party prevailing on such claims is entitled to fees. *See G+ Commc'ns, LLC*, 2024 U.S. Dist. LEXIS 10789, *8 ("[T[he party who fails to act in good faith is liable to the other party for any reasonable damages which arise from such breach, including but not limited to attorney's fees and the cost of litigation."); Ex. 17 at ¶ 18 (Rebuttal Report of N. Molfessis)

[redacted]

(prevailing party entitled to "costs and/or fees associated with the present infringement case incurred due to the bad-faith conduct."). The Court should therefore award attorneys' fees based on Plaintiffs' bad faith negotiation tactics, which were confirmed by the jury's verdict.

**D. Plaintiffs' inflated damages theories**

Plaintiffs sought excessive damages and attempted to hide the ball regarding what damages amount they would actually seek at trial. Plaintiffs served their damages expert reports on June 27, 2025. Mr. Kennedy's report included multiple damages models, including one with amounts reaching [redacted] against all Carriers—[redacted] higher than the highest damages ever awarded in a patent case. Dkt. 517 at 2. Defendants immediately raised this issue in a motion for additional time to serve responsive reports. In response, Plaintiffs claimed the [redacted] figure was incorrect, but refused to put a firm range on what they would seek in damages. Dkt. 525. Between July 14 and July 22, Plaintiffs continued to claim the [redacted] figure was not what they intended to seek, but also refused to put a firm amount on what damages they would seek. Finally, Defendants' counsel wrote: "We understand that Plaintiffs are declining to specify a royalty range for each defendant." Plaintiffs responded: "We are not declining to do anything," but again refused to provide a range. Ex. 22 (July 22, 2025 Emails). Accordingly, Defendants needed to prepare expert analysis to rebut what might be damages amounting to nearly [redacted]

Plaintiffs finally provided what Defendants sought—a firm range of what damages Celerity would seek—a full year later. On July 17, 2026, the Court heard argument on the motion to exclude Mr. Kennedy's damages figures. Hoping to salvage Mr. Kennedy's analysis, Plaintiffs' counsel emailed the Court a range of damages that it would seek from each Defendant by patent (the "Damages Email"). Ex. 23. The Court struck Mr. Kennedy's damages conclusions but allowed

[redacted]

him leave to supplement his damages report. Dkt. 885.

Even then, Celerity continued to hide the ball. On July 24, 2026, Mr. Kennedy filed a supplemental report with various damages figures inconsistent with the Damages Email. Defendants' counsel asked if Plaintiffs would honor the email they sent to the Court. Plaintiffs refused. With no other options, Defendants moved to strike any damages figures inconsistent with the Damages Email, Dkt. 913 at 7-8, which the Court granted, Dkt. 1020 at 4-8. Even then, Plaintiffs refused to provide a clear idea of what it would seek in damages and moved for clarification of the Court's order. Dkt. 1059. The Court denied the motion on August 13. Dkt. 1060. Accordingly, Defendants only had a firm notion of what Plaintiffs would seek in damages ***one day*** before jury selection was set to begin.

**E. Plaintiffs consistently and needlessly deployed sharp litigation tactics**

*Sandbagging Amended Complaints.* Plaintiffs' original complains asserted only two patents—one per plaintiff entity. Then, on January 4, 2024—the deadline to serve infringement contentions—Plaintiffs filed First Amended Complaints adding six additional patents to the case. This tactic jammed up Defendants' ability to conduct thorough prior art searches and delayed their evaluation of the newly asserted claims. This worked as designed: Plaintiffs had already worked up their infringement contentions on these six patents, but chose to wait to assert them until contentions were due. Specifically, the infringement contentions for the new patents relied on packet capture data that was collected in September 2023, months before the amended complaints were filed. Ex. 24 at 547:23-548:12. And the contentions were based on the same claim charts that Plaintiffs made available to the Carriers in early 2023, mapping the patents to the 5G standard specifications. *See, e.g.*, Ex. 25. In other words, Plaintiffs had the analysis, the evidence, and the claim charts in hand for months, and chose to sit on six patents until the last possible moment.

[redacted]

*The 5G Core Network.* Perhaps the most illustrative example of Plaintiffs' discovery abuse involved the 5G core network. Plaintiffs filed a Motion to Compel, Dkt. 124, demanding source code and technical documents for "all components of Defendants' 5G core architecture," specifically targeting eight "Management Functions."[1] Plaintiffs argued that these core network functions were central to their infringement theories and submitted an expert declaration, Dkt. 124-1, asserting that "[s]ource code and technical specifications for the 5G core networks would provide evidence of the presence of infringement of Plaintiffs' Asserted Claims." At the hearing, Plaintiffs' counsel went further: "[T]he claims that we've selected and the claims that are at issue are not claims that are directed at a base station; they're directed at claims that involve a network design that involves a number of other features beyond just the base station." Ex. 26 at 5:9–14. One month later, Plaintiffs tripled down with a Motion to Enforce, Dkt. 199, the Court's order, using the '754 patent as their poster child, arguing that production of the Management Functions' code "will provide evidence of the presence of" key claim limitations. As a result, Defendants were forced to collect and produce thousands of technical documents, millions of lines of source code, and prepare for and defend multiple depositions on core network architecture. Then Plaintiffs abandoned every bit of it. At trial, not a single line of 5G core network source code was referenced. Not one of the thousands of core network technical documents was presented. Not one of the eight Management Functions was even mentioned. The core network depositions Plaintiffs demanded—of AT&T's network architect (Redfern), T-Mobile's packet core engineer (Barawkar), and Verizon's core planning lead (Kondratiuk)—were not played or referenced at trial on the core

[1] The Policy Control Function (PCF), Session Management Function (SMF), Access and Management Mobility Function (AMF), Network Exposure Function (NEF), Network Repository Function (NRF), Unified Data Management (UDM), Authentication Server Function (AUSF), and User Plane Function (UPF).

[redacted]

network issues for which they were taken. The 5G core network campaign, from start to finish, served no purpose other than to inflict costs on Defendants.

*Stonewalling on Patent Pool Documents.* Plaintiffs were equally obstructive when it came to producing their own documents. Defendants requested patent pool documents—contracts, essentiality analyses, patent valuations, and licensing revenue data from the Avanci and Via pools—beginning in February 2024. Dkt. 203. Plaintiffs stalled for six months, producing nothing, until Defendants moved to compel. Plaintiffs told the Court the motion was "moot" because they would produce by September 15, 2024. Dkt. 233. The Court denied the motion on that representation. But the September 15 production was a sham; it was riddled with unexplained redactions that blacked out entire pages, hid exhibits and appendices, and obscured even contractual provisions. A 69-page Avanci agreement amendment, for instance, contained 63 fully or substantially redacted pages. Dkt. 284 at 5. Plaintiffs claimed no privilege for any redaction and instead blamed Avanci, asserting the pool had insisted on the redactions. Dkt. 284 at 6. That too was false. When defense counsel contacted Avanci directly, Avanci made clear it had not requested the redactions. Defendants filed a second motion to compel unredacted production, Dkt. 293, which the Court granted. And when the unredacted documents were finally produced, the reason for the redactions became apparent: Plaintiffs had not been shielding third-party confidential information—they had been hiding contractual provisions on essentiality and holding back representations about essentiality that were directly inconsistent with their litigation positions in this case.

**F. Plaintiffs' claims were exceptionally weak on the merits**

Plaintiffs' case on the merits was fatally weak on all three patents they took to trial, and their decision to press these claims through a multi-week jury trial underscores the exceptionality of this case. *AdjustaCam, LLC v. Newegg, Inc.*, 861 F.3d 1353, 1360-62 (Fed. Cir. 2017)

[redacted]

(plaintiff's baseless litigation position was a trait of an exceptional case given that no reasonable factfinder could conclude that the accused products infringe after the district court's *Markman* order); *Cartner v. Alamo Grp., Inc.*, 561 F. App'x 958, 964-67 (Fed. Cir. 2014) (affirming exceptional case in part because infringement claims were frivolous and unreasonable as to certain claim limitations).

*The '559 Patent: Infringement Based on Word Games.* Both sides agreed that the claims of the '559 Patent require dual connectivity involving both a first and second "eNodeB" or "eNB." Ex. 24 at 596:8–10. And the overwhelming, undisputed evidence showed that Defendants' accused networks do not support dual connectivity involving both a first and second eNodeB. *Id.* at 595:10–596:7. Rather than accept this reality, Plaintiffs tried to save their infringement theory by pointing to Defendants' use of dual connectivity involving a first eNodeB and a second ***gNodeB***. *Id.* at 597:1–14. But this argument was dead on arrival. The Court had construed "eNodeB" to mean "an E-UTRAN base station providing ***4G/LTE cellular connectivity*** to the UE." Dkt. 428 at 41 (emphasis added). And the overwhelming, undisputed evidence established that the gNodeB in Defendants' dual connectivity architecture provides ***5G/NR cellular connectivity***—not 4G/LTE connectivity—to the UE. Ex. 24 at 608:21–609:3. Plaintiffs' entire infringement case on the '559 Patent thus rested on asking the jury to ignore the Court's claim construction and pretend that a 5G node is a 4G node. The jury saw through it.

*The '754 Patent: No Answer on Obviousness.* On the '754 Patent, Defendants presented two prior art references—both submitted by the same company, CATT, in back-to-back 3GPP standards meetings on the same subject matter—that collectively disclosed every element of the asserted claims. Plaintiffs did not challenge the substance of that showing. They never disputed that the two CATT contributions, taken together, taught each limitation of the claims. Their only

[redacted]

response was an argument against motivation to combine. But two contributions from the same company, submitted to the same standards body at consecutive meetings on the same technical topic, presented an overwhelming case for combination that Plaintiffs had no credible basis to rebut. The jury agreed, finding the asserted claims of the '754 Patent invalid by clear and convincing evidence. Tellingly, Plaintiffs declined to offer a rebuttal invalidity case.

*The '359 Patent: Rewriting the Application After the Standard.* The invalidity case on the '359 Patent equally lacked merit. The timeline told the story: ASUS filed its original patent application in January 2018, and the draft 5G standard was published to 3GPP members in June 2018. Less than six months later, ASUS amended its patent application, adding the very claim language that it would later assert against Defendants. The evidence showed that the amendment was made to read on the standard after the standard came out, a textbook case of an applicant molding its claims to cover published prior art. Plaintiffs had no good answer. The one sentence in the original application Plaintiffs pointed to as support for the amended claims actually supported Defendants' position, confirming that the specific concept added in the amendment was not disclosed in the original filing. The jury found the asserted claims of the '359 Patent invalid as well.

## III. CONCLUSION

For the reasons set forth above, the Court should award fees for two independent reasons. First, it is undisputed that the prevailing party on a breach-of-good faith claim is entitled to attorneys' fees. Second, this is an exceptional case warranting an award of attorneys' fees. Upon such a finding, and at the Court's direction, Defendants are prepared to submit a fee application with documentation sufficient to quantify the amount of reasonable attorneys' fees incurred in connection with this case. *See Optis Wireless Tech., LLC, et al v. Huawei Device USA, Inc., et al*, No. 2:17-CV-123, Dkt. 409 at 9 (E.D. Tex., Nov. 15, 2019).

[redacted]

Dated: September 9, 2026

Respectfully submitted,

/s/ *Nicholas Mathews*
Nicholas Mathews
Texas State Bar No. 24085457
nmathews@McKoolSmith.com
Warren Lipschitz
Texas State Bar No. 24078867
wlipschitz@McKoolSmith.com
Erik Fountain
Texas State Bar No. 24097701
efountain@mckoolsmith.com
Jonathan Powers
Texas State Bar No. 24098277
jpowers@mckoolsmith.com
Samuel L. Moore
Texas State Bar No. 24132421
smoore@mckoolsmith.com
Arden Seavers
Texas State Bar No. 24137186
aseavers@McKoolSmith.com
**MCKOOL SMITH, P.C.**
300 Crescent Court Suite 1500
Dallas, TX 75201
Telephone: (214) 978-4000
Telecopier: (214) 978-4044

Kevin Hess
Texas State Bar No. 24087717
khess@McKoolSmith.com
Matthew Cameron
Texas State Bar No. 24097451
mcameron@mckoolsmith.com
**MCKOOL SMITH, P.C.**
303 Colorado Street, Suite 2100
Austin, TX 78701
Telephone: (512) 692-8752
Telecopier: (512) 692-8744

Eliza Beeney
New York State Bar No. 5518972
ebeeney@mckoolsmith.com
**MCKOOL SMITH, P.C.**
1301 Avenue of the Americas
32nd Floor
New York, NY 10019
212-402-9400

[redacted]

Blake H. Bailey
Texas State Bar No. 24069329
bbailey@mckoolsmith.com
dkellam@mckoolsmith.com
**McKool Smith, P.C.**
600 Travis Street, Suite 7000
Houston, TX 77002
Telephone: (713) 485-7300
Telecopier: (713) 485-7344

Jennifer L. Truelove
Texas State Bar No. 24012906
jtruelove@McKoolSmith.com
**MCKOOL SMITH, P.C.**
104 East Houston Street, Suite 300
Marshall, TX 75670
Telephone: (903) 923-9000
Telecopier: (903) 923-9099

Deron R. Dacus
Texas State Bar No. 00790553
ddacus@dacusfirm.com
**THE DACUS FIRM, PC**
821 ESE Loop 323, Suite 430
Tyler, TX 75701
Telephone: (903)705-1117
Facsimile: (903) 581-2543

**COUNSEL FOR AT&T CORP., AT&T MOBILITY LLC, AT&T MOBILITY II LLC, AND AT&T SERVICES, INC. T-MOBILE USA, INC., AND CELLCO PARTNERSHIP D/B/A VERIZON WIRELESS, ERICSSON INC., AND NOKIA OF AMERICA CORPORATION**

[redacted]

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the above and foregoing document has been served on all counsel of record via the Court's ECF system on September 9, 2026.

/s/ *Nicholas Mathews*
Nicholas Mathews

**CERTIFICATE OF AUTHORIZATION TO FILE UNDER SEAL**

I hereby certify that the foregoing document is authorized to be filed under seal pursuant to the Protective Order entered in this case.

/s/ *Nicholas Mathews*
Nicholas Mathews

**CERTIFICATE OF CONFERNECE**

The undersigned certifies that counsel for Defendants conferred with counsel for Plaintiffs regarding this motion. Counsel for Plaintiffs indicated that they oppose the relief sought herein.

/s/ *Nicholas Mathews*
Nicholas Mathews